Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Athanasios E. Agelakopoulos, Esq.
Nevada Bar No. 14339
aagelakopoulos@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

*Attorneys for Plaintiffs*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 22-10942-MKN |
| J & J CONSULTING SERVICES, INC., | Chapter 11 – Involuntary |
| Alleged Debtor. | |
| _____ | |
| ANTHONY BONIFAZIO, an individual; KEITH OZAWA, an individual; JANELLE OZAWA, an individual; and BRIAN SCHUMANN, an individual, | Adv. Proceeding No.: |
| Plaintiffs, | **ADVERSARY COMPLAINT** |
| v. | |
| JEFFREY J. JUDD, an individual; JENNIFER R. JUDD, an individual; JEFFREY J. JUDD AND JENNIFER J. R. JUDD, AS TRUSTEES OF JUDD NEVADA TRUST, DATED DECEMBER 15, 2020, a Nevada trust; J & J CONSULTING SERVICES, INC., an Alaska corporation; MATTHEW BEASLEY, an individual; PAULA BEASLEY, an individual; BEASLEY LAW GROUP PC, a Nevada professional corporation; SHANE M. JAGER, | |

an individual, WILLOW A. JAGER, an )
individual; KARSEN D. JAGER, an individual; )
SHANE M. JAGER AND WILLOW A. )
JAGER, AS TRUSTEES OF JAGER FAMILY )
TRUST, DATED JUNE 30, 2003, AMENDED )
JUNE 30, 2009, a Nevada trust; STIRLING )
CONSULTING L.L.C., a Nevada limited )
liability company; JASON JONGEWARD, an )
individual; JOHN CANNON, AS TRUSTEE )
OF THE CAROLINA CHASE TRUST, )
DATED ___, a California trust, )
)
               Defendants, )
)
   and )
)
J & J CONSULTING SERVICES, INC., a )
Nevada corporation; J and J PURCHASING, )
LLC, a Nevada limited liability company, )
)
            Nominal Defendants. )
_____ )

## ADVERSARY COMPLAINT

Plaintiffs Anthony Bonifazio, Keith Ozawa, Janelle Ozawa, and Brian Schumann (the "**Plaintiffs**"), by and through their undersigned counsel, Schwartz Law, PLLC, hereby file their Complaint and allege as follows:

## I.    JURISDICTION AND VENUE.

1.    Jurisdiction exists over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157(b)(2) (A), (B), (E), (F) (H), (K), (I), and (O), and 11 U.S.C. §§ 105(a), 544, 547, & 548.

2.    This adversary proceeding relates to the Chapter 11 case of J&J Consulting, Inc., Case No. 22-10942-MKN currently pending before the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"), constitutes and is brought by Plaintiffs by way of adversary proceeding pursuant to Bankruptcy Rules 7001(1), (2), (7) and (9).

3.    This adversary proceeding raises claims that are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (F) (H), (K), (I), and (O).

4.      Pursuant to Fed. R. Bankr. P. 7008 and Local Rule of Bankruptcy Practice 7008, Plaintiffs consent to entry of a final order or judgment by the Bankruptcy Court.

## II.    GENERAL ALLEGATIONS.

5.      On March 17, 2022, Plaintiffs filed an involuntary petition for reorganization relief against J & J Consulting Services, Inc. ("**J&J Consulting**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**"), in the United States Bankruptcy Court, District of Nevada.

6.      That same day (collectively, the "**Petition Date**"), Plaintiffs filed an involuntary petition for reorganization relief against J and J Purchasing, LLC ("**J&J Purchasing**," together with J&J Consulting, the "**Nominal Defendants**" or the "**Alleged Debtors**") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

### A.    THE PLAINTIFFS.

7.      Each of the following Plaintiffs entered into, and were damaged by, one or more business transactions with each of the Nominal Defendants.

8.      Plaintiff Anthony Bonifazio ("**Bonifazio**"), is now, and was at all times relevant hereto, a resident of the State of Nevada, doing business in the State of Nevada.

9.      Plaintiff Keith Ozawa ("**K. Ozawa**"), is now, and was at all times relevant hereto, a resident of the State of Nevada, doing business in the State of Nevada.

10.      Plaintiff Janelle Ozawa ("**J. Ozawa**"), is now, and was at all times relevant hereto, a resident of the State of Nevada, doing business in the State of Nevada.

11.      Plaintiff Brian Schumann ("**Schumann**"), is now, and was at all times relevant hereto, a resident of the State of California, doing business in the State of Nevada.

### B.    THE DEFENDANTS.

12.      J&J Consulting, is now, and was at all times relevant hereto, a Nevada corporation, doing business in the State of Nevada.

13.     J&J Purchasing, is now, and was at all times relevant hereto, a Florida limited liability company, doing business in the State of Nevada.

14.     Defendant Jeffrey J. Judd ("**J.J. Judd**"), is now, and was at all times relevant hereto, a resident of the State of Nevada.

15.     Upon information and belief, J.J. Judd resides at 9 Sky Arc Court, Henderson, Nevada 89012, APN: 178-33-610-039 ("**9 Sky Arc**").

16.     J.J. Judd is the President, Treasurer, and Director of J&J Consulting.

17.     J.J. Judd is a member and authorized representative of J&J Purchasing.

18.     Defendant Jennifer R. Judd ("**J.R. Judd**," collectively with J.J. Judd, the "**Judd Defendants**"), is now, and was at all times relevant hereto, a resident of the State of Nevada.

19.     Upon information and belief, J.R. Judd resides at 9 Sky Arc.

20.     J.R. Judd is the Secretary of J&J Consulting.

21.     Defendant Judd Nevada Trust, dated December 15, 2020 (the "**Judd Trust**"), of which J.J. Judd and J.R. Judd are the Trustees, holds real properties in trust.

22.     Defendant J & J Consulting Services, Inc., is also registered as a domestic business corporation in Alaska (the "**Duplicate J&J Entity**," included with the Judd Defendants).

23.     The Duplicate J&J Entity is now and was at all times relevant hereto doing business in the State of Nevada.

24.     The Duplicate J&J Entity was created by the Judd Defendants with the Alaska Secretary of State on or around November 20, 2019.

25.     J.J. Judd is the Director, President, Shareholder, and Treasurer of the Duplicate J&J Entity while J.R. Judd is its Director, Secretary, and Shareholder.

26.     Plaintiffs are informed and believe that Defendants J.J. Judd and J.R. Judd are a husband and wife who own and/or control the Nominal Defendants as well as the Judd Trust and other related entities at all relevant times herein.

27.    Defendants J.J. Judd and J.R. Judd are accused of operating a Ponzi scheme using the Nominal Defendants, Defendants, and other related entities.

28.    Defendant Matthew Beasley ("**M. Beasley**"), is now, and was at all times relevant hereto, a resident of the State of Nevada.

29.    Upon information and belief, M. Beasley resides at 5475 Ruffian Rd., Las Vegas Nevada 89149, APN: 126-36-501-029 ("**5475 Ruffian**").

30.    M. Beasley operated a law firm called Beasley Law Group P.C. ("**Beasley Law**") that is now, and was at all times relevant hereto, a Nevada corporation, doing business in the State of Nevada.

31.    M. Beasley is the President, Secretary, Treasurer, and Director of Beasley Law.

32.    Defendant Paula Beasley ("**P. Beasley**," collectively with M. Beasley, the "**Beasley Defendants**") is now, and was at all times relevant hereto, a resident of the State of Nevada.

33.    Upon information and belief, P. Beasley resides at 5475 Ruffian.

34.    Plaintiffs are informed and believe that Defendants M. Beasley and P. Beasley are a husband and wife who own and/or control the Nominal Defendants as well as the other related entities at all relevant times herein.

35.    Defendant Beasley confessed to operating a Ponzi scheme using the Nominal Defendants and other related entities.

36.    Defendant Shane M. Jager ("**S. Jager**"), is now, and was at all times relevant hereto, a resident of the State of Nevada.

37.    Upon information and belief, S. Jager resides at 16 Paradise Valley Court, Henderson, Nevada 89052, APN: 190-08-612-003 ("**16 Paradise Valley**").

38.    S. Jager was a marketing manager with both J&J Consulting and J&J Purchasing at all times relevant hereto.

39.     S. Jager is the managing member of Defendant Stirling Consulting L.L.C. ("**Stirling**").

40.     Stirling was formed on April 20, 2018, by S. Jager.

41.     Stirling is now and was at all times relevant hereto doing business in the State of Nevada.

42.     Defendant Willow A. Jager ("**W. Jager**"), is now, and was at all times relevant hereto, a resident of the State of Nevada.

43.     Upon information and belief, W. Jager resides at 16 Paradise Valley.

44.     Defendant Karsen D. Jager ("**K. Jager**," together with S. Jager, Stirling, and K. Jager, the "**Jager Defendants**"), is now, and was at all times relevant hereto, a resident of the State of Nevada.

45.     Defendant Jager Family Trust, dated June 30, 2003, amended June 30, 2009 (the "**Jager Trust**"), of which S. Jager and W. Jager are the Trustees, holds real properties in trust.

46.     Plaintiffs are informed and believe that Defendants S. Jager and W. Jager are a husband and wife who own and/or control the Nominal Defendants as well as the Jager Trust and other related entities at all relevant times herein.

47.     Defendants S. Jager and W. Jager are accused of operating a Ponzi scheme using the Nominal Defendants and other related entities.

48.     Defendant Jason Jongeward ("**Jongeward**") is now, and was at all times relevant hereto, a resident of the State of Nevada.

49.     Jongeward is now and was at all times relevant hereto doing business in the State of Nevada.

50.     Jongeward was a key marketer for the Nominal Defendants.

51.     Defendant The Carolina Chase Trust, dated _ (the "**Carolina Trust**"), of which John Cannon is the Trustee, holds real properties in trust.

/ / /

## C.    THE PONZI SCHEME

### 1.    The Beginning of J&J Consulting.

52.    J&J Consulting was formed on May 26, 2005.

53.    In or around late-2016, J.J. Judd and M. Beasley agreed to work together to get J&J Consulting into the litigation finance business (the "**Scheme**").

54.    At the time the Scheme was concocted, J.J. Judd and M. Beasley had no experience relevant to litigation financing.

55.    In 2016, M. Beasley primarily practiced family law.

56.    In 2016, J.J. Judd worked as pharmaceutical sale representative.

57.    Each investment in the Scheme was documented by an independent agreement between each investor and the applicable Nominal Defendant (the "**Investment Contracts**").

58.    Typically, these Investment Contracts contained a bare-bones statement of the terms.

59.    These Investment Contracts were called "investor," "buyer," or "letter" agreements, and usually referenced the name of the personal-injury plaintiff whose settlement interest was to be purchased along with the dollar amount that investors were providing.

60.    Defendants laid out instructions in the contracts for wiring the investment capital to a Wells Fargo Interest on Lawyers' Trust Account ("**IOLTA Account**") belonging to M. Beasley's law firm, Beasley Law.

61.    Since 2017, the Plaintiffs understand and allege, upon information and belief, over $300 million passed into this IOLTA Account from investors.

62.    Defendants required investors to sign non-disclosure agreements encompassing all facts relating to—and even the existence of—the Investment Contracts.

63.    The investors were permitted to invest in multiple Investment Contracts, simultaneously, and many did.

64.     At each and every opportunity, the J&J Principals promised investors that the Scheme was genuine, legitimate, and *legal*.

65.     At each and every opportunity, the J&J Principals promised investors that counsel who had been engaged to opine on the legality of the Scheme rendered their professional opinion in favor of the Scheme's legality and ultimately determined it to be legal.

### 2.     <u>The Purported Investments.</u>

66.     In early-2017, the Judd Defendants, the Beasley Defendants, and the Jager Defendants (individually a "**J&J Principal**," and collectively, the "**J&J Principals**") began promoting the Scheme to potential investors, including Plaintiffs.

67.     The J&J Principals represented to potential investors that J&J Consulting's business was to provide financial assistance to parties suffering from various types of injuries, while their attorneys, medical providers, and insurance carrier negotiate and distribute the funds obtained through the parties' personal injury settlement.

68.     The Scheme focused solely on investments in post-settlement claims in personal injury cases.

69.     The Nominal Defendants had no website to describe the Scheme.

70.     The Nominal Defendants had no marketing materials to educate potential investors on the Scheme.

71.     The J&J Principals, on behalf of the Nominal Defendants, made no marketing pitches for the Scheme in writing.

72.     All marketing pitches for the Scheme were made by the J&J Principals in person or over the phone.

73.     The investor base mainly consisted of regular, non-financial professionals such as small business owners and doctors.

74.     As a result of the J&J Principals' representations, various parties invested millions of dollars into the Scheme.

75.     In exchange for the funds, the investors, received a 25% interest rate for a 90-day advance translates to a simple interest rate of 100% per annum (or a 136% compounded rate of return).

76.     The J&J Principals promised a return of 7.5 - 13% in 90 days.

77.     The investors allocated either $80,000 or $100,000 to each investment.

78.     The Nominal Defendants employed no less than 12 individual marketers who canvassed for investors

79.     The Nominal Defendants and the J&J Principals kept half of the profit (12.5% every 90 days) with the other half going to the investors (12.5%).

80.     The investors were encouraged (but not required) to roll their capital back into new cases (and many did), for a simple 50% return per year (a 12.5% profit each quarter).

81.     Based on the return on the Investment Contracts and representations of continued returns, numerous investors reinvested their original principal into new contracts after the initial 90 days.

82.     The J&J Principals used different methods to repay the investors, including sending disbursements from the Nominal Defendants, the Duplicate J&J Entity, and Stirling.

83.     The J&J Principals used funds received from the later Investment Contracts to repay investors who had preceded these later investors.

84.     The promoters controlled the flow of information from Defendants, including the instructions for making the investment. This was often made explicit in the investment agreements.

85.     Sometimes the agreements were executed by these promoters as agents "representing J & J Consulting."

86.     Both S. Jager and J. Jongeward were key marketers and promoters who spoke directly to investors.

87.    Upon information and belief, the marketers and promoters were compensated for every investment they successfully solicited.

88.    Upon information and belief, J. Jongeward knew of the Scheme.

89.    The promoters also controlled investors' up-the-chain communications with Defendants and generally discouraged direct contact with Defendants.

90.    Investors, therefore, remained in the dark on the details and management of their investments, including the nature of Defendants' venture.

91.    The Scheme was marketed off of referrals only because the J&J Principals, upon information and belief, did no direct-to-consumer marketing.

92.    The investment opportunity spread rapidly via word of mouth, largely through the Mormon communities centered around Nevada, where the firm and its principals are based.

93.    S. Jager asserted that he had seen Beasley Law's IOLTA account and had seen actual payouts to the attorneys on the Investment Contracts.

94.    Upon information and belief, S. Jager's representation about seeing actual payouts to the attorneys was false.

95.    Beasley Law helped run the Scheme.

96.    Investor funds were wired to a bank account controlled by Beasley Law on behalf of the Nominal Defendants.

97.    From the outset of the Scheme in 2017 through March 3, 2022, more than $300 million moved into the Beasley Law bank account.

98.    From the outset of the Scheme in 2017 through March 3, 2022, the Beasley Defendants, the Judd Defendants, and the Jager Defendants, among others, whom are yet to be identified, successfully persuaded at least 150 total investors to invest an amount totaling over $300 million in the Nominal Defendants.

99.     The J&J Principals asserted perfect 50% annual returns across the Nominal Defendants purported portfolio of 20,000 Investment Contracts, with zero defaults and zero late payments since 2017.

**3.      The Fraud is Revealed.**

100.     On January 1, 2022, J&J Purchasing purportedly took over the services that had been provided by J&J Consulting.

101.     J&J Purchasing was formed on October 13, 2021.

102.     Upon information and belief, J&J Purchasing was formed as part of a filing with the Securities and Exchange Commission (the "**SEC**") done to persuade the SEC that the Nominal Defendants' business did *not* include giving financial advice.

103.     Upon information and belief, neither the investments nor the promoters were properly registered with the SEC or FINRA, and the promoters were operating as unregistered stockbrokers improperly taking a commission on every investment.

104.     In or around March 2022, the Federal Bureau of Investigation ("**FBI**") contacted J.J. Judd about the purported business.

105.     J.J. Judd continued to represent that the Scheme and the Investment Contracts were legitimate.

106.     The FBI's involvement began after a Wall Street firm was tipped off by a financial professional working with several investors in the Nominal Defendants.

107.     The firm undertook a sting operation to uncover this potential fraud by Defendants.

108.     The operation was successful, and the FBI was given the information.

109.     On or about March 3, 2022, the FBI contacted Beasley about the Scheme.

110.     When the FBI went to interview M. Beasley a shoot-out ensued wherein M. Beasley threatened a federal officer and was shot twice.

111.   During a four-hour standoff with the FBI and Special Weapons and Tactics ("**SWAT**") team, ___**M. Beasley confessed that the Scheme was a "ponzi scheme."**___

112.   At the time of his arrest, M. Beasley claimed he had only about $40,000 in the bank account at the time of his arrest, and bank statements showed daily balances of only $3 – 4 million.

113.   Due to the nature of the Scheme (i.e., the funds from new investors are used to pay off the older investors), many investors received timely 90-day payments from the Nominal Defendants.

114.   The J&J Principals knew that the Nominal Defendants were not operating a genuine and legitimate litigation funding company.

115.   Despite this knowledge, the J&J Principals continued to recruit new investors in order to continue repaying earlier investors.

116.   Despite this knowledge, the J&J Principals continued to direct the promoters to continue to market the Scheme to new investors and solicit additional investors and investments.

117.   The J&J Principals knew there was no legitimate business being conducted through the Nominal Defendants.

118.   Upon information and belief, the purported $300 – 400 million or more in investments simply do not exist.

119.   The Plaintiffs are among the final round of investors, and, due to the nature if the Scheme (i.e., the misrepresentations have been uncovered so there cannot be any new investors) Plaintiffs cannot be repaid through the Scheme.

120.   The Scheme culminated in J&J Principals persuading over 150 people to believe that (1) for more than five years, the Nominal Defendants have issued and collected on approximately 20,000 contracts without any defaults, (2) Nominal Defendants have been able to generate a 25% return in 90 days (for every contract executed, for a 100% annual return), (3) Nominal Defendants had a network of 66 law firms that have always sent in payments precisely

within the 90-day time frame, and (4) that all of this has been achieved with the paper-thin infrastructure of the Nominal Defendants.

121.    Each and every J&J Principal made material and significant false representations about the Scheme to the Plaintiffs as well as numerous other potential investors.

**D.    THE FRAUDULENTLY TRANSFERRED REAL PROPERTIES.**

122.    In 2020 and 2021, the Judd Defendants and the Jager Defendants caused certain real property (the "**Real Property**"), to be transferred to the Judd Trust and the Jager Trust as well as other related entities, yet to be uncovered to keep them from the investors were the Scheme to fall apart.

123.    Upon information and belief, the following Real Property, among others, was purchased using the proceeds of the Scheme.

124.    The following table provides the details of each and every transfer currently identified by the Plaintiffs (the "**Transfers**"); specifically:

| <u>No.</u> | <u>Address of Property</u> | <u>Current Owner</u> | <u>Date of Transfer to Current Owner</u> |
|---|---|---|---|
| 1 | 9 Sky Arc Court, Henderson, Nevada 89012, APN: 178-33-610-039 | Judd Trust | December 12, 2020 |
| 2 | 8 Twisted Rock Court, Nevada 89012, APN: 178-33-510-037 | Judd Trust | February 15, 2022 |
| 3 | 7329 Ravines Avenue, Las Vegas Nevada 89131, APN: 125-10-115-020 | Judd Trust | December 21, 2020 |
| 4 | 19 Sky Arc, Henderson, Nevada 89012, APN: 178-33-210-004 | Jager Trust | December 14, 2020 |
| 5 | 29 Rockstream, Henderson, Nevada 89012, APN: 178-33-213-010 | Jager Trust and Karsen D. Jager | August 12, 2021 |
| 6 | 16 Paradise Valley Court, Henderson, Nevada 89052, APN: 190-08-612-003 | Jager Trust | August 9, 2021 |
| 7 | 3 Sankaty Circle, Henderson, Nevada 89052, APN: 190-07-619-017 | Carolina Trust | June 4, 2021 |

| | | | |
|---|---|---|---|
| 8 | 599 N. Red Mountain Court, Heber City, Utah 84032, APN: 00-0021-0348, Tax ID No. 0RX-1Q210-0-034-035 | Judd Trust | January 20, 2021 |
| 9 | 2314 E. La Sal Peak Dr., Heber City, Utah 84032, APN: 00-0021-1113, Tax ID No. 0RX-2K509-0-028-035 | Judd Trust | April 14, 2021 |
| 10 | 2394 E. La Sal Peak Dr., Heber City, Utah 84032, APN: 00-0021-1104 | Jager Trust | October 22, 2020 |
| 11 | 2364 E. La Sal Peak Dr., Heber City, APN: 84032, APN: 00-0021-1105 | Jager Trust | January 26, 2021 |
| 12 | 4015 Calle Lisa, San Clemente, California, APN: 060-231-23 | Jager Trust | June 3, 2019 |
| 13 | 5475 Ruffian Road, Las Vegas, Nevada 89149, APN: 126-36-501-029 | Matthew & Paula Beasley | July 30, 2019 |
| 14 | 2143 Via Regina Coeli Street, Mt. Charleston, Nevada 89124, APN: 129-02-410-074 | Matthew Beasley | November 1, 2017 |
| 15 | Real property commonly known as APN: 126-36-501-031, located at the corner of W. Stephen Ave. & Ruffian Rd., Las Vegas, Nevada, 89149 | Matthew & Paula Beasley | October 15, 2019 |
| 16 | 5485 Ruffian Rd. Las Vegas, Nevada, 89149, APN: 126-36-501-030 | Matthew & Paula Beasley | September 25, 2020 |
| 17 | Real property commonly known as APN: 126-36-501-017, located at the corner of W. Hammer Ln. & Ruffian Rd., Las Vegas, Nevada, 89149 | Matthew & Paula Beasley | January 11, 2021 |

125.    Before transferring the Real Property above to their respective trusts, both the Judd Defendants and the Jager Defendants owned the Real Property.

126.    Once the Scheme was uncovered, the J&J Principals began to secrete their assets to keep the assets and proceeds away from the investors turned creditors.

127.    Each of the Real Properties identified above, are currently on the market to be sold by either the Judd Trust or the Jager Trust.

128.    The Real Property purchased by Judd Defendants and the Jager Defendants was obtained with funds received through misrepresentations related to the Scheme.

129.    The Judd Trust and the Jager Trust obtained the Real Property from the Judd Defendants and the Jager Defendants in violation of Nevada's Uniform Fraudulent Transfer Act ("**UFTA**").

130.    The Judd Trust and the Jager Trust are currently attempting to sell the Real Property in order to abscond with the proceeds.

131.    Upon information and belief, the Internal Revenue Service is and was a creditor of the Nominal Defendants at all relevant times.

### FIRST CLAIM FOR RELIEF
*Against Judd Defendants and Defendant Judd Trust*
**Actual fraud - Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(A), N.R.S. § 112.180(1)(a), Alaska Stat. § 34.40.010, Fla. Stat. § 726.105(1)(a), 28 U.S.C. §§ 3304(b)(1)(A) & 3306(b)(1), 26 U.S.C. § 6502(a)(1), and 11 U.S.C. § 550(a)**

132.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

133.    The Judd Defendants made the Transfers to the Judd Trust with the actual intent to hinder, delay, or defraud the Nominal Defendants' creditors.

134.    Each of the Transfers constituted or were comprised of transfers within the meaning of 11 U.S.C. § 101(54), including 101(54)(D), of the Alleged Debtor(s) property or interests in property under 11 U.S.C. § 541 cognizable and traceable under otherwise applicable non-bankruptcy law and, as otherwise applicable, bankruptcy law.

135.    The Judd Trust is actively attempting to sell the following Real Property in Nevada: (a) 9 Sky Arc, (b) 8 Twisted Rock, and (c) 7329 Ravines; and the following Real property in Utah: (a) 599 N. Red Mountain, and (b) 2314 E. La Sal Peak.

136.    The Plaintiffs claims arose either before or after the Transfers.

137.    The Transfers are avoidable pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(a), as well as 28 U.S.C. §§ 3304(b)(1)(A) & 3306(b)(1), and 26 U.S.C. § 6502(a)(1).

138.    Upon information and belief, the Judd Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

139.    The Judd Trust was the initial transferee of the Real Property (or the Alleged Debtor(s) property under 11 U.S.C. § 541 that was used to purchase, or that can be traced to, the Real Property) or the entity for whose benefit the Transfer was made.

140.    Among other things, the Judd Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

141.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to Bankruptcy Code section 550.

142.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover prejudgment interest from the date of the Transfers pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(a).

### SECOND CLAIM FOR RELIEF
***Against Jager Defendants and Defendant Jager Trust***
**Actual Fraud - Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(A), N.R.S. § 112.180(1)(a), Alaska Stat. § 34.40.010, Fla. Stat. § 726.105(1)(a), 28 U.S.C. §§ 3304(b)(1)(A) & 3306(b)(1), 26 U.S.C. § 6502(a)(1), and 11 U.S.C. § 550(a)**

143.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

144.    The Jager Defendants made the Transfers to the Jager Trust with the actual intent to hinder, delay, or defraud the Nominal Defendants' creditors.

145.    Each of the Transfers constituted or were comprised of transfers within the meaning of 11 U.S.C. § 101(54), including 101(54)(D), of the Alleged Debtor(s) property or

interests in property under 11 U.S.C. § 541 cognizable and traceable under otherwise applicable non-bankruptcy law and, as otherwise applicable, bankruptcy law.

146. The Jager Trust is actively attempting to sell the following Real Property in Nevada: (a) 19 Sky Arc, (b) 8 Twisted Rock, and (c) 29 Rockstream, (d) 16 Paradise Valley; and the following Real property in Utah: (a) 2394 E. La Sal Peak, and (b) 2364 E. La Sal Peak.

147. The Plaintiffs claims arose either before or after the Transfers.

148. The Transfers are avoidable pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(a), as well as 28 U.S.C. §§ 3304(b)(1)(A) & 3306(b)(1), and 26 U.S.C. § 6502(a)(1).

149. Upon information and belief, the Jager Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

150. The Jager Trust was the initial transferee of the Real Property (or the Alleged Debtor(s) property under 11 U.S.C. § 541 that was used to purchase, or that can be traced to, the Real Property) or the entity for whose benefit the Transfer was made.

151. Among other things, the Jager Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

152. Plaintiffs, as well as the Nominal Defendants estate are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to Bankruptcy Code section 550.

153. Plaintiffs, as well as the Nominal Defendants estate are entitled to recover prejudgment interest from the date of the Transfers pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(a).

///
///
///

### THIRD CLAIM FOR RELIEF
*Against Judd Defendants and Defendant Judd Trust*
**Constructive Fraud - Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), N.R.S. § 112.180(1)(b), Fla. Stat. § 726.105(1)(b), 28 U.S.C. §§ 3304(b)(1)(B) & 3306(b)(2), 26 U.S.C. § 6502(a)(1), and 11 U.S.C. § 550(a)**

154.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

155.    The Judd Defendants did not receive reasonably equivalent value in exchange for making the Transfers to the Judd Trust because the Judd Trust did not provide the Judd Defendants with any consideration for the Transfers.

156.    Each of the Transfers constituted or were comprised of transfers within the meaning of 11 U.S.C. § 101(54), including 101(54)(D), of the Alleged Debtor(s) property or interests in property under 11 U.S.C. § 541 cognizable and traceable under otherwise applicable non-bankruptcy law and, as otherwise applicable, bankruptcy law.

157.    At the time of the Transfers, the Judd Defendants (a) were engaged or were about to be engaged in a business or a transaction for which the remaining assets of the Judd Defendants were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed, that the Judd Defendants would incur debts beyond its ability to pay as they became due.

158.    At the time of the Transfers, the J&J Principals admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Judd Defendants, were or could be subject to substantial claims related to the Ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

159.    Plaintiffs' claims arose either before or after the Transfers.

160.    The Transfer is avoidable pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(b), as well as 28 U.S.C. §§ 3304(b)(1)(B) & 3306(b)(2), and 26 U.S.C. § 6502(a)(1).

161. Upon information and belief, the Judd Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

162. The Judd Trust was the initial transferee of the Real Property (or the Alleged Debtor(s) property under 11 U.S.C. § 541 that was used to purchase, or that can be traced to, the Real Property) or the entity for whose benefit the Transfer was made.

163. Among other things, the Judd Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

164. Plaintiffs, as well as the Nominal Defendants estate are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to Bankruptcy Code section 550.

165. Plaintiffs, as well as the Nominal Defendants estate are entitled to recover prejudgment interest from the date of the Transfers pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(a).

### FOURTH CLAIM FOR RELIEF
*Against Jager Defendants and Defendant Jager Trust*
**Constructive Fraud - Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), N.R.S. § 112.180(1)(b), Fla. Stat. § 726.105(1)(b), 28 U.S.C. §§ 3304(b)(1)(B) & 3306(b)(2), 26 U.S.C. § 6502(a)(1), and 11 U.S.C. § 550(a)**

166. Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

167. The Jager Defendants did not receive reasonably equivalent value in exchange for making the Transfers to the Jager Trust because the Jager Trust did not provide the Jager Defendants with any consideration for the Transfers.

Each of the Transfers constituted or were comprised of transfers within the meaning of 11 U.S.C. § 101(54), including 101(54)(D), of the Alleged Debtor(s) property or interests in property under 11 U.S.C. § 541 cognizable and traceable under otherwise applicable non-bankruptcy law and, as otherwise applicable, bankruptcy law.

168.    At the time of the Transfers, the Jager Defendants (a) were engaged or were about to be engaged in a business or a transaction for which the remaining assets of the Jager Defendants were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed, that the Jager Defendants would incur debts beyond its ability to pay as they became due.

169.    At the time of the Transfers, the J&J Principals admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Jager Defendants, were or could be subject to substantial claims related to the Ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

170.    Plaintiffs' claims arose either before or after the Transfers.

171.    The Transfer is avoidable pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(b), as well as 28 U.S.C. §§ 3304(b)(1)(B) & 3306(b)(2), and 26 U.S.C. § 6502(a)(1).

172.    Upon information and belief, the Jager Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

173.    The Jager Trust was the initial transferee of the Real Property (or the Alleged Debtor(s) property under 11 U.S.C. § 541 that was used to purchase, or that can be traced to, the Real Property) or the entity for whose benefit the Transfer was made.

174.    Among other things, the Jager Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

175.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to Bankruptcy Code section 550.

176.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover prejudgment interest from the date of the Transfers pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(a).

## FIFTH CLAIM FOR RELIEF
*Against Judd Defendants and Defendant Judd Trust*
**Turnover and Accounting Pursuant to 11 U.S.C. §§ 542, 544(b), N.R.S. § 112.220 (2), Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a), 28 U.S.C. §§ 3304(b)(1)(B) & 3306(b)(2), 26 U.S.C. § 6502(a)(1), and 11 U.S.C. § 550(a)**

177.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

178.    Plaintiffs' claims arose before the Transfers.

179.    Each of the Transfers constituted or were comprised of transfers within the meaning of 11 U.S.C. § 101(54), including 101(54)(D), of the Alleged Debtor(s) property or interests in property under 11 U.S.C. § 541 cognizable and traceable under otherwise applicable non-bankruptcy law and, as otherwise applicable, bankruptcy law.

180.    The Judd Defendants did not receive reasonably equivalent value in exchange for making the Transfer to the Judd Trust because the Judd Trust did not provide the Judd Defendants with any consideration for the Transfers.

181.    At the time of the Transfers, the Judd Defendants were insolvent or became insolvent as a result of the Transfers.

182.    At the time of the Transfers, the Judd Defendants admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Judd Defendants, were or could be subject to substantial claims related to the Ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

183.    The Transfer is avoidable pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.220, as well as 28 U.S.C. §§ 3304(a)(1) & 3306(b)(2), and 26 U.S.C. § 6502(a)(1).

184.    Upon information and belief, the Judd Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

185.    The Judd Trust was the initial transferee of the Real Property (or the Alleged Debtor(s) property under 11 U.S.C. § 541 that was used to purchase, or that can be traced to, the Real Property) or the entity for whose benefit the Transfer was made.

186.    Among other things, the Judd Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

187.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to Bankruptcy Code section 550.

188.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover prejudgment interest from the date of the Transfers pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(a).

### SIXTH CLAIM FOR RELIEF
*Against Jager Defendants and Defendant Jager Trust*
**Turnover and Accounting Pursuant to 11 U.S.C. §§ 542, 544(b), N.R.S. § 112.220 (2), Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a), 28 U.S.C. §§ 3304(b)(1)(B) & 3306(b)(2), 26 U.S.C. § 6502(a)(1), and 11 U.S.C. § 550(a)**

189.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

190.    Plaintiffs' claims arose before the Transfers.

191.    Each of the Transfers constituted or were comprised of transfers within the meaning of 11 U.S.C. § 101(54), including 101(54)(D), of the Alleged Debtor(s) property or interests in property under 11 U.S.C. § 541 cognizable and traceable under otherwise applicable non-bankruptcy law and, as otherwise applicable, bankruptcy law.

192.    The Jager Defendants did not receive reasonably equivalent value in exchange for making the Transfer to the Jager Trust because the Jager Trust did not provide the Jager Defendants with any consideration for the Transfers.

193.    At the time of the Transfers, the Jager Defendants were insolvent or became insolvent as a result of the Transfers.

194.    At the time of the Transfers, the Jager Defendants admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Jager Defendants, were or could be subject to substantial claims related to the ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

195.    The Transfer is avoidable pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.220, as well as 28 U.S.C. §§ 3304(a)(1) & 3306(b)(2), and 26 U.S.C. § 6502(a)(1).

196.    Upon information and belief, the Jager Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

197.    The Jager Trust was the initial transferee of the Real Property (or the Alleged Debtor(s) property under 11 U.S.C. § 541 that was used to purchase, or that can be traced to, the Real Property) or the entity for whose benefit the Transfer was made.

198.    Among other things, the Jager Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

199.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to Bankruptcy Code section 550.

200.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover prejudgment interest from the date of the Transfers pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(a).

### SEVENTH CLAIM FOR RELIEF
*Against Defendant Carolina Trust*
**Constructive Fraud - Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), N.R.S. § 112.180(1)(b), Fla. Stat. § 726.105(1)(b). 28 U.S.C. §§ 3304(b)(1)(B) & 3306(b)(2), 26 U.S.C. § 6502(a)(1), and 11 U.S.C. § 550(a)**

201.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

202.    At the time of the Transfer, the Jager Defendants (a) were engaged or were about to be engaged in a business or a transaction for which the remaining assets of the Jager Defendants were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed, that the Jager Defendants would incur debts beyond its ability to pay as they became due.

203.    Each of the Transfers constituted or were comprised of transfers within the meaning of 11 U.S.C. § 101(54), including 101(54)(D), of the Alleged Debtor(s) property or interests in property under 11 U.S.C. § 541 cognizable and traceable under otherwise applicable non-bankruptcy law and, as otherwise applicable, bankruptcy law.

204.    At the time of the Transfer, the J&J Principals admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Jager Defendants, were or could be subject to substantial claims related to the Ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

205.    Upon information and belief, Defendant Carolina Trust had knowledge of the ponzi scheme and the Plaintiffs' claims before the Transfer.

206.    Plaintiffs' claims arose either before or after the Transfers.

207.    The Transfer is avoidable pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(b), as well as 28 U.S.C. §§ 3304(b)(1)(B) & 3306(b)(2), and 26 U.S.C. § 6502(a)(1).

208.    Upon information and belief, the Jager Defendants purchased the 3 Sankaty Circle using the proceeds of the Scheme.

209.    Defendant Carolina Trust was the final transferee of the Real Property or the entity for whose benefit the transfer was made.

210.    Among other things, the Defendant Carolina Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

211.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover the avoided transferred property or the value thereof from the initial or intermediate transferee of such transfer or the entity for whose benefit such transfer was made pursuant to Bankruptcy Code section 550.

212.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover prejudgment interest from the date of the Transfer pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(a).

### EIGHTH CLAIM FOR RELIEF
*Against Defendant Carolina Trust*
**Turnover and Accounting Pursuant to 11 U.S.C. § 544(b), N.R.S. § 112.220 (2), Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a), 28 U.S.C. §§ 3304(b)(1)(B) & 3306(b)(2), 26 U.S.C. § 6502(a)(1), and 11 U.S.C. § 550(a)**

213.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

214.    Plaintiffs' claims arose before the Transfers.

215.    Each of the Transfers constituted or were comprised of transfers within the meaning of 11 U.S.C. § 101(54), including 101(54)(D), of the Alleged Debtor(s) property or interests in property under 11 U.S.C. § 541 cognizable and traceable under otherwise applicable non-bankruptcy law and, as otherwise applicable, bankruptcy law.

216.    At the time of the Transfer, the Jager Defendants were insolvent or became insolvent as a result of the Transfers.

217.    At the time of the Transfer, the Jager Defendants admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Jager Defendants, were or could be subject to substantial claims related to the ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

218.    Upon information and belief, Defendant Carolina Trust had knowledge of the ponzi scheme and the Plaintiffs' claims before the Transfer.

219.    The Transfer is avoidable pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.220, as well as 28 U.S.C. §§ 3304(a)(1) & 3306(b)(2), and 26 U.S.C. § 6502(a)(1).

220.    Upon information and belief, the Jager Defendants purchased the 3 Sankaty Circle using the proceeds of the Scheme.

221.    Defendant Carolina Trust was the final transferee of the Real Property or the entity for whose benefit the transfer was made.

222.    Among other things, the Defendant Carolina Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

223.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover the avoided transferred property or the value thereof from the initial or intermediate transferee of such transfer or the entity for whose benefit such transfer was made pursuant to Bankruptcy Code section 550.

224.    Plaintiffs, as well as the Nominal Defendants estate are entitled to recover prejudgment interest from the date of the Transfer pursuant to Bankruptcy Code section 544(b) and N.R.S. § 112.180(1)(a).

## NINTH CLAIM FOR RELIEF
### *Against Judd Defendants and Defendant Judd Trust*
**Actual fraud - Avoidance and Recovery of Transfers Pursuant to N.R.S. § 112.180(1)(a), Alaska Stat. § 34.40.010, Fla. Stat. § 726.105(1)(a)**

225.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

226.    The Judd Defendants made the Transfers to the Judd Trust with the actual intent to hinder, delay, or defraud the Nominal Defendants' creditors.

227.    Each of the Transfers constituted or were comprised of transfers within the of the Alleged Debtor(s) property or interests in property cognizable and traceable under otherwise applicable non-bankruptcy law.

228.    The Judd Trust is actively attempting to sell the following Real Property in Nevada: (a) 9 Sky Arc, (b) 8 Twisted Rock, and (c) 7329 Ravines; and the following Real property in Utah: (a) 599 N. Red Mountain, and (b) 2314 E. La Sal Peak.

229.    The Plaintiffs claims arose either before or after the Transfers.

230.    The Transfers are avoidable pursuant to N.R.S. § 112.180(1)(a), Alaska Stat. § 34.40.010, Fla. Stat. 726.105(1)(a).

231.    Upon information and belief, the Judd Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

232.    The Judd Trust was the initial transferee of the Real Property or the entity for whose benefit the transfer was made.

233.    Among other things, the Judd Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

234.    Plaintiffs are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to N.R.S. § 112.180(1)(a), Alaska Stat. § 34.40.010, Fla. Stat. 726.105(1)(a).

235.    Plaintiffs are entitled to recover prejudgment interest from the date of the Transfers because the Transfers are for an amount certain.

### TENTH CLAIM FOR RELIEF
*Against Jager Defendants and Defendant Jager Trust*
**Actual Fraud - Avoidance and Recovery of Transfers Pursuant to N.R.S. § 112.180(1)(a), Alaska Stat. § 34.40.010, Fla. Stat. 726.105(1)(a)**

236.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

237.    The Jager Defendants made the Transfers to the Jager Trust with the actual intent to hinder, delay, or defraud the Nominal Defendants' creditors.

238.    Each of the Transfers constituted or were comprised of transfers within the of the Alleged Debtor(s) property or interests in property cognizable and traceable under otherwise applicable non-bankruptcy law.

239.    The Jager Trust is actively attempting to sell the following Real Property in Nevada: (a) 19 Sky Arc, (b) 8 Twisted Rock, and (c) 29 Rockstream, (d) 16 Paradise Valley; and the following Real property in Utah: (a) 2394 E. La Sal Peak, and (b) 2364 E. La Sal Peak.

240.    The Plaintiffs claims arose either before or after the Transfers.

241.    The Transfers are avoidable pursuant to N.R.S. § 112.180(1)(a), Alaska Stat. § 34.40.010, Fla. Stat. 726.105(1)(a).

242.    Upon information and belief, the Jager Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

243.    The Jager Trust was the initial transferee of the Real Property or the entity for whose benefit the transfer was made.

244.    Among other things, the Jager Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

245.    Plaintiffs are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to N.R.S. § 112.180(1)(a), Alaska Stat. § 34.40.010, Fla. Stat. 726.105(1)(a).

246.    Plaintiffs are entitled to recover prejudgment interest from the date of the Transfers because the Transfers are for an amount certain.

### ELEVENTH CLAIM FOR RELIEF
*Against Judd Defendants and Defendant Judd Trust*
**Constructive Fraud - Avoidance and Recovery of Transfers Pursuant to N.R.S. § 112.180(1)(b), Fla. Stat. § 726.105(1)(b)**

247.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

248.    The Judd Defendants did not receive reasonably equivalent value in exchange for making the Transfers to the Judd Trust because the Judd Trust did not provide the Judd Defendants with any consideration for the Transfers.

249.    Each of the Transfers constituted or were comprised of transfers within the of the Alleged Debtor(s) property or interests in property cognizable and traceable under otherwise applicable non-bankruptcy law.

250.    At the time of the Transfers, the Judd Defendants (a) were engaged or were about to be engaged in a business or a transaction for which the remaining assets of the Judd Defendants were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed, that the Judd Defendants would incur debts beyond its ability to pay as they became due.

251.    At the time of the Transfers, the J&J Principals admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Judd Defendants, were or could be subject to substantial claims related to the ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

252.    Plaintiffs' claims arose either before or after the Transfers.

253.    The Transfer is avoidable pursuant to N.R.S. § 112.180(1)(b) and Fla. Stat. 726.105(1)(b).

254.    Upon information and belief, the Judd Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

255.    The Judd Trust was the initial transferee of the Real Property or the entity for whose benefit the transfer was made.

256.    Among other things, the Judd Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

257.    Plaintiffs are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to N.R.S. § 112.180(1)(b) and Fla. Stat. 726.105(1)(b).

258.    Plaintiffs are entitled to recover prejudgment interest from the date of the Transfers because the Transfers are for an amount certain.

**TWELFTH CLAIM FOR RELIEF**
***Against Jager Defendants and Defendant Jager Trust***
**Constructive Fraud - Avoidance and Recovery of Transfers Pursuant to N.R.S. § 112.180(1)(b), Fla. Stat. 726.105(1)(b)**

259.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

260.    The Jager Defendants did not receive reasonably equivalent value in exchange for making the Transfers to the Jager Trust because the Jager Trust did not provide the Jager Defendants with any consideration for the Transfers

261.    Each of the Transfers constituted or were comprised of transfers within the of the Alleged Debtor(s) property or interests in property cognizable and traceable under otherwise applicable non-bankruptcy law.

262.    At the time of the Transfers, the Jager Defendants (a) were engaged or were about to be engaged in a business or a transaction for which the remaining assets of the Jager

Defendants were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed, that the Jager Defendants would incur debts beyond its ability to pay as they became due.

263.   At the time of the Transfers, the J&J Principals admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Jager Defendants, were or could be subject to substantial claims related to the ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

264.   Plaintiffs' claims arose either before or after the Transfers.

265.   The Transfer is avoidable pursuant to N.R.S. § 112.180(1)(b) and Fla. Stat. 726.105(1)(b).

266.   Upon information and belief, the Jager Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

267.   The Jager Trust was the initial transferee of the Real Property or the entity for whose benefit the transfer was made.

268.   Among other things, the Jager Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

269.   Plaintiffs are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to N.R.S. § 112.180(1)(b) and Fla. Stat. 726.105(1)(b).

270.   Plaintiffs are entitled to recover prejudgment interest from the date of the Transfers because the Transfers are for an amount certain.

///

///

///

## THIRTEENTH CLAIM FOR RELIEF
### *Against Judd Defendants and Defendant Judd Trust*
**Turnover and Accounting Pursuant to N.R.S. § 112.220 (2), Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a)**

271.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

272.    Plaintiffs' claims arose before the Transfers.

273.    Each of the Transfers constituted or were comprised of transfers within the of the Alleged Debtor(s) property or interests in property cognizable and traceable under otherwise applicable non-bankruptcy law.

274.    The Judd Defendants did not receive reasonably equivalent value in exchange for making the Transfer to the Judd Trust because the Judd Trust did not provide the Judd Defendants with any consideration for the Transfers.

275.    At the time of the Transfers, the Judd Defendants were insolvent or became insolvent as a result of the Transfers.

276.    At the time of the Transfers, the Judd Defendants admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Judd Defendants, were or could be subject to substantial claims related to the ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

277.    The Transfers are avoidable pursuant to N.R.S. § 112.220, Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a).

278.    Upon information and belief, the Judd Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

279.    The Judd Trust was the initial transferee of the Real Property or the entity for whose benefit the transfer was made.

280.    Among other things, the Judd Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

281.    Plaintiffs are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to N.R.S. § 112.220, Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a).

282.    Plaintiffs are entitled to recover prejudgment interest from the date of the Transfers because the Transfers are for an amount certain.

**FOURTEENTH CLAIM FOR RELIEF**
*Against Jager Defendants and Defendant Jager Trust*
**Turnover and Accounting Pursuant to N.R.S. § 112.220 (2), Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a)**

283.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

284.    Plaintiffs' claims arose before the Transfers.

285.    Each of the Transfers constituted or were comprised of transfers within the of the Alleged Debtor(s) property or interests in property cognizable and traceable under otherwise applicable non-bankruptcy law.

286.    The Jager Defendants did not receive reasonably equivalent value in exchange for making the Transfer to the Jager Trust because the Jager Trust did not provide the Jager Defendants with any consideration for the Transfers.

287.    At the time of the Transfers, the Jager Defendants were insolvent or became insolvent as a result of the Transfers.

288.    At the time of the Transfers, the Jager Defendants admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Jager Defendants, were or could be subject to substantial claims related to the Ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

289.    The Transfer is avoidable pursuant to N.R.S. § 112.220, Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a).

290.    Upon information and belief, the Jager Defendants purchased the foregoing Real Property using the proceeds of the Scheme.

291.    The Jager Trust was the initial transferee of the Real Property or the entity for whose benefit the transfer was made.

292.    Among other things, the Jager Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

293.    Plaintiffs are entitled to recover the avoided transferred property or the value thereof from the initial transferee of such transfer or the entity for whose benefit such transfer was made pursuant to N.R.S. § 112.220, Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a).

294.    Plaintiffs are entitled to recover prejudgment interest from the date of the Transfers because the Transfers are for an amount certain.

### FIFTEENTH CLAIM FOR RELIEF
*Against Defendant Carolina Trust*
**Constructive Fraud - Avoidance and Recovery of Transfers Pursuant to N.R.S. § 112.180(1)(b), Fla. Stat. 726.105(1)(b)**

295.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

296.    At the time of the Transfer, the Jager Defendants (a) were engaged or were about to be engaged in a business or a transaction for which the remaining assets of the Jager Defendants were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed, that the Jager Defendants would incur debts beyond its ability to pay as they became due.

297.    Each of the Transfers constituted or were comprised of transfers within the of the Alleged Debtor(s) property or interests in property cognizable and traceable under otherwise applicable non-bankruptcy law.

298.    At the time of the Transfer, the J&J Principals admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Jager Defendants, were or could be subject to substantial claims related to the ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

299.    Upon information and belief, Defendant Carolina Trust had knowledge of the ponzi scheme and the Plaintiffs' claims before the Transfer.

300.    Plaintiffs' claims arose either before or after the Transfers.

301.    The Transfer is avoidable pursuant to N.R.S. § 112.180(1)(b) and Fla. Stat. 726.105(1)(b).

302.    Upon information and belief, the Jager Defendants purchased the 3 Sankaty Circle using the proceeds of the Scheme.

303.    Defendant Carolina Trust was the final transferee of the Real Property or the entity for whose benefit the transfer was made.

304.    Among other things, the Defendant Carolina Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

305.    Plaintiffs are entitled to recover the avoided transferred property or the value thereof from the initial or intermediate transferee of such transfer or the entity for whose benefit such transfer was made pursuant to N.R.S. § 112.180(1)(b) and Fla. Stat. 726.105(1)(b).

306.    Plaintiffs are entitled to recover prejudgment interest from the date of the Transfer because the Transfers are for an amount certain.

///

///

///

## SIXTEENTH CLAIM FOR RELIEF
### *Against Defendant Carolina Trust*
**Turnover and Accounting Pursuant to N.R.S. § 112.220(2), Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a)**

307.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

308.    Plaintiffs' claims arose before the Transfers.

309.    Each of the Transfers constituted or were comprised of transfers within the of the Alleged Debtor(s) property or interests in property cognizable and traceable under otherwise applicable non-bankruptcy law.

310.    At the time of the Transfer, the Jager Defendants were insolvent or became insolvent as a result of the Transfers.

311.    At the time of the Transfer, the Jager Defendants admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Jager Defendants, were or could be subject to substantial claims related to the ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

312.    Upon information and belief, Defendant Carolina Trust had knowledge of the ponzi scheme and the Plaintiffs' claims before the Transfer.

313.    The Transfer is avoidable pursuant to N.R.S. § 112.220, Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a).

314.    Upon information and belief, the Jager Defendants purchased the 3 Sankaty Circle using the proceeds of the Scheme.

315.    Defendant Carolina Trust was the final transferee of the Real Property or the entity for whose benefit the transfer was made.

316.    Among other things, the Defendant Carolina Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the

transferred property for its own benefit and purposes, including marketing the transferred property for sale.

317.    Plaintiffs are entitled to recover the avoided transferred property or the value thereof from the initial or intermediate transferee of such transfer or the entity for whose benefit such transfer was made pursuant to N.R.S. § 112.180(1)(a), Alaska Stat. § 34.40.020, Fla. Stat. § 726.108(a).

318.    Plaintiffs are entitled to recover prejudgment interest from the date of the Transfer because the Transfers are for an amount certain.

<u>SEVENTEENTH CLAIM FOR RELIEF</u>
*Against the J&J Principals, Jongeward*
**Violation of NRS 41.600**

319.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

320.    Nevada Revised Statue 598.0923(2) provides that it is a deceptive trade practice for any person to knowingly, in the course of their business and profession, "[f]ail[] to disclose a material fact in connection with the sale or lease of goods or services." NRS 598.023(3) provides that it is a deceptive trade practice for a person to knowingly, in the course of their business and profession, "[v]iolate[] a state or federal statute or regulation relating to the sale or lease of goods or services."

321.    NRS 598.100 defines a "pyramid promotional scheme" as:

[A]ny program or plan for the disposal or distribution of property and merchandise or property or merchandise by which a participant gives or pays a valuable consideration for the opportunity or chance to receive any compensation or thing of value in return for procuring or obtaining one or more additional persons to participate in the program, or for the opportunity to receive compensation of any kind when a person introduced to the program or plan by the participant procures or obtains a new participant in such a program.

322.    NRS 598.110 provides that "[e]very person who contrives, prepares, sets up, proposes, operates, advertises or promotes any pyramid promotional scheme or endless chain commits a deceptive trade practice" under NRS 598.0923(3).

323.    The J&J Principal's Scheme qualifies as a pyramid promotional scheme under NRS 598.100, which the J&J Principals and Jongeward used to sell illusory goods and services to Plaintiffs as well as used Plaintiffs to recruit numerous other investors, including their neighbors and fellow church members.

324.    The J&J Principals and Jongeward operated this scheme in the course of their business and/or profession.

325.    Accordingly, the J&J Principals and Jongeward violated NRS 598.0923(3).

326.    Additionally, the J&J Principals and Jongeward knowingly concealed material facts regarding the transactions in question, i.e., they failed to disclose the true nature of the scheme and its means of raising revenue.

327.    The J&J Principals' and Jongeward's concealment came in the course of their business and/or profession. Accordingly, the J&J Principals and Jongeward violated NRS 598.0923(2).

328.    NRS 41.600(2)(e) provides that a person commits "consumer fraud" when violating, inter alia, NRS 598.0923(2)-(3). Accordingly, Plaintiffs are all "victims of consumer fraud" as contemplated by NRS 41.600(1).

### EIGHTEENTH CLAIM FOR RELIEF
#### *Against all Defendants, except the Carolina Trust*
#### Conversion

329.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

330.    Defendants' actions were intentional and resulted in serious interference with the personal property rights of Plaintiffs.

331.    Defendants exercised dominion and control over Plaintiffs' personal property, namely their investment funds, by converting the same to their own use.

332.    Defendants are not the rightful owners of the personal property of Plaintiffs.

333.   Defendants' intentional acts directly and proximately caused the conversion of the personal property of Plaintiffs.

334.   As a direct and proximate result of the above-described conduct of Defendants, Plaintiffs sustained damages in an amount to be determined at trial.

335.   Plaintiffs seek to recover all available remuneration, including damages and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

### NINETEENTH CLAIM FOR RELIEF
*Against all Defendants, except the Carolina Trust*
**Fraudulent Misrepresentation / Fraudulent Concealment**

336.   Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

337.   Defendants named in this Count perpetrated a fraud upon Plaintiffs through materially false and misleading statements and omissions that misled Plaintiffs to believe they were investing in personal injury settlements.

338.   Defendants knew these statements and omissions to be false.

339.   Among other fraudulent conduct, Defendants made or participated in the making of the following misrepresentations and omissions.

340.   Defendants falsely told Plaintiffs that their investments would be used to purchase interests in personal-injury settlements.

341.   Defendants falsely promised returns on their investments.

342.   Defendants concealed from Plaintiffs that they were operating a Ponzi scheme by, among other unlawful acts, commingling investor funds and paying earlier investors with funds obtained from later investors.

343.   Defendants concealed from Plaintiffs that Defendants misappropriated and misused millions of investor funds for improper purposes.

344.    Plaintiffs reasonably relied to their detriment upon these misrepresentations and omissions when they invested with Defendants.

345.    As a direct and proximate cause of the fraud by Defendants, Plaintiffs sustained damages in an amount to be determined at trial.

346.    Plaintiffs seek to recover all available remuneration, including damages, punitive damages, and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

### TWENTIETH CLAIM FOR RELIEF
*Against all Defendants, except the Carolina Trust*
**Conspiracy to Commit Fraudulent Misrepresentation / Fraudulent Concealment**

347.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

348.    Defendants agreed to unlawfully and unjustly perpetrate the Scheme in which they solicited Plaintiffs to provide Defendants with millions of dollars by creating the false appearance through materially false and misleading statements and omissions that Plaintiffs were investing in personal-injury settlements.

349.    In furtherance of the conspiracy and in pursuit of the object of conspiracy, Defendants drafted and executed numerous agreements creating the false appearance that Plaintiffs were investing in personal-injury settlements, when in truth and in fact those funds were misappropriated to unjustly enrich Defendants.

350.    In furtherance of the conspiracy, Defendants solicited investors to transfer millions of dollars to Defendants to fund the purchase of interests in personal-injury settlements, when they well knew that the investors' funds would be misappropriated by Defendants to unjustly enrich themselves and their coconspirators.

351.    As a direct and proximate cause of Defendants' civil conspiracy, Plaintiffs sustained damages in an amount to be determined at trial. Plaintiffs seek to recover all available

remuneration, including damages, punitive damages, and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

### TWENTY-FIRST CLAIM FOR RELIEF
*Against all Defendants*
**Injunctive Relief Pursuant to 11 U.S.C. §§ 105(a), Fed. R. Bankr. P. 7001(7), 7065 and Fed. R. Civ. P. 65**

352.   Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

353.   The facts herein alleged and incorporated by reference establish that the J&J Principals engaged in and operated a Ponzi scheme and used the proceeds therefrom to purchase the Real Property.

354.   The J&J Principals then transferred the ill-gotten Real Property to associated entities, including the Judd Trust and the Jager Trust.

355.   The Judd Trust and the Jager Trust are in the process of marketing the Real Property for sale to conceal the proceeds of the Scheme and defeat the Plaintiffs recovery.

356.   Plaintiffs are entitled to entry of a temporary restraining order and preliminary and permanent injunctive relief pursuant to 11 U.S.C. §§ 105, 544, and 550, Fed. R. Bankr. P. 7001, 7065 and Fed. R. Civ. P. 65, as Plaintiffs are entitled to the relief demanded and such relief consists in restraining the commission or continuance of the acts complained of, now and in the future.

357.   Defendants' continued violations of the law threaten irreparable harm to the Plaintiffs as set forth above.

358.   Should the Real Property be secreted out of the reach of Plaintiffs then Plaintiffs will be irreparably injured.

359.   Accordingly, Plaintiffs are entitled to a preliminary and permanent injunction as follows: Defendants are prohibited from using, transferring, disposing of, or encumbering the Real Property, other than the reasonable and necessary operating expenses of the business, until further order of this Court.

### TWENTY-SECOND CLAIM FOR RELIEF
*Against the Judd Trust and the Jager Trust*
**Avoidance as Fraudulent Pursuant to 11 U.S.C. §548(e)**

360.    Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

361.    The Judd Trust was settled and is dated December 15, 2020.

362.    The Jager Trust was settled and is dated June 30, 2003, and was amended on June 30, 2009.

363.    Upon information and belief, numerous transfers, including the Transfers mentioned above, were made to the Judd Trust and the Jager Trust – two self-settled trusts.

364.    Each of the Transfers constituted or were comprised of transfers within the meaning of 11 U.S.C. § 101(54), including 101(54)(D), of the Alleged Debtor(s) property or interests in property under 11 U.S.C. § 541 cognizable and traceable under otherwise applicable non-bankruptcy law and, as otherwise applicable, bankruptcy law.

365.    Upon information and belief, all, or a portion of these Transfers numerous transfers, including the Transfers mentioned above, were made by one of the Nominal Defendants.

366.    Upon information and belief, either of the Nominal Defendants is a beneficiary of Judd Trust and/or the Jager Trust.

367.    The Nominal Defendants made such Transfers with actual intent to hinder, delay, or defraud any entity including Plaintiffs, to which the Nominal Defendants were or became, on or after the date that such Transfer was made, indebted.

368.    At the time of the Transfer, the J&J Principals admittedly were operating a "ponzi scheme" through the use of the Nominal Defendants as their instrumentalities and therefore knew that those entities, as well as other entities formed and operated by the Jager Defendants, were or could be subject to substantial claims related to the Ponzi scheme and/or the transfer of proceeds of the Ponzi scheme.

369.    Plaintiffs' claims arose either before or after the Transfers.

370.    The Transfer is avoidable pursuant to 11 U.S.C. §548(e).

371.    Upon information and belief, the J&J Principals purchased the Real Property using the proceeds of the Scheme.

372.    Defendants Judd Trust and Jager Trust were the initial transferees of the Real Property or the entity for whose benefit the transfer was made.

373.    Among other things, the Defendants Judd Trust and Jager Trust benefitted in that the Transfers resulted in the Real Property being transferred to it, and it used (and continues to use) the transferred property for its own benefit and purposes, including marketing the transferred property for sale.

374.    Plaintiffs are entitled to recover the avoided transferred property or the value thereof from the initial or intermediate transferee of such transfer or the entity for whose benefit such transfer was made pursuant to 11 U.S.C. §548(e).

375.    Plaintiffs are entitled to recover prejudgment interest from the date of the Transfer because the Transfers are for an amount certain.

## DEMAND FOR RELIEF

WHEREFORE, the Plaintiffs request that the Court enter relief on their behalf for each of the claims identified above, including:

A.    For Injunctive Relief and entry of a temporary restraining order to prohibit Defendants from using, transferring, disposing of, or encumbering the Real Property, other than the reasonable and necessary operating expenses of the business, until further order of this Court;

B.    An award of actual damages, compensatory damages, statutory damages, restitution, punitive damages, and all other forms of monetary relief provided for or made available by law or equity;

C.    That the Transfers are avoidable by Plaintiffs as a fraudulent transfer;

D.    That Plaintiffs are entitled to recover the fraudulently transferred property, or the value thereof in an amount to be determined;

E.      For turnover of the transferred property or its value, and any income derived therefrom, to Plaintiffs;

F.      The Plaintiffs' reasonable attorneys' fees and costs, and for such other relief as the Court deems just or appropriate.

Declaratory relief that any Transfer(s) set forth in this complaint were made either directly with, or proceeds from, property of the Alleged Debtor(s) bankruptcy estate(s) and constituted, as necessary transfers within the meaning of 11 U.S.C. § 101(54), including 101(54)(D), of the Alleged Debtor(s) property or interests in property under 11 U.S.C. § 541 cognizable and traceable under otherwise applicable non-bankruptcy law and, as otherwise applicable, bankruptcy law or constituted transfers within the of the Alleged Debtor(s) property or interests in property cognizable and traceable under otherwise applicable non-bankruptcy law.

DATED: March 31, 2022

Respectfully Submitted,

/s/ Samuel A. Schwartz
Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Athanasios E. Agelakopoulos, Esq.
Nevada Bar No. 14339
Emily D. Anderson, Esq.
Nevada Bar No. 13814
Schwartz Law, PLLC
601 E. Bridger Avenue
Las Vegas, Nevada 89119
*Attorneys for the Plaintiffs*