Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Athanasios E. Agelakopoulos, Esq.
Nevada Bar No. 14339
aagelakopoulos@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

*Attorneys for the Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: 22-10942-MKN |
| J & J CONSULTING SERVICES, INC., | Chapter 11 – Involuntary |
| Alleged Debtor. | |
| ANTHONY BONIFAZIO, an individual; KEITH OZAWA, an individual; JANELLE OZAWA, an individual; and BRIAN SCHUMANN, an individual | Adv. Proceeding No.: 22-01061-MKN |
| Plaintiffs, | Hearing Date: *OST REQUESTED* Hearing Time: *OST REQUESTED* |
| v. | |
| JEFFREY J. JUDD, an individual; JENNIFER R. JUDD, an individual; JEFFREY J. JUDD AND JENNIFER J. R. JUDD, AS TRUSTEES OF JUDD NEVADA TRUST, DATED DECEMBER 15, 2020, a Nevada trust; J & J CONSULTING SERVICES, INC., an Alaska corporation; MATTHEW BEASLEY, an individual; PAULA BEASLEY, an individual; BEASLEY LAW GROUP PC, a Nevada Professional Corporation; SHANE M. JAGER, an individual, WILLOW A. JAGER, an individual; KARSEN D. JAGER, an individual; SHANE M. JAGER AND WILLOW A. JAGER, AS TRUSTEES OF JAGER FAMILY | |

1

TRUST, DATED JUNE 30, 2003, AMENDED )
JUNE 30, 2009, a Nevada trust; STIRLING )
CONSULTING L.L.C., a Nevada limited )
liability company; JASON JONGEWARD, an )
individual; JOHN CANNON, AS TRUSTEE )
OF THE CAROLINA CHASE TRUST, )
DATED __, a California trust, )
                                                  )
              Defendants, )
                                                  )
     and )
                                                  )
J & J CONSULTING SERVICES, INC., a )
Nevada corporation; J and J PURCHASING, )
LLC, a Nevada limited liability company, )
                                                  )
        Nominal Defendants. )
_____ )

## DECLARATION OF SAMUEL A. SCHWARTZ, ESQ.

I, Samuel A. Schwartz, being duly sworn, depose and say:

1.     I am the principal of Schwartz Law, PLLC ("**SL**" or the "**Firm**"), 601 East Bridger Avenue; Las Vegas, Nevada 89101. I am admitted to practice in the Supreme Court of Nevada, and the United States District Court for the District of Nevada, the Bankruptcy Appellate Panel for the Ninth Circuit Court of Appeals, the Ninth Circuit Court of Appeals, and the United States Supreme Court, among others. I am authorized to make this declaration.

2.     I submit this declaration in support of the *Motion for Appointment of (A) Chapter 11 Trustee Either (I) for Cause Under 11 U.S.C. § 1104(a)(1) or (II) in the Best Interests of Creditors Under 11 U.S.C. § 1104(a)(2) and Federal Rules of Bankruptcy Procedure 2007.1(a), 2009, and 9014 and (B) Gap Period Trustee Pending Entry of the Order for Relief Under 11 U.S.C. § 303* filed in Case Nos. 22-10942-MKN and 22-10943-MKN.[1]

3.     I also submit this declaration in support of the *Motion for Preliminary Injunction and Temporary Restraining Order* filed in Adv. Pro. No. 22-01061-MKN.[2]

---

[1]    Any term not defined herein shall have the meaning ascribed to such term in the Motion.
[2]    Any term not defined herein shall have the meaning ascribed to such term in the Motion.

4.     On March 16, 2022, the law firm of Cook & Kelesis filed a complaint against Matthew Beasley, Esq., Beasley Law Group, P.C., Jeffrey Judd, J&J Consulting Services, Inc., and J and J Purchasing, LLC.  *See* Complaint, attached hereto as **Exhibit 1**, is a true and correct copy of the Complaint filed in Case No. A-22-849806-B, in the District Court for Clark County Nevada.

5.     On March 30, 2022, the Court executed and Cook & Kelesis filed the Order purporting to Appoint a Receiver over J&J Consulting Services, Inc., among others.  *See* Order Appointing Receiver, attached hereto as **Exhibit 2**, is a true and correct copy of the Order entered in Case No. A-22-849806-B, in the District Court for Clark County Nevada.

6.     On March 25, 2022, the law firm of Knepper & Clark, LLC filed a class action complaint against Matthew Beasley, Esq., Beasley Law Group, P.C., Jeffrey Judd, J&J Consulting Services, Inc., and J and J Purchasing, LLC.  *See* Class Action Complaint, attached hereto as **Exhibit 3**, is a true and correct copy of the Complaint filed in Case No. 2:22-CV-00529, in the United States District Court for the District of Nevada.

7.     On March 24, 2022, the Hindenberg Research organization published its research relating to J and J Purchasing, LLC finding and concluding that J and J Purchasing, LLC is a ponzi-scheme.  *See* Class Action Complaint pg. 28 – 29, attached hereto as **Exhibit 4**, is a true and correct copy of the Article downloaded from https://hindenburgresearch.com/jj-purchasing/ on or around March 28, 2022.

8.     On behalf of Plaintiffs, I am aware of the following list prices for certain of the Real Property currently being advertised for sale; specifically:

- Judd Nevada Trust properties:
  o   9 Sky Arc Court, Henderson, NV - $6,700,000
  o   8 Twisted Rock Court, Henderson, NV - $2,950,000
  o   599 N. Red Mountain Court, Heber City, Utah - $2,800,000
  o   2314 E. La Sal Peak, Heber City, Utah - $799,000

- Jager Family Trust properties:
  o   19 Sky Arc Court, Henderson, NV - $2,595,000
  o   29 Rockstream Drive, Henderson, NV - $1,965,000
  o   16 Paradise Valley Court, Henderson, NV - $3,635,400
  o   2364 E. La Sal Peak Dr., Heber City, Utah - $750,000
  o   4015 Calle Lisa, San Clemente, CA - $5,499,999

9.     Upon information and belief, more than one of the foregoing properties is currently under contract for sale.

10.    Allowing these properties to be sold will cause irreparable harm to Plaintiffs.

11.    In the days before this filing, the prices on certain Judd Trust real properties have been significantly cut in an apparent effort to sell them as quickly as possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 1st day of April, 2022.

/s/ Samuel A. Schwartz
Samuel A. Schwartz, Esq.

4

# EXHIBIT 1

Electronically Filed
3/16/2022 3:24 PM
Steven D. Grierson
CLERK OF THE COURT

1   **COMPB**
MARC P. COOK
2   Nevada State Bar No. 004574
COOK & KELESIS, LTD.
3   517 South Ninth Street
Las Vegas, Nevada 89101
4   Phone: (702) 737-7702
Fax: (702) 737-7712
5   E-mail: mcook@bckltd.com
*Attorneys for Plaintiffs*
6

CASE NO: A-22-849806-B
Department 22

7                           **DISTRICT COURT**

8                       **CLARK COUNTY, NEVADA**

9

10  MARK A. MURPHY, an individual; and         CASE NO.
MARK A MURPHY, LTD., a Nevada              DEPT. NO.
11  Limited Liability Company,
**BUSINESS COURT**
12              Plaintiff,

13  v.                                         **COMPLAINT**

14  MATTHEW BEASLEY, an individual;            **JURY TRIAL DEMANDED**
BEASLEY LAW GROUP PC, a Nevada
15  Professional Corporation; JEFFREY JUDD,    **EXEMPT FROM ARBITRATION**
an individual; J&J CONSULTING              (Seeks Declaratory Relief and Receivership)
16  SERVICES, INC., a Nevada Corporation; J
AND J PURCHASING, LLC; a Florida
17  Limited Liability Company; DOE
INDIVIDUALS I through XX; and ROE          **Hearing Date:**
18  ENTITIES I through XX, inclusive,          **Hearing Time:**

19              Defendants.

20

21          COMES NOW, Plaintiffs, Mark A. Murphy, (hereinafter "Plaintiff" or "Mr. Murphy")

22  and Mark A Murphy, Ltd. (hereinafter "Plaintiff" or "Murphy Ltd."), by and through their

23  attorney of record, Marc P. Cook, Esq., of the law firm of Cook & Kelesis, Ltd., and pursuant to

24  the Nevada Rules of Civil Procedure complain and allege as follows:

25                              **I.**

26                       **INTRODUCTION**

27

28                          Page 1 of 18

1. Plaintiffs are pursuing this litigation for lost funds in a purported Ponzi scheme to which Plaintiff was an investor and to which Plaintiff is aware of a multitude of other investors. In this action, Plaintiff requests a constructive trust over all funds of all investors for the purpose of a pro rata distribution to each investor and, in an effort to provide the necessary funds to make all investors whole, not just moving Plaintiffs through the creation of a Receivership as pled hereinbelow.

2. Plaintiff, Murphy, is and was at all times relevant hereto, a resident of the County of Clark, State of Nevada.

3. Plaintiff Mark A Murphy, Ltd., is and was at all times relevant hereto, a Nevada domestic professional limited liability company, duly registered in the State of Nevada, and authorized to conduct business in the County of Clark, State of Nevada.

4. Defendant, Matthew Beasley, (hereinafter "Defendant" or "Beasley"), is and was at all times relevant hereto, a resident of the County of Clark, State of Nevada.

5. Defendant, Beasley Law Group PC, (hereinafter "Defendant" or "Beasley Law Group"), is and was at all times relevant hereto, a Nevada domestic professional corporation, duly registered in the State of Nevada, and authorized to conduct business in the County of Clark, State of Nevada.

6. Defendant, Jeffrey Judd, (hereinafter "Defendant" or "Judd"), is and was at all times relevant hereto, a resident of the County of Clark, State of Nevada.

7. Defendant, J&J Consulting Services, Inc., (hereinafter "Defendant" or "J&J Consulting"), is and was at all times relevant hereto, a Nevada domestic corporation, duly registered in the State of Nevada, and authorized to conduct business in the County of Clark, State of Nevada.

8. Defendant, J and J Purchasing, LLC, (hereinafter "Defendant" or "J and J Purchasing"), is and was at all times relevant hereto, a Florida limited liability company authorized to conduct business in the County of Clark, State of Nevada.

1   9.    The true names or capacities, whether individual, corporate, associate or otherwise, of

2         Defendants, DOE Individuals I through XX are unknown to Plaintiffs who, therefore, sue

3         said Defendants by such fictitious names; Plaintiffs are informed and believe and thereon

4         allege that each of the Defendants designated herein as DOE are responsible in some

5         manner for the events and happenings referred to and caused damages proximately to

6         Plaintiffs as herein alleged and that Plaintiffs will ask leave of this Court to amend this

7         Complaint to insert the true names and capacities of DOES I through XX when the same

8         have been ascertained and to join such Defendant in this action.

9   10.   The true names or capacities, whether corporate, associate or otherwise, of ROE Entities,

10        I through XX are unknown to Plaintiffs who, therefore, sue said Defendants by such

11        fictitious names; Plaintiffs are informed and believe and thereon allege that each of the

12        Defendants designated herein as ROE are responsible in some manner for the events and

13        happenings referred to and caused damages proximately to Plaintiffs as herein alleged and

14        that Plaintiffs will ask leave of this Court to amend this Complaint to insert the true

15        names and capacities of ROE Entities I through XX when the same have been ascertained

16        and to join such Defendant in this action.

17  11.   As a result of the actions as outlined herein, Plaintiffs have been forced to obtain the

18        services of an attorney to prosecute this action and are entitled to an award of reasonable

19        attorney's fees.

20                                              **II.**

21                          **GENERAL FACTUAL ALLEGATIONS**

22  12.   Jeffrey Judd was president of J and J Consulting to whom Plaintiffs and each of them

23        understood have been operating since at least 2005 and was a legal, viable entity.

24  13.   Matthew Beasley, Esq., is the owner of Beasley Law Group PC since approximately 2011

25        and has been practicing law since 2006.  Beasley had the highest rating available on

26        Martindale-Hubbel, the lawyers/attorneys rating site.

27

28                                      Page 3 of 18

14. Plaintiff met Judd in or around 2002.  At that time Judd was a mortgage loan officer.

15. Over the next few years, Judd was involved in different businesses and Plaintiff's company did the tax returns for those entities.

16. During 2017, Judd said that he had an attorney, Matthew Beasley of the Beasley Law Group, who had started a company.  The function of the company was to provide financial assistance to parties suffering from various types of injuries in which an attorney was seeking monetary settlements from insurance companies.

17. Judd and Beasley represented that they were conducting a business wherein investors would provide funds related to providing personal injury clients with quicker access to funds to which they would pay interest and the investor would receive a short return profit on each investment.  Defendants and each of them represented that these investments were legal and sound.  Defendants provided contracts for investments, initially under J&J Consulting Services, to Plaintiff beginning in 2017

18. The idea and the business model presented appeared legitimate and meritorious.

19. During 2018, clients of Murphy asked if they could also invest.  American Colocation Services, LLC, a company properly formed by Murphy individually, was used to segregate funds to be invested from those other sources.

20. Murphy individually invested in the company with a beginning amount of $100,000.00.

21. Murphy received his first check in December 2017.  Thereafter, Murphy received checks every three months timely and without issues or problems.

22. Over time, Murphy invested $700,000.00 with the same results.

23. Plaintiffs began investing with Defendants and each of them beginning in 2017 through March 2022 in Nevada and had invested significant sums by 2022.

24. Plaintiffs' investments increased and gradually, with continued returns on investments from 2017 through March 3, 2022, began assisting clients in placing these investments with Defendants and each of them.

25. From 2017 through March 3, 2022, Plaintiffs, by and through Mark Murphy, had multiple conversations with Jeffrey Judd wherein the soundness and legality of these investments was represented by Judd. These representations continued relative to new investors wherein Judd would personally represent to these new investors and to Murphy the soundness, legality and fluidity of these continued investments.

26. These discussions preceded investments from the investment schedules and took place telephonically in Las Vegas, Nevada.

27. Based on the return on investments and representations of continued returns, the investors reinvested their original principle into new contracts after the initial 90 days.

28. Plaintiff and other investors Plaintiff was aware were led to believe that these investments would continue paying and therefore, based on the representation of the legality and continued funds, agreed to continue these investments.

29. These investments paid off as represented from 2017 through March 2022.

30. Plaintiffs and other investors wired money to the Beasley trust fund or as otherwise directed by Beasley and Judd.

31. Plaintiffs and other investors were promised a return of 7.5 - 13% in 90 days.

32. Plaintiffs and each of them reasonably relied on the representations by each and every Defendant throughout this process including at the time of each investment.

33. Beginning in January 1, 2022, these same services were to be provided through J and J Purchasing which was represented to be a Florida company.

34. In representing the legality of the same, Defendants and each of them provided a copy of a confidential private placement memorandum purportedly prepared by a law firm in Dallas, Texas. This documentation included operating agreements, disclosures, and what appeared to all be appropriate business paperwork to demonstrate the sound legal investments to which Defendants and each of them were soliciting.

35. Judd formed J and J Purchasing as part of doing an SEC Reg. D filing which was

1    represented to take effect January 2022.

2    36.    On March 2, 2022, Murphy received a phone call from Judd.  Judd said that the FBI had

3    been to his home to question him about this business.  Judd also told Murphy that the FBI

4    had been to Beasley's home and Beasley had been injured.  Judd had advised that his

5    home was raided by the FBI and his assets were frozen or taken based on the FBI's

6    allegations of a Ponzi Scheme.  Even in this conversation, Judd represented that it was

7    not a Ponzi Scheme, the investments were solid, the business was legal, and if allowed to

8    continue, the profit distributions would continue as well.

9    37.    Based on the FBI report, the FBI advised that these investments were part of a Ponzi

10    Scheme that had operated from 2017 to March 2022 in Nevada, Utah and California

11    promising up to a 13% return in 90 days if investors invested $80,000 or $100,000 into

12    personal injury investments.

13    38.    As the FBI's statement attested, Plaintiffs' earlier contracts were 4 - 5 pages long and

14    often contained references to slip and fall incidents, the name of slip and fall victims

15    attorney, a settlement monetary award, a non-disclosure agreement, a purchasing

16    agreement and an investor agreement.

17    39.    From the time it began in 2017 until March 2022, there have been over 163 total

18    investors.  Plaintiff is aware of investing over $16,000,000.00 in contracts.  Some

19    contracts have only one investor while others have several.

20    **FIRST CAUSE OF ACTION**

21    **(Piercing the Corporate Veil)**

22    40.    Plaintiffs' repeat and reallege each and every allegation contained in Paragraphs 1

23    through 39 of this Complaint and incorporates them by reference as though fully set forth

24    herein.

25    41.    Notwithstanding the various entity structures of Defendants', and each of them, each of

26    them are jointly, severally, and individually liable under the doctrine of piercing the

27

28    Page 6 of  18

1    corporate veil.

2    42.    Defendants, and each of them, have commingled funds, assets, and accounts without

3    regard to entity formalities to perpetuate a fraud, to justify a wrong and/or create an

4    injustice.

5    43.    As a result of the above, each Defendant is individually, by and through their

6    representatives, their boards and/or their trustees, responsible and liable for each and

7    every cause of action referenced hereinabove.

8    44.    As a result of Defendants' actions and inactions, as referenced hereinabove, Plaintiffs

9    have been damaged in an amount in excess of $10,000.00 to be more specifically

10    determined at the time of trial.

11                              **SECOND CAUSE OF ACTION**

12                                    **(Accounting)**

13    45.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through

14    44 of this Complaint and incorporates them by reference as though fully set forth herein.

15    46.    Plaintiffs hereby demand that the Defendants, and each of them, produce for inspection

16    and copying all of the business books, records, and financial records, including, but not

17    limited to, all financial transactions, all bank account records, disbursement records, sales

18    and tax records pertaining to each of the Defendant companies from 2017 forward.

19    47.    Plaintiffs hereby demands that Defendants produce for inspection and copying all of the

20    books and records pertaining to any transaction relating to any of Defendants' companies.

21                              **THIRD CAUSE OF ACTION**

22                                  **(Breach of Contract)**

23    48.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through

24    47 of this Complaint and incorporates them by reference as though fully set forth herein.

25    49.    Plaintiffs had valid enforceable contracts with Defendants.

26    50.    Plaintiffs have performed all conditions precedent and performed to the extent required.

27

28                                   Page 7 of 18

1    51.    Defendants, and each of them, have breached the terms of the contractual agreement as

2        set forth hereinabove.

3    52.    Plaintiffs have been substantially and materially harmed by such breach(es) in an amount

4        in excess of $10,000.00 to be more specifically determined at time of trial.

5                **FOURTH CAUSE OF ACTION**

6                 **(Unjust Enrichment)**

7    53.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through

8        52 of this Complaint and incorporates them by reference as though fully set forth herein.

9    54.    In the event that the trier of fact determines the parties do not have valid agreement, with

10       the modifications and/or novation set forth herein, then the Defendants have been unjustly

11       enriched.

12    55.    Further, as to issues beyond the scope of any contract, Defendants and each of them, have

13       been unjustly enriched.

14    56.    Plaintiffs have been substantially and materially harmed by Defendants in an amount in

15       excess of $10,000.00 to be more specifically determined at time of trial.

16                **FIFTH CAUSE OF ACTION**

17        **(Breach of the Covenant of Good Faith and Fair Dealing)**

18    57.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through

19       56 of this Complaint and incorporates them by reference as though fully set forth herein.

20    58.    Under Nevada law, every contract contains an implied covenant of good faith and fair

21       dealing that imposes on the parties the obligation to deal with each other fairly and

22       honestly.

23    59.    Defendants placed themselves in the position of trust with Plaintiffs.

24    60.    The Defendants, in their treatment of Plaintiffs, have breached the covenant of good faith

25       and fair dealing by engaging in a scheme of misinformation, withholding information and

26       intentional misrepresentation, including, but not limited to the acts set forth in paragraphs

27

28                   Page 8 of 18

1   12 - 39 hereinabove, all of which have been promulgated by Defendants and each of

2   them, through Beasley and Judd individually and as an agent for the other Defendants in

3   Las Vegas/Henderson, Nevada from approximately 2017, through the date of filing the

4   Complaint.

5   61.   As a result of Defendants' breaches of the covenant of good faith and fair dealing,

6   Plaintiffs have suffered economic losses and have further suffered emotional distress that

7   was reasonably foreseeable by the Defendants, all in an amount in excess of $10,000.00.

8   **SIXTH CAUSE OF ACTION**

9   **(Breach of Fiduciary Duty)**

10  62.   Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through

11  61 of this Complaint and incorporates them by reference as though fully set forth herein.

12  63.   Defendants and each of them, individually, as board members and officers, employees

13  and/or trustees have mismanaged the entities and the associated companies and breached

14  their obligations and duties owed to the entity, and its investors.

15  64.   This breach of fiduciary duties by the board members of each Defendant specifically

16  includes all actions alleged herein which where ratified by its board tacitly or actively or

17  through willful blindness.

18  65.   As a direct and proximate result of the foregoing, Plaintiffs have been damaged in an

19  amount in excess of $10,000.00 to be more specifically determined at the time of trial.

20  **SEVENTH CAUSE OF ACTION**

21  **(Conversion)**

22  66.   Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through

23  65 of this Complaint and incorporates them by reference as though fully set forth herein.

24  67.   The above referenced acts of the Defendants and each of them, were intentional and

25  resulted in serious interference with Plaintiffs' rights.

26  68.   Defendants and each of them, exercised dominion and control over Plaintiffs' personal

27

28  Page 9 of 18

1      property by converting the same to their own use.

2   69.   Defendants and each of them, are not the rightful owner of Plaintiffs' personal property

3      and its acts caused the conversion of the Plaintiffs' property.

4   70.   Plaintiffs have been substantially and materially harmed by Defendants in an amount in

5      excess of $10,000.00 to be more specifically determined at time of trial.

6                  **EIGHTH CAUSE OF ACTION**

7                  **(Embezzlement)**

8   71.   Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through

9      70 of this Complaint and incorporates them by reference as though fully set forth herein.

10   72.   The Defendants embezzled funds from Plaintiffs through several means, including, but

11      not limited to, transferring money rightfully belonging to Plaintiffs to other accounts for

12      Defendants' own use.

13   73.   Plaintiffs are still gathering accounting information to account for some of the fraud and

14      conversion/embezzlements but further details may not be ascertained until discovery

15      takes place and information is obtained from Defendants.

16   74.   Plaintiffs have been substantially and materially harmed by Defendants in an amount in

17      excess of $10,000.00 to be more specifically determined at time of trial.

18                  **NINTH CAUSE OF ACTION**

19         **(Obtaining Money/Property Under False Pretenses)**

20   75.   Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through

21      74 of this Complaint and incorporates them by reference as though fully set forth herein.

22   76.   Defendants and each of them intended to defraud Plaintiffs from their money (or acted

23      with reckless disregard for the truth).

24   77.   Defendants' misrepresentations and misinformation was intentional or with reckless

25      disregard for the truth, knowing the same would be, and in fact, were relied on by the

26      Plaintiffs.

27

28                  Page 10 of 18

1  78.  Plaintiffs have been substantially and materially harmed in an amount in excess of

2       $10,000.00 to be more specifically determined at time of trial.

3                              **TENTH CAUSE OF ACTION**

4                                      **(Fraud)**

5  79.  Plaintiffs hereby repeat and reallege each and every cause of action contained in

6       paragraphs 1 through 78 of this Complaint and incorporates them by reference as though

7       fully set forth herein.

8  80.  Defendants and each of them, made false representations and committed fraud by

9       omission as described in paragraphs 12 - 39 hereinabove, all of which have been

10      promulgated by Defendants and each of them, through Judd, individually and as an agent

11      for the other Defendants in Las Vegas/Henderson, Nevada from approximately 2017,

12      through the date of filing the Complaint.

13 81.  These representations were made by the above-referenced individual beginning in the Las

14      Vegas/Henderson, Nevada area.

15 82.  The representations and omissions were mutual and made in order to induce Plaintiffs to

16      act.

17 83.  Plaintiffs' reliance on these representations was reasonable.

18 84.  The statements made by the parties represented hereinabove were known to be false and

19      fraudulent or made with reckless disregard for the truth and were part of the scheme on

20      behalf of the Defendants and each of them, to defraud Plaintiffs and others.

21 85.  Plaintiffs are still gathering accounting information to account for some of the fraud and

22      conversion/embezzlements but further details may not be ascertained until discovery

23      takes place and information is obtained from Defendants.

24 86.  Plaintiffs have been substantially and materially harmed by Defendants in an amount in

25      excess of $10,000.00 to be more specifically determined at time of trial.

26

27

28                              Page 11 of 18

## ELEVENTH CAUSE OF ACTION

### (Conspiracy to Defraud)

87. Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 86 of this Complaint and incorporates them by reference as though fully set forth herein.

88. Defendants and each of them, made false representations and committed fraud by omission as described in paragraphs 12 - 39 hereinabove, all of which had been promulgated by Defendants and each of them, through Judd, individually and as an agent for the other Defendants in Las Vegas/Henderson, Nevada from approximately 2017, through the date of filing the Complaint.

89. These representations were made by the above-referenced individuals beginning in the Las Vegas/Henderson, Nevada area.

90. The representations and omissions were mutual and made in order to induce Plaintiffs to act.

91. Plaintiffs' reliance on these representations was reasonable.

92. The statements made by the Defendants represented hereinabove were known to be false and fraudulent or made with reckless disregard for the truth and were part of the scheme on behalf of the Defendants and each of them, to defraud Plaintiffs and others.

93. Defendants and each of them, together, and with each other and with third parties acting in concert with them did combine, conspire, confederate, and agree together and with each other to defraud the Plaintiffs.

94. In an overt act in furtherance of the conspiracy, Defendants and each of them acted together with third parties in an effort to acquire, transfer, or otherwise attain assets rightfully belonging to the Plaintiffs.

95. On information and belief, the Defendants and each of them, engaged in numerous transactions involving millions of dollars and transferring funds to third parties designed to further obscure and conceal the nature and extent of the fraud as well as the location of

Page 12 of 18

1    the moved assets.

2  96.  All of the foregoing was done intentionally, willfully, and with the specific purpose of

3    misleading and defrauding the Plaintiffs.

4  97.  As a direct and proximate result of the Defendants, and each of their actions, Plaintiffs

5    have been damaged in an amount in excess of $10,000.00 but within the jurisdictional

6    limits of this Court, to be more particularly determined at the time of trial.

7              **TWELFTH CAUSE OF ACTION**

8         **(Violation of the Uniform Fraudulent Transfer Act)**

9  98.  Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through

10    97 of this Complaint and incorporates them by reference as though fully set forth herein.

11  99.  Defendants and each of them, made certain transfers from funds or from proceeds from

12    funds derived from Plaintiffs and from other innocent third parties and transferred assets

13    to other Defendant companies.

14  100.  The transfers made and the obligations incurred by Defendants and each of them, were

15    fraudulent as to the Plaintiffs and other third parties who are defined as creditors under

16    NRS 112.150 because the Defendants and each of them, made transfers and otherwise

17    incurred obligations with the actual intent to hinder, delay or defraud the Plaintiffs.

18  101.  In this regard, the intent to defraud the Plaintiffs is evident in that (a) transfers or

19    obligations were made to parties qualifying as insiders as that term is defined in NRS

20    112.150; (b) that the Defendants retained possession or control of property after the

21    transfer; (c) that transfers were made or obligations incurred after the Defendants or

22    entities learned that Plaintiffs were creditors; (d) that the transfers were of substantially

23    all of the Defendants' assets; (e) that the Defendants removed or concealed assets; and (f)

24    that the transfers occurred shortly before or shortly after a substantial debt was incurred.

25  102.  As a direct and proximate result of the Defendants, and each of their actions, Plaintiffs

26    have been damaged in an amount in excess of $10,000.00 but within the jurisdictional

27

28                  Page 13 of 18

limits of this Court, to be more particularly determined at the time of trial.

## THIRTEENTH CAUSE OF ACTION

### (Civil RICO)

103.  Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 102 of this Complaint and incorporates them by reference as though fully set forth herein.

104.  Defendants, and each of them have engaged in fraud, obtaining money and/or property under false pretenses, embezzlement, conversion and/or other general crimes including, but not limited to those referenced in the causes of action hereinabove.

105.  The foregoing acts that have been committed by the Defendants and each of them, are prerequisite Nevada State RICO acts in excess of three (3) separate occasions through the Defendants' enterprises.

106.  The actions of Defendants, including, but not limited to, those acts as described in paragraphs 12 - 39 hereinabove, discussed on separate occasions to several third parties, including the Plaintiffs herein, all having the same or similar pattern, intents, results, accomplishments, victims or methods of commission or as otherwise interrelated by distinguishing characteristics, in a not isolated instance, having all occurred within a five (5) year period of time.

107.  Plaintiffs have been injured in their business or property by reasons of Defendants and each of their violations of NRS 207.400 and resultantly have a cause of action against Defendants and each of them for damages three (3) times the actual amount sustained as well as attorney's fees, appellate costs, costs of investigation and litigation reasonably incurred.

108.  Plaintiffs have been substantially and materially harmed in an amount to be proven and determined at trial, but in an amount in excess of this Court's minimal jurisdictional requirement.

1 | **FOURTEENTH CAUSE OF ACTION**

2 | **(Declaratory Relief as Against All Defendants)**

3 | 109.  Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through

4 | 108 of this Complaint and incorporates them by reference as though fully set forth herein.

5 | 110.  Plaintiffs seek declaratory relief as to their rights to terminate certain agreements.

6 | 111.  Plaintiffs seek an order from this Court terminating Defendants' self-dealing agreements

7 | between the parties.

8 | 112.  It has become necessary for Plaintiffs to engage the services of an attorney to commence

9 | this action and Plaintiffs are, therefore, entitled to reasonable attorney's fees and costs for

10 | damages.

11 | **FIFTEENTH  CAUSE OF ACTION**

12 | **(Claim and Delivery)**

13 | 113.  Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through

14 | 112 of this Complaint and incorporates them by reference as though fully set forth herein.

15 | 114.  Defendants and each of them are wrongfully detaining, possessing and/or converting

16 | Plaintiffs' property.  Plaintiffs are informed and believe, and based thereon allege that the

17 | actual value of said property is in excess of $10,000.00 to be more specifically

18 | determined at the time of trial.

19 | 115.  All demands for the return of said funds have been refused by Defendants.

20 | 116.  Because of the Defendants never lawfully retained said funds, the Defendants must return

21 | said funds to its rightful owner, the Plaintiffs, or in the alternative, pay to Plaintiffs the

22 | actual value of said funds, to be more specifically determined at the time of trial.

23 | 117.  As a result of Defendants' actions and inactions, as referenced hereinabove, Plaintiffs

24 | have been damaged in an amount in excess of $10,000.00 to be more specifically

25 | determined at the time of trial.

26 |

27 |

28 |

## SIXTEENTH CAUSE OF ACTION

### (Receiver/Accounting/Constructive Trust)

118. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 117 of this Complaint and incorporates them by reference as though fully set forth herein.

119. The appointment of a receiver and/or constructive trust for each Defendant is appropriate for the reasons set forth hereinabove and, on information and belief, Defendants have (1) commingled funds from various investors into multiple improper entities; (2) misrepresented company activities and earnings to various investors and governmental agencies; (3) misrepresented company activities and earnings to various contracted professionals; (4) encumbered the Corporation financially in amounts in excess of what the Corporation could afford; (5) improperly engaged in self dealing; (6) engaging in a series of business decisions which have resulted in financial hardship for the Corporation; and (7) wholly mismanaged the entities as is more particularly set forth in the factual background hereinabove and outlined in the causes of action.

120. Plaintiffs are informed and believe that unless otherwise restrained by this Court, Defendants and/or others subject to their dominion, influence or control, will cause further damage to the entities, and their value to the irrevocable detriment of Plaintiffs.

121. Plaintiffs believe and allege the appointment of a receiver and/or constructive trust will assist the investors of all Defendant entities.

122. Plaintiffs make such application for a receiver in this matter pursuant to NRS 78.650 and 32.010.

123. Plaintiffs are further entitled to an accounting and a Receiver and/or constructive trust to maintain these proceeds and account for the same and allow for the transition of the same to Plaintiffs, the rightful owner of the funds.

124. As a result of Defendants' actions and inactions, as referenced hereinabove, Plaintiffs are specifically entitled to the appointment of a Receiver and/or constructive trust.

## SEVENTEENTH CAUSE OF ACTION

### (Punitive Damages)

125.   Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 124 of this Complaint and incorporates them by reference as though fully set forth herein.

126.   Various causes of action pled herein demonstrate that the conduct of Defendants and each of them are of such an egregious, reckless and/or intentional nature or with such depraved indifference for the rights of the Plaintiffs to the extent to permit Plaintiffs to recover punitive damages in an amount in an amount in excess of $10,000.00 to be more specifically determined at the time of trial.

WHEREFORE, Plaintiffs expressly reserve to amend their Complaint at the time of the trial herein to include all items of damage not yet ascertained, and prays for judgment against Defendants as follows:

127.   For general damages in an amount in excess of $10,000.00;

128.   For special damages in an amount in excess of $10,000.00;

129.   For compensatory damages in an amount in excess of $10,000.00;

130.   For treble damages under civil RICO in an amount in excess of $10,000.00;

131.   For punitive damages in an amount in excess of $10,000.00;

132.   For declaratory relief;

133.   For equitable relief;

134.   For attorney's fees;

135.   For costs of suit herein incurred;

136.   For attorney's fees and costs incurred to collect any judgment entered herein;

/ / /

/ / /

/ / /

/ / /

137.    For such other and further relief as the Court may deem just and proper.

DATED this 16th day of March, 2022.

COOK & KELESIS, LTD.


_____
MARK P. COOK
Nevada State Bar No. 004574
517 South Ninth Street
Las Vegas, Nevada 89101
*Attorneys for Plaintiffs*

Page 18 of 18

# EXHIBIT 2

Electronically Filed
03/30/2022 8:03 AM

*[signature]*

CLERK OF THE COURT

1  **ORDR**
MARC P. COOK
2  Nevada State Bar No. 004574
COOK & KELESIS, LTD.
3  517 South Ninth Street
Las Vegas, Nevada 89101
4  Phone: (702) 737-7702
Fax: (702) 737-7712
5  E-mail: mcook@bckltd.com
*Attorneys for Plaintiffs*
6

7                          **DISTRICT COURT**

8                    **CLARK COUNTY, NEVADA**

9

10  MARK A. MURPHY, an individual; and            CASE NO.  **A-22-849806-B**
MARK A MURPHY, LTD., a Nevada                 DEPT. NO. **XXII**
11  Limited Liability Company,

12              Plaintiffs,                      **BUSINESS COURT**

13  v.                                           **ORDER APPOINTING RECEIVER**

14  MATTHEW BEASLEY, an individual;
BEASLEY LAW GROUP PC, a Nevada
15  Professional Corporation; JEFFREY JUDD,
an individual; J&J CONSULTING             Hearing Date: March 29, 2022
16  SERVICES, INC., a Nevada Corporation; J   Hearing Time: 8:30 a.m.
AND J PURCHASING, LLC; a Florida
17  Limited Liability Company; and DOE            **EXEMPT FROM ARBITRATION**
INDIVIDUALS I through XX, inclusive;      (Seeks Declaratory Relief and Receivership)
18  ROE ENTITIES I through XX, inclusive,

19              Defendants.

20                    <u>**ORDER APPOINTING RECEIVER**</u>

21          Pursuant to the Petition for Appointment of Receiver ("Petition"), the Affidavit of Marc

22  P. Cook, Esq., and the Complaint, the Court having reviewed the pleadings and papers on file

23  herein and hear the arguments presented by the parties at the hearings scheduled for this matter,

24  and good cause appearing therefor:

25          **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

26  1.      Appointment of Receiver, Daniel Ayala of Parcelon ("Receiver") is hereby appointed

27

28                          Page 1 of  15

permanent Receiver in this action, over the following Defendant entities and individuals: Matthew Beasley; Beasley Law Group PC; Jeffrey Judd; J&J Consulting Services, Inc.; and J and J Purchasing, LLC ("Receivership Estate").[1]  Such appointment shall be effective as of ~~the later of~~ the date this Order is executed by the undersigned District Court Judge (the "Effective Date").

2.    The business of the Receivership Estate has ceased to exist for purposes of appointment of a Receiver under NRS 78.600 as Beasley is in criminal custody and Defendant Judd cannot legally access his trust account where Plaintiffs believe the funds are transferred. Further, every entity likely keeps a separate set of books thus, it is necessary for a new third party to come in and evaluate the same for purposes consistent with the statute to "appoint one or more persons to be receivers of and for the corporation, to take charge of the estate and affects thereof, and to collect the debts and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation, or otherwise, all such suits as may be necessary and proper for the purpose aforesaid, and to appoint an agent or agents under them, and to do all other acts which might be done by the corporation, if in being, that may be necessary for the final settlement of the unfinished business of the corporation."  As Defendant entities have ceased to exist in some manner, NRS 78.600 is satisfied and the Court should appoint a Receiver with the powers to marshal assets and operate the company as requested herein.

3.    In the case *sub judice*, this investor as well as several other investors have an interest in the property  and the proceeds thereof (NRS 32.010(1)) and have clearly demonstrated

---

[1]A Chapter 11 Involuntary Bankruptcy Petition has been filed as to J & J Consulting Services Inc. in the District of Nevada, Case No. 22-10942. A Chapter 11 Involuntary Bankruptcy Petition has also been filed as to J and J Purchasing LLC., in the District of Nevada, Case No. 22 -10943. Any and all applicable bankruptcy stays or restrictions shall apply to the extent that the same would preclude Receiver's direct receivership over either or both of those entities. The Receiver will include in his initial report, and as an ongoing concern, the status of those bankruptcies to the extent that they may or may not limit the Receiver's access to control over the same.

1    that the property or fund is in danger of being lost, removed or materially injured.

2    Additionally, the issues addressed under NRS 78.600 hereinabove require a Receiver.

3    4.    The Receiver shall be appointed to perform the following duties:

4        a.    To marshal all assets from all of the Receivership Companies and trace assets out

5            to any other sources and determine the legitimacy of ~~an~~ any transfer/payments.

6        b.    To the ~~extend~~ extent viable, to reinstate the entity in good standing to allow it to collect

7            any and all outstanding receivables, if any.

8        c.    To evaluate the legality of the licenses and evaluate actions, including, but not

9            limited to, withdrawals /reinstatements of active licenses.

10        d.    To take possession of all property and/or withdrawn and/or Secretary of State

11            filings of all of the Receivership Companies to the extent necessary to determine

12            where the assets and funds invested by Plaintiff and similarly situated investors,

13            has been disgorged.

14        e.    To address issues related to government agencies, including but not limited to

15            amended tax returns, federal and state, state employment issues, license

16            compliance issues, etc.

17        f.    To have all powers vested in the board of directors of each entity.

18        g.    To have all powers as identified pursuant to Nevada Revised Statutes.

19        h.    All of the powers set forth in the Order Appointing Receiver.

20    5.    To Perform the above stated duties, the Receiver shall have access to all books and

21        records of:

22        a) Matthew Beasley;

23        b) Beasley Law Group PC;

24        c) Jeffrey Judd;

25        d) J&J Consulting Services, Inc.; and

26        e) J and J Purchasing, LLC. (collectively referenced as the "Associated Companies").

27

28                        Page 3 of 15

As to the individual Defendants, they shall cooperate and provide tax returns, Quickbooks with login information, financial logs, journals and all bank statements and loan applications from 2017 forward to allow the Receiver to evaluate what income was derived from said business and report the same to the Court.

6.    It has yet to be determined whether there will be any ability for any ongoing business for the Receivership Companies.  However, amended tax returns may need to be filed, issues with regard to the licensing may exist with the Receivership Companies.

7.    Duties of Receiver:  The Receiver is granted the following powers and duties:

a.    To incur all expenses necessary for the care, preservation, maintenance of the Receivership Estate;

b.    To take from Receivership Companies and Trusts, its agents and employees, immediate possession of the books and records and all things of value relating thereto, including, without limitation, its Rents, revenues, royalties, issues, income, payments and profits, and any and all personal property used or associated therewith or otherwise owned by Borrower, regardless of where such property is located, including, but not limited to, any rental payments, lease payments, insurance payments, condemnation awards, operating accounts, bank accounts, security deposits, records, files, reports, studies, options, contracts, leases, occupancy agreements, rent rolls, permits, licenses, checks, drafts, notes, documents, accounts receivable, and all other things and articles of any kind or type used or associated therewith;

c.    To employ or terminate the employment of any Nevada licensed person or firm to perform services consistent with the Receiver's duties;

d.    To determine the extent necessary, if at all to operate, manage, control and conduct the business for the Receivership Companies and incur the expenses necessary in such operation, management, control, and conduct in the ordinary

1    and usual course of business, and do all things and incur the risks and obligations

2    ordinarily incurred by owners, managers, and operators of similar properties, and

3    no such risks or obligations so incurred shall be the personal risk or obligation of

4    Receiver, but shall be a risk or obligation of the receivership estate;

5    e.    With respect to all assets and interests on any Receivership matter, the Receiver

6    may contact any party it reasonably believes to be an account debtor of any

7    Defendant(s) and arrange for direct payment of the obligations due from account

8    debtors to the Receiver.

9    f.    To bring and prosecute all proper actions against persons for the (i) collection of

10    monies derived from the Receivership Companies, (ii) removal from the

11    property/persons not entitled to entry thereon, (iii) protection of the Receivership

12    Estate, and (iv) recovery of possession of the Receivership Estate;

13    g.    To employ or terminate any person or firm to account for and operate the

14    Receivership Companies if the Receiver deems it necessary or appropriate in his

15    discretion and judgment to do so, provided, however, to the extent the Receiver

16    employs any such person or firm, it shall be on commercially reasonable terms

17    and conditions;

18    h.    To retain or terminate, in the Receiver's discretion, existing employees of

19    Receivership Companies in order to continue business operations, if any, in which

20    case payroll taxes, workers compensation insurance and related costs will be

21    carried and reported as those of the Receivership Companies, and not of Receiver

22    and the Receiver may, in the alternative at his sole discretion, carry all employees

23    as those of any management company or other entity hired by the Receiver;

24    i.    To hire, employ, pay and terminate, agents, employees, clerks and accountants,

25    purchase materials, supplies, advertising, and other services at ordinary and usual

26    rates and prices using funds that shall come into the Receiver's possession in order

27

28    Page 5 of  15

1    to preserve the status quo and/or regain assets;

2    j.    To hire, employ, retain, and/or terminate attorneys, certified public accountants,

3          investigators, security guards, consultants, property management companies,

4          brokers, construction management companies, appraisers, title companies,

5          licensed construction control companies, etc., and any other personnel or

6          employees which the Receiver deems reasonably necessary to assist him in the

7          discharge of his duties, provided, however, to the extent the Receiver employs any

8          such person, it shall be on commercially reasonable terms and conditions;

9    k.    To continue in effect any contracts presently existing and not in default relating to

10         the Property;

11   l.    The Receiver may, in his discretion, continue to operate, care for, preserve,

12         maintain and collect profits generated by, and sell the Receivership Estate in a

13         manner necessary to preserve its overall value and shall incur the expenses

14         necessary in such operation, care, preservation, maintenance, collection and sale

15         of the Receivership Estate, all without further order of this Court; that monies

16         coming into the possession of the Receiver pursuant hereto and not expended for

17         any of the purposes herein authorized shall be held by the Receiver, subject to

18         such orders as this Court may hereinafter issue as to its disposition;

19   m.    To enter into and modify contracts affecting any part or all of the Property,

20         including, without limitation, any and all leases affecting the Property, subject to

21         in all cases pursuant to this paragraph, the consent of Plaintiff to the extent that

22         such consent is required pursuant to the Loan Documents (as defined in the

23         Complaint on file herein).  In addition, the Receiver shall have the authority to

24         immediately terminate any existing contract, agreement, or instrument which is

25         not, in Receiver's sole discretion, deemed commercially reasonable or beneficial

26         to the Property.  The Receiver shall not be bound by any contract between the

27

28                              Page 6 of  15

1        Borrower and any third party that the Receiver does not expressly assume in

2        writing;

3    n.    To apply, obtain and pay any reasonable fees for any lawful license, permit or

4        other governmental approval relating to the Receivership Companies or the

5        operation thereof; confirm the existence of and, to the extent permitted by law,

6        exercise the privileges of any existing license or permit or the operation thereof,

7        and do all things necessary to protect and maintain such licenses, permits and

8        approvals;

9    o.    To apply for, transfer, obtain and renew, as necessary to prevent the loss of or loss

10       of use of all licenses, permits and entitlements required for the operation of the

11       Property or issued in connection therewith;

12    p.    With respect to any operation or activity that is now conducted on the Property or

13       is customarily conducted on similar properties, and that may lawfully be

14       conducted only under governmental license or permit, to continue such operation

15       or activity under the licenses or permits issued to Borrower subject to compliance

16       with the terms thereof;

17    q.    To notify all local, state and federal governmental agencies, all vendors and

18       suppliers, and any and all others who provide goods or services to the

19       Receivership Companies of his appointment as Receiver.  No utility may

20       terminate service to the Property as a result of non-payment of pre-receivership

21       obligations without prior order of this Court.  No insurance company may cancel

22       its existing current-paid policy as a result of the appointment of the Receiver,

23       without prior order of this Court;

24    r.    To open and utilize bank accounts for receivership funds.  The Receiver is

25       authorized to use the Defendant's taxpayer identification number to establish such

26       accounts.  As to any existing accounts relating to the Property, the Receiver shall

27

28

1    be entitled to manage and modify such accounts, including, without limitation, the

2    ability to change existing signature cards to identify the Receiver as the authorized

3    party for such  accounts, limit the use of such accounts by others, and/or to close

4    such accounts as the Receiver deems appropriate;

5    s.    To present for payment any checks, money orders or other forms of payment made

6    payable to Borrower which constitute Rents of the Property, endorse same and

7    collect the proceeds thereof, such proceeds to be used and maintained as

8    elsewhere provided herein;

9    t.    The Receiver is authorized to receive proceeds and profits from any sale, use,

10    transfer or disposition of the Receivership Estate; and to deposit and hold such

11    funds in one or more interest-bearing accounts;

12    u.    The Receiver shall prepare on a monthly basis, commencing 30 days after his

13    appointment, so long as the Property shall remain in his possession or care,

14    reports for the Property setting forth all receipts and disbursements, cash flow,

15    changes in the assets in his charge, claims against the assets in his charge, and

16    other relevant operational issues that have occurred during the preceding month.

17    The Receiver is directed to file such reports with the Clerk of this Court.  The

18    Receiver shall serve a copy of this report on the attorneys of record for the parties

19    and any other interested parties who request the same concurrently with the filing

20    thereof with the Clerk of this Court;

21    v.    The Receiver shall charge the rates set forth in the proposal attached as Exhibit

22    "2" to the Petition for Appointment of Receiver.  In addition, the Receiver shall be

23    reimbursed for all expenses reasonably incurred by the Receiver in performance of

24    the Receivership.  The Receiver, his management company, his consultants,

25    agents, employees, legal counsel, and professionals shall be paid on a monthly

26    basis as funds are available.  To be paid on a monthly basis, funds must be

27

28    Page 8 of  15

1    available and the Receiver must file a statement of account with the Court and

2    serve a copy on all parties to this action each month for the time and expense

3    incurred in the preceding calendar month.  If no objection thereto is filed and

4    served on or within ten (10) days following service thereof, such statement of

5    account may be paid.  If an objection is timely filed and served, such statement of

6    account shall not be paid absent further order of the Court.  In the event objections

7    are timely made to fees and expenses, objected to fees and expenses will be paid

8    within ten (10) days of an agreement among the parties or entry of a Court order

9    adjudicating the matter;

10    w.    Despite the periodic payment of Receiver's fees and administrative expenses, such

11    fees and expenses shall be submitted to the court for approval and confirmation in

12    the form of either a notice of interim application for fees, a stipulation among

13    parties or the Receiver's final account and report;

14    x.    After expending the necessary funds to operate the Property and pay all reasonable

15    and necessary costs and expenses associated with such operation, the Receiver

16    shall maintain any remaining funds for distribution to Plaintiff and such other

17    party or non-party as may be legally entitled to receive such funds in accordance

18    with the requirements of NRS 107A.310; and may distribute such funds from time

19    to time without further order of this Court;

20    y.    The Receiver is authorized and empowered to take any and all steps necessary to

21    receive, collect and review all mail addressed to Receivership Companies

22    including, but not limited to, mail addressed to any post office boxes held in the

23    name of the Receivership Companies, and the Receiver is authorized to instruct

24    the U.S. Postmaster to reroute, hold, ~~and or~~ release said mail to said Receiver.
      and/or

25    Mail reviewed by the Receiver in the performance of his duties will promptly be

26    forwarded to Borrower after review by the Receiver;

27

28                          Page 9 of  15

z.    To generally do such other things as may be necessary or incidental to the foregoing specific powers, directions and general authorities and take actions relating to the Property beyond the scope contemplated by the provisions set forth above, provided the Receiver obtains prior court approval for any actions beyond the scope contemplated herein pursuant to a motion to be served upon the parties and subject to any objection or opposition that is filed on behalf of any party;

aa.    To apply to the Court at any time during the course of the receivership for further directions and guidance to assist the Receiver in its managerial role, which application shall be served upon the parties and subject to any objection or opposition that is filed on behalf of any party hereto ;

bb.    Notwithstanding anything in this Order to the contrary, Receiver does not assume and is not obligated to assume and will not ~~on~~ be obliged to pay, perform or otherwise discharge any Employment Related Liability (as defined below) of Defendant.  Defendant is and will be solely and exclusively liable with respect to all Employment Related Liabilities. Without limitation of the generality of the foregoing, the term "Employment Related Liabilit(ies)" includes all liabilities of Defendant to any former or current employee in any way related to such employee's employment with or separation from the Defendant including, but not limited to, any claims: (i) for salary, wages, commissions, bonuses, benefits, vacation, or any other form of compensation; (ii) arising out of any acts or omissions of Defendant or Defendant's agents and representatives with respect to any benefit plan, employee practices or employee programs, including employee claims of discrimination, retaliation or other wrongful conduct or discharge decisions; (iii) severance liabilities; (iv) obligations under employment contracts or any

other related agreements with employees; (v) any change of control amounts payable to any employees; (vi) all liabilities under the Worker Adjustment and Retraining Notification Act (WARN) 29 U.S.C. 2101 et seq., or similar state statute or regulation and (vii) any other statutory or common law claim;

cc.   Neither Plaintiff nor the Receiver shall be liable for any obligation of Defendant relating to the Receivership Companies that arose prior to the Order Appointing Receiver, including, without limitation, any contingent or unliquidated obligations, nor shall the Plaintiff or the Receiver be obligated to advance any funds to pay any expense of maintenance or other liability of the Receivership Companies other than as cash flows permits payment of such expenses;

dd.   The Receiver shall have no liability to any party for any claims, actions or causes of action arising out of or relating to events or circumstances occurring prior to the appointment of the Receiver. This protection of the Receiver from liability shall include, but not be limited to any liability from the performance of services rendered by third parties on behalf of Defendant, and any liability to which Defendant is currently or may ultimately be exposed under any applicable laws pertaining to the ownership and use of the Property and operation of the Defendant's businesses;

ee.   The Receiver shall not be responsible for payment of any utility bills, unpaid payroll expenses or other unpaid invoices for services or utilities incurred by the Borrower or for the benefit of the Property prior to the Receiver's taking possession of the Property.

ff.   Following the Receiver's appointment, the Receiver shall not be deemed

1             in any way to be an owner of any Receivership Company.  Daniel Ayala is

2             acting solely in his capacity as Receiver and no risk, obligation or expense

3             incurred shall be the personal risk, obligation or expense of Receiver, but

4             shall be the risk, obligation or expense of the receivership estate;

5     gg.     The Receiver shall have no responsibility for paying any unpaid federal

6             and state payroll taxes and expenses of Defendant.  The responsibility for

7             such filings and payments lies exclusively with Defendant and its agents,

8             employees, and representatives.

9   8.     Non-Interference With Receiver: Matthew Beasley and Jeffrey Judd, including, without

10       limitation, their agents, representatives, and employees, are, during the period that the

11       Receiver shall be in possession of the Property, enjoined from:

12     a.     Interfering with the Receiver, directly or indirectly, in the management and

13             operation of the Property;

14     b.     Interfering with the Receiver, directly or indirectly, in the collection of Rents

15             derived from the Property;

16     c.     Operating or attempting to operate Defendant Companies, except to the ~~extend~~ extent

17             Beasley is required to act and appear for clients as counsel as nothing in this Order

18             shall be construed as the Receiver taking over legal client representation for

19             Beasley's legal practice, if any;

20     d.     Extending, dispersing, transferring, assigning, selling, conveying, devising,

21             pledging, mortgaging, creating a security interest in or disposing of the whole or

22             on behalf of any part of the Receivership Companies without the prior written

23             consent of the Receiver; and

24     e.     Doing any act which will, or which will tend to, impair, defeat, divert, prevent or

25             prejudice the preservation of the Receivership Companies or the interest of

26             Plaintiffs.

27

28                                  Page 12 of 15

9.      Turnover: Defendants' and each of them, and employees, shall, within 72 hours of the
Effective Date:

     a.      Turn over to the Receiver the possession of the Receivership Companies,
including all keys to all locks on the property, and the records, books of account,
ledgers and all business records for the Receivership Companies, wherever
located in and whatever mode maintained, including, without limitation,
information contained on computers and any and all software relating thereto as
well as all banking records, statements and canceled checks for all dates up to the
date of this Order;

     b.      Turn over to the Receiver all documents which constitute or pertain to all licenses,
permits or governmental approvals relating to the Property;

     c.      Turn over to the Receiver all documents which constitute or pertain to insurance
policies, whether currently in effect or lapsed,which relate to the Property;

     d.      Turn over to the Receiver all contracts, leases and subleases, royalty agreements,
licenses, assignments or other agreements of any kind whatsoever, whether
currently in effect or lapsed, which relate to any interest in the Property;

     e.      Turn over to the Receiver all documents pertaining to past, present or future
business investments of any type with respect to all or any part of the Property;

     f.      Nothing herein is intended to, nor is to be construed to, require Defendants to turn
over any documents protected from disclosure by either the attorney-client
privilege or the attorney work product privilege;

     g.      Turn over to the Receiver all Rents derived from the Property (including, without
limitation, all security deposits, advances, prepaid rents, storage fees, and parking
fees) wherever and whatsoever mode maintained;

     h.      Forward all mail addressed to Receivership Companies to the Receiver.  Any and
all persons or entities acting under Defendant's direction or on its behalf are

1    further directed and ordered to deliver to the Receiver all rents, revenues, issues,

2    profits, and security deposits of and from the Receivership Companies, which may

3    yet come into their possession or come under their control; and

4    i.    Nothing in this section requires Beasley to turn over legal representation client

5    files nor relieves him of any obligation to any legal client or clientele.

6    10.    Discharge:  The Receiver shall relinquish possession and control of the Receivership

7    Companies and shall be discharged from all further duties, liabilities and responsibilities

8    relating to such Receivership Companies or such portion thereof; pending approval of the

9    Receiver's final account and report to the Court relating thereto as directed by the Court.

10    11.    Final Report:  No later than 60 days after the receivership terminates, the Receiver shall

11    file and serve a motion for approval of the Receiver's final report and account.  The

12    Receiver shall give notice of such motion to all persons of whom the Receiver is aware

13    who have potential claims against receivership property.  The motion to approve the final

14    report and account and for discharge of the Receiver shall contain the following:  (1) a

15    declaration or declarations (i) showing what was done during the receivership; (ii)

16    certifying the accuracy of the final accounting; (iii) stating the basis for the termination of

17    the receivership (such as foreclosure or reinstatement); and (iv) stating the basis for an

18    order for the distribution of any surplus or payment of any deficit; and (2) a summary of

19    the receivership accounting, which shall include (i) the total revenues received; (ii) the

20    total expenditures identified and enumerated by major categories; (iii) the net amount of

21    any surplus or deficit; and (iv) evidence of necessary supporting facts.

22    12.    Suit Against Receiver:  No individual or entity may sue the Receiver without first

23    obtaining the permission of this Court.

24    13.    Future Litigation:  All parties to this action shall bring any future litigation involving the

25    use, possession or control over the Property in this Court or the parties to such litigation

26    shall first obtain leave of this Court except the Receiver is authorized and granted leave to

27

28    Page 14 of 15

1    bring any unlawful detainer actions relating to the Property in any court.

2    14.    Receiver's Bond:  The Receiver shall serve without bond.

3    15.    Cooperation Between Defendants and Receiver: The Defendants, and each of them, and

4    Receiver shall cooperate and take necessary steps to avoid unnecessary expense with

5    regard to the Receiver taking possession of, managing, and maintaining the Receivership

6    Companies.

7    16.    Further Instructions:  The Receiver, Plaintiff, Defendant, or any other party who

8    maintains an interest in any Receivership Companies, may at any time apply to this court

9    for any further or other instructions and powers necessary to enable the Receiver to

10    perform his duties properly and/or modify this order.

11    **IT IS SO ORDERED.**

12
Dated this 30th day of March, 2022

13

14

15    DISTRICT COURT JUDGE
E5B E69 48C1 E5DA
Susan Johnson
District Court Judge

16    Respectfully Submitted By:

17    COOK & KELESIS, LTD.

18

19    _/s/ Marc P. Cook_
MARC P. COOK, ESQ.

20    Nevada Bar No. 4574
517 S. Ninth Street

21    Las Vegas, Nevada 89101
*Attorneys for Plaintiffs*

22

23

24

25

26

27

28    Page 15 of  15

**CSERV**

## DISTRICT COURT
## CLARK COUNTY, NEVADA

| | |
|---|---|
| Mark Murphy, Plaintiff(s) | CASE NO: A-22-849806-B |
| vs. | DEPT. NO.  Department 22 |
| Matthew Beasley, Defendant(s) | |

### <u>AUTOMATED CERTIFICATE OF SERVICE</u>

This automated certificate of service was generated by the Eighth Judicial District Court. The foregoing Order was served via the court's electronic eFile system to all recipients registered for e-Service on the above entitled case as listed below:

Service Date: 3/30/2022

| | |
|---|---|
| Marc Cook | mcook@bckltd.com |
| Shannon Fagin | sfagin@bckltd.com |

# EXHIBIT 3

1  Eric H. Gibbs (*pro hac vice* forthcoming)
2  David K. Stein (*pro hac vice* forthcoming)
   Iudis Sominskaia (*pro hac vice* forthcoming)
3  **GIBBS LAW GROUP LLP**
   505 14th Street
4  Oakland, California 94612
5  (510) 350-9700
   ehg@classlawgroup.com
6  ds@classlawgroup.com
   ids@classlawgroup.com
7
                                          Miles N. Clark (NBN 13848)
8  Scott L. Silver (*pro hac vice* forthcoming)   **KNEPPER & CLARK LLC**
   **SILVER LAW GROUP**                    5510 S. Fort Apache Rd., Suite 30
9  11780 W. Sample Road                    Las Vegas, NV 89148-7700
   Coral Springs, Florida 33065            (702) 856-7430
10 (954) 755-4799                          miles.clark@knepperclark.com
   ssilver@silverlaw.com
11
12 *Counsel for Plaintiffs and Proposed Class*
13
14              **UNITED STATES DISTRICT COURT**
                **DISTRICT OF NEVADA**
15

| | |
|---|---|
| 16  BARRETT HENZEL; BRYCE BUSSEY; TINA GUILDER; ANTHONY GUILDER; on behalf of themselves and all others similarly situated, | |
| 17 | Case No.: 2:22-cv-00529 |
| 18         *Plaintiffs*, | |
| 19      v. | **CLASS ACTION COMPLAINT** |
| 20  JEFFREY JUDD; J & J CONSULTING | |
| 21  SERVICES, INC., a Nevada corporation; J & J CONSULTING SERVICES, INC., an | **JURY TRIAL DEMANDED** |
| 22  Alaska corporation; J and J PURCHASING, LLC, a Florida limited liability company; | |
| 23  MATTHEW BEASLEY; and BEASLEY LAW GROUP PC, a Nevada professional | |
| 24  corporation, | |
| 25         *Defendants*. | |
| 26 | |

27
28

_____
                CLASS ACTION COMPLAINT - 1

Plaintiffs Barrett Henzel, Bryce Bussey, Tina Guilder, and Anthony Guilder, on behalf of themselves and all others similarly situated, allege the following against Defendants Jeffrey Judd; J & J Consulting Services, Inc., a Nevada corporation; J & J Consulting Services, Inc., an Alaska corporation; J and J Purchasing, LLC, a Florida limited liability company; Matthew Beasley; and Beasley Law Group PC, a Nevada professional corporation.

## INTRODUCTION

1.   This case arises from a classic Ponzi operation run by two Nevadans who ensnared investors across several states. Defendants used investors' money to finance lavish lifestyles replete with luxury cars, extravagant homes, and even a private jet. They utilized a network of promoters to push their venture through churches, fitness clubs, and the like. Investors were told to send tens of thousands of dollars at a time to a lawyer's trust account with Wells Fargo, where the money was to be used strictly for investment purposes. Instead, their retirement savings, college funds, and other monies were plundered in what one Defendant has admitted was a massive Ponzi scheme involving $300 million or more. The scheme came crashing down in dramatic fashion—with an FBI visit to one Defendant's home ending in a shooting and a four-hour standoff.

2.   Beginning in 2017, Defendant Jeffrey Judd began soliciting investments for the then-new business venture. He told investors the venture would purchase future interests in personal-injury settlements from plaintiffs who wanted immediate payouts at a portion of their value.

3.   Judd offered investment opportunities at set dollar levels, which purportedly would be bundled with Judd's own capital and used to purchase the settlements. Each investment, and the risk involved in it, was said to depend on payment from the settling defendant, usually an insurance company.

4.   The purchases of the personal-injury settlements were to be facilitated by Matthew Beasley, a Nevada attorney, with whom Judd ran his venture. Beasley was ostensibly locating personal-injury plaintiffs willing to accept lower payments in exchange for faster payouts and negotiating the purchase of those settlements.

5.   Defendants promised investors that when they later collected the full amount of the

settlement, investors would be entitled to a portion of the profits realized from the deal as interest. The principal, on the other hand, was typically reinvested automatically.

6. In March 2022, Defendants' venture collapsed. FBI agents took Beasley into custody following a shoot-out at his Nevada home. The FBI also issued a call to the public for information about this "slip-and-fall lawsuit Ponzi scheme."[1] Per the *Wall Street Journal*, Beasley confessed to FBI agents during the altercation, admitting that Defendants' venture had been a Ponzi scheme.[2]

7. Plaintiffs are among the many investors who have been defrauded by Defendants, with each investing significant sums of money in Defendants' venture. They bring this action on behalf of themselves and for the benefit of all other similarly situated investors to recoup their investments and to disgorge Defendants of all ill-gotten gains.

**PARTIES**

**I.    Plaintiffs**

8. Plaintiff Barrett Henzel is a citizen and resident of Las Vegas, Nevada, who invested money with Defendants.

9. Plaintiffs Tina Guilder and Anthony Guilder are citizens and residents of Trabuco Canyon, California, who invested money with Defendants.

10. Plaintiff Bryce Bussey is a citizen and resident of Payson, Utah, who invested money with Defendants.

**II.    Defendants**

11. Defendant Jeffrey Judd is a citizen and resident of Nevada, and an owner, officer, or manager of Defendants J & J Consulting Services, Inc., a Nevada corporation; J & J Consulting Services, Inc., an Alaska corporation; and J & J Purchasing, LLC, a Florida limited liability company.

---

[1] *See generally*, Ex. A, Federal Bureau of Investigation, "Seeking Victim Information in Slip-and-Fall Lawsuit Ponzi Scheme Investigation" (hereinafter "FBI Form"), available at: https://forms.fbi.gov/seeking-victim-information-in-slip-and-fall-lawsuit-ponzi-scheme-investigation/ (last accessed Mar. 24, 2022).

[2] B Ex. B, Ben Foldy, "An Alleged Fraud Uncovered by a Short Seller Ends in Gunfire," THE WALL STREET JOURNAL, (Mar. 23, 2022, 12 p.m. ET), at p. 8, (hereinafter "WSJ Article").

12. Defendant J & J Consulting Services, Inc. ("J & J Consulting"), is a Nevada corporation with its principal place of business in Nevada.

13. J & J Consulting Services, Inc. ("J & J Consulting (AK)") is an Alaska corporation with its principal place of business in Nevada.

14. J & J Purchasing, LLC ("J & J Purchasing"), is a Florida limited liability company with its principal place of business in Nevada.

15. Matthew Beasley is a citizen and resident of Nevada, and an owner of Beasley Law Group PC.

16. Beasley Law Group PC is a Nevada professional corporation with its principal place of business in Nevada.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 (codified at 28 U.S.C. § 1332(d)(2)). At least one member of the proposed class is a citizen of a different state than at least one defendant, there are more than one hundred members of the proposed class, and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

18. This Court has general personal jurisdiction over Defendants because J & J Consulting, J & J Consulting (AK), J and J Purchasing, and Beasley Law Group PC all maintain their principal place of business in this District, and because Defendants Judd and Beasley reside in Nevada and at all relevant times have engaged in continuous and systemic business in Nevada, including by committing the tortious acts described in this complaint. Each Defendant is also amenable to service of process under Federal Rule of Civil Procedure 4(e)–(f).

19. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants' unlawful course of conduct occurred in large part in this District

## STATEMENT OF FACTS

### I.      Defendants' Ponzi Scheme

20. In March 2017, Judd, through his company J & J Consulting, began offering would-be investors the opportunity to buy what he styled as "lawsuit settlement contracts" or "settlement

funding contracts."[3] Several years later, Judd continued the same venture under a new business, J and J Purchasing. Despite the shift to this new entity, the venture—and its fraudulent nature—remained fundamentally the same.

21. In describing the venture, Judd claimed that he used "his own money and money from friends and family" to purchase interests in personal-injury plaintiffs' settlements. Upon information and belief, he did this through a separate entity he controlled, J & J Consulting (AK).

22. Judd told investors that Matthew Beasley, a personal injury and family law attorney, would assist him in finding settlement interests to purchase and in writing the contracts he offered investors.

23. Judd had no background in investments; he had previously worked selling pharmaceuticals and home mortgage loans.

24. Judd said he purchased the settlement interests from personal-injury plaintiffs for less than their face value, usually around 25% less, and then realized a profit when the settlement was paid in full. In 2021, Judd claimed that he had made between 16,000 and 20,000 settlement interest purchases, and he had never had one go bad.[4] He pitched the investments not just as "risk-free,"[5] but also "immaculate."[6]

25. Judd and several promoters acting at his direction represented that these contracts were available for purchase in amounts of $80,000 or $100,000, although investors were sometimes able to purchase half of the contract ($40,000 or $50,000, respectively). He promised investors high rates of return: for instance, 12.5% after 90 days, which translated into 50% on annual basis.[7] Further, if the settlement was not paid out within 90 days, Judd promised as much as an additional $5,000 per month. *Id.*

26. As part of the transaction, Defendants purportedly retained the remainder of the profits, including a $5,000 "administration fee" on each investment, which was split between the

---

[3] *See generally,* FBI Form.

[4] WSJ Article at p. 10; *see also* Ex. C, Hindenburg Research, "J&J Purchasing: When It Sounds Too Good To Be True" (hereinafter "Hindenburg Report"), at p. 22.

[5] WSJ Article at p. 10.

[6] Hindenburg Report at p. 24.

[7] *Id.* at p. 23.

personal-injury plaintiff's attorney and Beasley.[8]

27. From the venture's beginning, through as late as December 2021, Judd and Beasley drafted individual investment agreements and presented them to investors for execution in order to confirm their agreement to invest in Defendants' venture. Typically, these agreements contained a barebones statement of the terms. The agreements were called "investor," "buyer," or "letter" agreements, and usually referenced the name of the personal-injury plaintiff whose settlement interest was to be purchased along with the dollar amount that investors were providing.

28. Defendants primarily accepted the investments from business entities. This required some investors to form business entities to make the investments. The entities functioned as pass-throughs for investment capital and any returns earned from it. Defendants required investors to enter the agreements referenced in the preceding paragraph in the name of, and sign on behalf of, their pass-through entities—although drafting errors sometimes resulted in the omission of the entity names from the agreements.

29. Defendants laid out instructions in the contracts for wiring the investment capital to a Wells Fargo Interest on Lawyers' Trust Account ("IOLTA account") belonging to Beasley's law firm, Beasley Law Group PC. Since 2017, over $300 million passed into this account from investors.[9]

30. Defendants required investors to sign non-disclosure agreements encompassing all facts relating to—and even the existence of—the investment agreements.

31. Defendants marketed these investment agreements primarily through a group of individual promoters in Nevada, Utah, and California. Upon information and belief, Judd utilized up to 15 of these promoters.[10] These promoters approached potential investors with whom they shared some common interest, often at their gym or place of worship. Judd directed the promoters' communications. When Judd spoke directly with investors, which was rare, he used the same language and talking points as his promoters.

---

[8] *Id.* at p. 37.
[9] WSJ Article, at p. 12.
[10] Hindenburg Report, at p. 22.

32. Upon information and belief, neither the investments nor the promoters were properly registered with the SEC or FINRA and the promoters were operating as unregistered stockbrokers improperly taking a commission on every investment.

33. Defendants and their promoters lured investors into these contracts by telling them that settlement purchase contracts were scarce and therefore rare and attractive investment opportunities. Investors' funds were usually automatically re-allocated to new purchase contracts once their initial investment had matured.

34. Defendants and their promoters told investors to move on a strict time frame or else miss out on these opportunities. Defendants thus frequently required investors to make additional investments on short notice.

35. Promoters controlled the flow of information from Defendants, including the instructions for making the investment. This was often made explicit in the investment agreements. Sometimes the agreements were executed by these promoters as agents "representing J & J Consulting."

36. The promoters also controlled investors' up-the-chain communications with Defendants and generally discouraged direct contact with Defendants.

37. Investors, therefore, remained in the dark on the details and management of their investments, including the nature of Defendants' venture.

38. In late 2021, however, Defendants made changes intended to increase the appearance of transparency and legitimacy from the outside.

39. Defendants shifted their operations from J & J Consulting to a newly formed Florida entity, J and J Purchasing, and had attorneys draft a 30-page "Confidential Private Placement Memorandum" and other related documents purporting to offer investors more details—and caveats—about the venture. Defendants also standardized the investment agreements and presented them to investors, through their promoters, often via DocuSign.

40. But, in several material aspects, Defendants' moves reduced transparency. For example, investors were given fewer details about the settlements purportedly tied to their investments. Defendants now provided investors with only the personal-injury plaintiff's last name, if that—

1    and not his or her location or the names of the lawyers who represented that plaintiff.

2    41. Defendants also adjusted their model to make it easier to invest. For instance, they billed

3    the fund as now using a "subscription" model, which made investments automatically

4    renewable after the first 90 days and permitted investors to keep their money in the fund

5    indefinitely. Defendants also dropped the requirement of investors' needing to pass investments

6    through a business entity.

7    42. In private conversations with investors, Judd remarked that these changes were

8    necessary because the work of managing the investors had become too much to handle. He also

9    suggested that it was necessary for the venture to clean up appearances in case regulators looked

10   into its operations. For example, he said that abandoning J & J Consulting in favor of J and J

11   Purchasing was necessary because the former entity's name suggested he was offering

12   investment advice.[11]

13   43. But Judd did not tell his investors what was actually prompting these actions: The FBI

14   had begun an investigation into Defendants on suspicion that they had been running a Ponzi

15   scheme.

16   44. The FBI's involvement apparently sprang from the efforts of a Wall Street firm that

17   specializes in detecting fraud in publicly traded companies, as well as Ponzi schemes.[12] Its

18   owner, Nate Anderson, had received a tip from a financial professional working with several

19   investors.[13] His curiosity piqued, Anderson undertook a sting operation to uncover potential

20   fraud by Defendants.[14] Using a high-school classmate of Judd's posing undercover as a potential

21   investor, he recorded conversations with Judd and his promoters about the scheme and then

22   tipped off federal authorities.[15]

23   45. Judd learned about the FBI's efforts as early as late fall 2021, when his promoters were

24   claiming to have collected over $400 million from over 1,000 investments.[16]

---

25   [11] *Id.* at p. 23
26   [12] WSJ Article at p. 12.
27   [13] *Id.*
     [14] *Id.*; Anderson's findings are collected at Hindenburg Report.
28   [15] WSJ Article at pp. 10-13.
     [16]*See* Hindenburg Report at p. 24.

---

46. In early 2022, federal law enforcement agents visited the home of Beasley to question him about Defendants' Ponzi scheme.[17] Beasley answered the door standing sideways, then turned to reveal a gun pressed against his own head.[18] When he pointed his gun at the agents, they shot him twice.[19] Beasley ran inside, which began a stand-off that required the intervention of a hostage negotiator.[20] During this time, Beasley confessed that the investment agreement were a Ponzi scheme and that it would be clear from his IOLTA account records. Eventually a SWAT team raided the home, and he was taken into federal custody.[21]

47. Upon learning this news, investors began their own investigations into Defendants' venture in attempt to assuage their fears that their capital had never gone towards the purchase of personal-injury settlement interests, but instead had been used to pay interest promised to earlier investors—and had been pocketed by Defendants. For some investors, these fears were confirmed when they contacted attorneys listed in their earlier investment agreements and learned that those attorneys had no knowledge or recollection of working with Beasley or Judd, or otherwise had never heard of the personal-injury plaintiffs Defendants said they purchased settlement interests from. One attorney who was contacted said he had no dealings with Beasley—but remembered him from law school.

48. At Beasley's initial court hearing on the charge of assaulting a federal officer, Assistant U.S. Attorney Tony Lopez, Chief of the Department of Justice's White Collar Crime Section, stated that since as early as 2017, Defendants' Ponzi scheme had taken in over $300 million from investors through the IOLTA account. Yet Beasley claimed he had only about $40,000 in the bank account at the time of his arrest, and bank statements reviewed by the U.S. attorney showed daily balances of just $3-4 million.[22]

49. At the hearing, Lopez also stated that Beasley had acquired significant assets in the recent

---

[17] WSJ Article at pp. 7-8.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] Ex. D, Tr. of Initial Hr'g Mar. 8, 2022, *United States v. Matthew Wade Beasley*, Case No. 2:22-MJ-00171-EJY (D. Nev.) (hereinafter "Beasley Hearing Tr."), at p. 63.

years: at least \$7,500,000 in real estate, and numerous luxury vehicles. Similarly, per Anderson's Report and the Wall Street Journal, Judd purchased several multi-million-dollar properties, luxury vehicles, and even a \$5,000,000 private jet in the past several years.[23]

50. Promoters confessed to investors that their funds could be at risk, and that they were likely victims of a Ponzi scheme.[24]

**II.    Plaintiffs' Facts**

<u>Plaintiff Barrett Henzel</u>

51. Between December 2019 and March 2022, when Defendants' scheme was exposed, Plaintiff Barrett Henzel invested \$400,000 into Defendants' venture, using Henzelhaus, LLC, a Nevada limited liability company that Henzel owns jointly with his wife.

52. Henzel learned of the opportunity to invest in Defendants' venture from a friend who had known Judd since college and who had promoted the venture to others on Judd's behalf.

53. On or about December 9, 2019, per Defendants' promoter's instructions, Henzel wired \$70,000 to fund his initial investment. The promoter told Henzel that his money would purchase 70% of a \$100,000 purchase contract, and that he would receive a 12.5% return on his investment in 90 days. Subsequently, Henzel funded a total of \$300,000 more in additional investments, also to purportedly purchase interests in personal-injury settlements.

54. Throughout his dealings with the venture, Henzel was typically instructed to wire investment funds directly to Beasley's IOLTA account.

55. To date, Henzel received payments of approximately \$296,250 as purported returns on his investments. The losses Henzel has incurred have caused hardship to Henzel and his family.

<u>Plaintiffs Tina and Anthony Guilder</u>

56. Between November 2019 and March 2022, the Guilder Plaintiffs invested \$2,100,000 on behalf of themselves and their family members, including through TTT Partners, LLC dba T&T Partners, a California limited liability company, of which Tina Guilder is the sole owner and of which Anthony Guilder is the manager.

---

[23] *Id.; see also* Hindenburg Report at pp. 43-44.
[24] *See* FBI Form.

57. Plaintiffs Tina and Anthony Guilder were friendly with others in their California community who had invested in Defendants' venture. In November 2019, they were introduced to a promoter who worked directly with Jeffrey Judd to solicit and process investments.

58. On or about November 29, 2019, per Defendants' promoter's instructions, the Guilder Plaintiffs wired funds for their initial investment of $100,000. The promoter told them this would purchase a $100,000 purchase contract, and that they would receive a 10% return on their investment in 90 days. Subsequently, the Guilder Plaintiffs funded in total an additional $2,000,000 in investments, also to purportedly purchase interests in personal-injury settlements.

59. Throughout their dealings with Defendants venture, the Guilder Plaintiffs were typically instructed to wire investment funds directly into Beasley's IOLTA account.

60. To date, the Guilder Plaintiffs have received payments of approximately $940,000 as purported returns on their investments. The losses that the Guilders have incurred have caused hardship for the Guilders and their family.

### Bryce Bussey

61. Between May 2020 and March 2022, when Defendants' scheme was exposed, Plaintiff Bryce Bussey invested $1,340,000 of his money, and that of his family and friends, in Defendants' venture.

62. Plaintiff Bussey was connected to one of the promoters of Defendants' venture by an acquaintance who had invested into it as well.

63. On or about May 12, 2020, per Defendants' promoter's instructions, Bussey wired $40,000 to fund his initial investment. The promoter told Bussey that his money would purchase half of an $80,000 purchase contract, and that he would receive a 6.25% return on his investment in 90 days. Subsequently, Bussey funded $700,000 in additional investments, also to purportedly purchase interests in personal-injury settlements. Bussey also assisted family and friends in investing $600,000 of their own funds in Defendants' venture.

64. All of Bussey's investments with Defendants were made in Bussey's name and through DIY CEO LLC, a Wyoming limited liability company of which Bussey is the sole owner.

65. Throughout his dealings with the venture, Bussey was typically instructed to wire

---

investment funds directly to Beasley's IOLTA account.

66. To date, Bussey has not recouped any of the principal investment amount for his own investments, nor those made on behalf of family and friends. This has caused hardship for Bussey and his family.

67. To date, Bussey has received payments of approximately $239,875 as purported returns on his personal investments, and payments of approximately $91,125 as purported returns on the investments made on behalf of family members and friends. The losses that Bussey has incurred have caused hardship for Bussey and his family.

### TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

68. Plaintiffs and the proposed class did not and could not have discovered the facts constituting Defendants' fraud and unlawful conduct until March 4, 2022, the day after charges against Beasley were filed following the FBI shootout, and the day the FBI victim bulletin was published[25].  Plaintiffs then retained counsel.

69. Until then, Plaintiffs and class members received information from Defendants that Defendants used to fraudulently conceal their unlawful conduct, and which purported to establish legitimate investment activity.

70. Because Plaintiffs and class members could not have reasonably discovered the facts constituting Defendants' unlawful conduct until March 4, 2022, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

### CLASS ACTION ALLEGATIONS

71. Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all persons and entities who invested money with J and J Purchasing or J & J Consulting. Excluded from the class are all Defendants; all members of the immediate families of any Defendant; all employees and agents of any Defendant; and any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons.

72. The class satisfies the requirements of Rule 23(a), as well as 23(b)(1)(B) and 23(b)(3).

---

[25] Beasley Hearing Tr. at p. 57.

73. <u>Numerosity</u>. The members of the class are so numerous that joinder of all members is impracticable. The size of the class, which is estimated to consist of hundreds if not thousands of individuals and business entities, can only be ascertained through discovery. Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

74. <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the members of the class as all members of the class are similarly affected by Defendants' wrongful conduct.

75. <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the members of the class and have retained counsel competent and experienced in class action and financial fraud litigation.

76. <u>Commonality and Predominance</u>. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions solely affecting individual members of the proposed class. The questions of law and fact common to the class include:

   a. Whether Defendants owed fiduciary duties to the Plaintiffs and the proposed class;

   b. Whether Defendants breached their fiduciary duties (or aided and abetted the breaching of others' fiduciary duties) to Plaintiffs and the proposed class;

   c. Whether Defendants operated a pyramid scheme within the meaning of NRS § 598.100;

   d. Whether Defendants misrepresented the nature of their business venture;

   e. Whether Defendants failed to disclose and concealed information about the nature of their business venture;

   f. Whether Defendants' misrepresentations and omissions were material;

   g. Whether Defendants' actions amounted to a civil conspiracy under the law;

   h. Whether Defendants' conduct constitutes the unlawful conversion of Plaintiffs' and class members' personal property;

   i. Whether and to what extent the class was damaged by Defendants' unlawful and fraudulent conduct; and

      j. Whether and to what extent Defendants have been unjustly enriched at the expense of Plaintiffs and the class.

77. <u>Superiority</u>. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Even if class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same fraudulent scheme, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

78. In the alternative, the proposed class may be certified because: (a) the prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications; (b) the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the proposed class, thereby making appropriate final and injunctive relief with respect to the members of the proposed class as a whole.

**CAUSES OF ACTION**

**<u>Count I</u>**

***Breach of Fiduciary Duty***

**(Against Defendants Jeffrey Judd, J & J Consulting, J and J Purchasing,**

**Matthew Beasley, and Beasley Law Group PC)**

79. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

80. Defendants named in this Count owed a fiduciary duty to Plaintiffs and the class. They

fostered a special relationship with Plaintiffs and the members of the class that engendered fiduciary duties of loyalty, care, honesty and good faith. They had a duty to act for the benefit of Plaintiffs and the members of the class upon matters within the scope of their special relationship with Plaintiffs and the members of the class. They undertook to act, agreed to act, and acted as trustee for the benefit of Plaintiffs and members of the class.

81. Specifically, as custodians of investor funds and fundraisers for the purported investment venture, Defendants Jeffrey Judd, J & J Consulting, and J and J Purchasing had a duty to take Plaintiffs' and members of the class's money and use it to purchase interests in personal-injury settlements, and to collect payments from those settlements and deliver money to Plaintiffs and members of the class. Beasley and Beasley Law Group, as holders of the IOLTA Account, were custodians of investor funds, were holding funds in trust, and were thus bound to act for the benefit of Plaintiffs and the class.

82. Plaintiffs and members of the class reposed their trust and confidence in Defendants.

83. Defendants undertook such trust and assumed a duty to advise, counsel, and protect Plaintiffs and the class.

84. The Defendants breached their fiduciary duty to Plaintiffs and the class.

85. Defendants prompted Plaintiffs and the class to send investments into the IOLTA Account where the funds would be held in trust and used solely for the purpose of purchasing interests in personal-injury settlements. Defendants perpetrated a scheme through which Defendants misappropriated, commingled, and otherwise misused investor funds and otherwise acted as alleged above in violation of their fiduciary duties to investors, including Plaintiffs and the class. Instead of protecting the funds invested by Plaintiffs and the class, the Defendants caused or allowed to be caused, the misappropriation, diversion, and misuse of the funds.

86. As a direct and proximate cause of the breaches of fiduciary duty by the Defendants, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including damages and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs,

and all other relief deemed fair and just.

## Count II

### *Aiding and Abetting Breach of Fiduciary Duty*

**(Against Defendants Jeffrey Judd, J & J Consulting, J and J Purchasing,**

**Matthew Beasley, and Beasley Law Group PC)**

87. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

88. Defendants breached their fiduciary duties to Plaintiffs and the members of the class as set forth above.

89. In the alternative, to the extent any Defendants are found not to have directly owed and breached fiduciary duties to Plaintiffs of the class, those Defendants knew that the Defendants who owed fiduciary obligations to Plaintiffs and the class were breaching those obligations by engaging in the conduct alleged above.

90. With such knowledge, Defendants assisted in the breaches of fiduciary duty. Defendants assisted in prompting Plaintiffs and the class to send investments into the IOLTA Account where the funds would be held in trust and used solely for the purpose of purchasing interests in personal-injury settlements. Defendants assisted in perpetrating the scheme through which Defendants misappropriated, commingled, and otherwise misused investor funds and otherwise acted as alleged above in violation of fiduciary duties to investors, including Plaintiffs and the class. Defendants' assistance contributed to the misappropriation, diversion, and misuse of the funds.

91. As a direct and proximate cause of Defendants' aiding and abetting these breaches of fiduciary duty, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including damages and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

**Count III**

*Fraud*

**(Against Defendants Jeffrey Judd, J & J Consulting,**

**J and J Purchasing, Matthew Beasley, and Beasley Law Group)**

92. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

93. As set forth above, Defendants named in this Count perpetrated a fraud upon Plaintiffs and members of the class through materially false and misleading statements and omissions that misled Plaintiffs and the members of the class to believe they were investing in personal-injury settlements. Defendants knew these statements and omissions to be false.

94. Among other fraudulent conduct, Defendants made or participated in the making of the following misrepresentations and omissions:

   a. through a uniform PPM, falsely told Plaintiffs and members of the class that their investments would be used to purchase interests in personal-injury settlements;

   b. falsely promised returns on their investments;

   c. concealed from Plaintiffs and members of the class that they were operating a Ponzi scheme by, among other unlawful acts, commingling investor funds and paying earlier investors with funds obtained from later investors; and

   d. concealed from Plaintiffs and members of the class that Defendants misappropriated and misused millions of investor funds for improper purposes.

95. In addition, by breaching their fiduciary duties to Plaintiffs and members of the class and not disclosing such breaches, Defendants are liable for constructive fraud.

96. Plaintiffs and members of the class reasonably relied to their detriment upon these misrepresentations and omissions when they invested with Defendants.

97. As a direct and proximate cause of the fraud by Defendants, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including damages, punitive damages, and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs,

and all other relief deemed fair and just.

### Count IV

*Civil Conspiracy*

**(Against all Defendants)**

98. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

99. Defendants named in this Count agreed to unlawfully and unjustly perpetrate a scheme in which they solicited Plaintiffs and members of the class to provide Defendants with millions of dollars by creating the false appearance through materially false and misleading statements and omissions that Plaintiffs and members of the class were investing in personal-injury settlements.

100. In furtherance of the conspiracy and in pursuit of the object of conspiracy, Defendants drafted and executed numerous agreements creating the false appearance that Plaintiffs and members of the class were investing in personal-injury settlements, when in truth and in fact those funds were misappropriated to unjustly enrich Defendants.

101. In furtherance of the conspiracy, Defendants solicited investors to transfer millions of dollars to Defendants to fund the purchase of interests in personal-injury settlements, when they well knew that the investors' funds would be misappropriated by Defendants to unjustly enrich themselves and their coconspirators.

102. As a direct and proximate cause of Defendants' civil conspiracy, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including damages, punitive damages, and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

//

//

## Count V

### *Unjust Enrichment*

### (Against Defendants Jeffrey Judd, J & J Consulting,

### J and J Purchasing, Matthew Beasley, and Beasley Law Group)

103.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

104.     Defendants named in this Count received and maintained the funds of Plaintiffs and members of the class in a trust account. The trust account was used to carry out the Ponzi scheme.

105.     The funds held by Defendants and used to further the scheme belonged to Plaintiffs and the members of the class. Defendants used such funds to make false distributions and take profit. Thus, Plaintiffs and members of the class conferred benefits upon the Defendants in the form of deposits from which Defendants generated income and profits.

106.     Defendants knowingly and voluntarily accepted, and retained, the deposits and those benefits.

107.     It would be inequitable for Defendants to retain the benefits they generated from monies of Plaintiffs and the members of the class.

108.     As a direct and proximate result of the above-described conduct of Defendants, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including disgorgement of Defendants' ill-gotten gains and restitution, plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

## Count VI

### *Conversion*

### (Against Defendants Jeffrey Judd, J & J Consulting,

### J and J Purchasing, Matthew Beasley, and Beasley Law Group)

109.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

110.     The above-described acts of Defendants were intentional and resulted in serious interference with the personal property rights of Plaintiffs and members of the class.

111.     Defendants exercised dominion and control over Plaintiffs' personal property, namely their investment funds, by converting the same to their own use.

112.     Defendants are not the rightful owners of the personal property of Plaintiffs and members of the class.

113.     Defendants' intentional acts directly and proximately caused the conversion of the personal property of Plaintiffs and members of the class.

114.     As a direct and proximate result of the above-described conduct of Defendants, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including damages and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

## Count VII

### *Equitable Accounting*

**(Against J & J Consulting, J and J Purchasing, and Beasley Law Group)**

115.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

116.     Defendants J & J Consulting and J and J Purchasing had a fiduciary relationship and/or were in contractual privity with Plaintiffs and members of the class.

117.     Defendants J & J Consulting and J and J Purchasing entered into and were participants in complex transactions as set forth above.

118.     Plaintiffs demand an accounting of the accounts related to these complex transactions and of the accounts related to Defendants J & J Consulting and J and J Purchasing.

119.     For purposes of this Count, Plaintiffs allege, in the alternative to the other Counts asserted in this complaint, Plaintiffs lack a full and adequate remedy at law. Plaintiffs, on behalf of themselves and all similarly situated individuals and entities, therefore demand an accounting of the Beasley IOLTA, all of Defendants J & J Consulting and J and J Purchasing's

foreign and domestic accounts, and for such further relief as is fair and just.

### Count VIII

*Violation of NRS 41.600*

**(Against Defendants Jeffrey Judd, J & J Consulting,**

**J and J Purchasing, Matthew Beasley, and Beasley Law Group)**

120.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

121.    Nevada Revised Statue ("NRS") 598.0923(2) provides that it is a deceptive trade practice for any person to knowingly, in the course of their business and profession, "[f]ail[] to disclose a material fact in connection with the sale or lease of goods or services." NRS 598.023(3) provides that it is a deceptive trade practice for a person to knowingly, in the course of their business and profession, "[v]iolate[] a state or federal statute or regulation relating to the sale or lease of goods or services."

122.    NRS 598.100 defines a "pyramid promotional scheme" as

[A]ny program or plan for the disposal or distribution of property and merchandise or property or merchandise by which a participant gives or pays a valuable consideration for the opportunity or chance to receive any compensation or thing of value in return for procuring or obtaining one or more additional persons to participate in the program, or for the opportunity to receive compensation of any kind when a person introduced to the program or plan by the participant procures or obtains a new participant in such a program.

123.    NRS 598.110 provides that "[e]very person who contrives, prepares, sets up, proposes, operates, advertises or promotes any pyramid promotional scheme or endless chain commits a deceptive trade practice" under NRS 598.0923(3).

124.    Based on the facts stated herein, Defendants named in this Count knowingly operated a pyramid promotional scheme under NRS 598.100, which they used to sell illusory goods and services to Plaintiffs and class members. Defendants operated this scheme in the course of their business and/or profession. Accordingly, Defendants violated NRS 598.0923(3).

---

CLASS ACTION COMPLAINT - 21

125.     Additionally, Defendant knowingly concealed material facts regarding the transactions in question, *i.e.*, they failed to disclose the true nature of the scheme and its means of raising revenue. Defendants' concealment came in the course of their business and/or profession. Accordingly, Defendants violated NRS 598.0923(2).

126.     NRS 41.600(2)(e) provides that a person commits "consumer fraud" when violating, inter alia, NRS 598.0923(2)-(3). Accordingly, Plaintiffs and class members are all "victims of consumer fraud" as contemplated by NRS 41.600(1).

127.     Plaintiffs and the class seek to recover all available remuneration, including damages and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, reasonable attorney's fees, and all other relief deemed fair and just.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court enter a judgment awarding the following relief:

a.  An order certifying the proposed class and appointing the undersigned counsel as class counsel;

b.  An award of actual damages, compensatory damages, statutory damages, restitution, punitive damages, and all other forms of monetary relief provided for or made available by law or equity;

c.  An award of Plaintiffs' reasonable attorneys' fees and litigation costs;

d.  An order commanding Defendants to submit to an accounting of Defendants' accounts; and

e.  Such other and further relief as this Court may deem just and proper.

//

//

//

---

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury as to all issues so triable.

Dated: March 25, 2022.,                    Respectfully submitted,


                                           /s/ Miles N. Clark
                                           Miles N. Clark, Esq.
                                           Nevada Bar No. 13848
                                           **KNEPPER & CLARK LLC**
                                           5510 S. Fort Apache Rd., Suite 30
                                           Las Vegas, NV 89148-7700
                                           Phone: (702) 856-7430
                                           miles.clark@knepperclark.com

                                           Eric H. Gibbs (*will comply with LR
                                           IA 11-2 within* 14 *days*)
                                           David K. Stein (*will comply with LR
                                           IA 11-2 within 14 days*)
                                           Iudis Sominskaia (*will comply with LR
                                           IA 11-2 within 14 days*)
                                           **GIBBS LAW GROUP LLP**
                                           505 14th Street
                                           Oakland, California 94612
                                           ehg@classlawgroup.com
                                           ds@classlawgroup.com
                                           ids@classlawgroup.com

                                           Scott L. Silver (*will comply with LR IA
                                           11-2 within 14 days*)
                                           **SILVER LAW GROUP**
                                           11780 W. Sample Road
                                           Coral Springs, Florida 33065
                                           (954) 755-4799
                                           ssilver@silverlaw.com

                                           *Counsel for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT - 23

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Barrett Henzel; Bryce Bussey; Tina Guilder; and Anthony Guilder, on behalf of themselves and all others | Jeffrey Judd; J&J Consulting Services, Inc.; J&J Consulting Services, Inc.; J&J Purchasing, LLC; Matthew Beasley; and |

**(b)** County of Residence of First Listed Plaintiff    Clark County, Nevada
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Clark County, Nevada
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment

Attorneys *(If Known)*

Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability   Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel &   [ ] 367 Health Care/ | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | Slander   Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'   Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability   [ ] 368 Asbestos Personal [ ] 340 Marine   Injury Product | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 345 Marine Product   Liability Liability   **PERSONAL PROPERTY** | | [ ] 840 Trademark [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle   [x] 370 Other Fraud | **LABOR** | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle   [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | Product Liability   [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 360 Other Personal   Property Damage Injury   [ ] 385 Property Damage | Relations [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| | [ ] 362 Personal Injury -   Product Liability Medical Malpractice | [ ] 751 Family and Medical Leave Act | [ ] 863 DIWC/DIWW (405(g)) [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts [ ] 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation [ ] 791 Employee Retirement | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights   **Habeas Corpus:** | Income Security Act | | [ ] 896 Arbitration |
| [ ] 220 Foreclosure | [ ] 441 Voting   [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/   Sentence Accommodations   [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities -   [ ] 535 Death Penalty | | | |
| [ ] 290 All Other Real Property | Employment   **Other:** | **IMMIGRATION** | | |
| | [ ] 446 Amer. w/Disabilities -   [ ] 540 Mandamus & Other Other   [ ] 550 Civil Rights | [ ] 462 Naturalization Application [ ] 465 Other Immigration | | |
| | [ ] 448 Education   [ ] 555 Prison Condition [ ] 560 Civil Detainee -   Conditions of Confinement | Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(d)(2)

Brief description of cause:
Fraud and other allegations

## VII. REQUESTED IN COMPLAINT:

[x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
03/25/2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Miles N. Clark

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

Eric H. Gibbs (pro hac vice forthcoming)
David K. Stein (pro hac vice forthcoming)
Iudis Sominskaia (pro hac vice forthcoming)
GIBBS LAW GROUP LLP
505 14th Street
Oakland, California 94612
(510) 350-9700
ehg@classlawgroup.com
ds@classlawgroup.com
ids@classlawgroup.com

Scott L. Silver (pro hac vice forthcoming)
SILVER LAW GROUP
11780 W. Sample Road
Coral Springs, Florida 33065
(954) 755-4799
ssilver@silverlaw.com

Miles N. Clark, Esq.
Nevada Bar No. 13848
KNEPPER & CLARK LLC
5510 S. Fort Apache Rd., Suite 30
Las Vegas, NV 89148-7700
(702) 856-7430
miles.clark@knepperclark.com

*Counsel for Plaintiffs and Proposed Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT INDEX**

EXHIBIT A - Federal Bureau of Investigation, "Seeking Victim Information in Slip-and-Fall Lawsuit Ponzi Scheme Investigation" ...............................................................................1

EXHIBIT B - An Alleged Fraud Uncovered by a Short Seller Ends in Gunfire," The Wall Street Journal ...................................................................................................................6

EXHIBIT C - Hindenburg Research, "J&J Purchasing: When It Sounds Too Good Too Be True" ...........................................................................................................................17

EXHIBIT D - Tr. of Initial Hr'g, Mar. 8, 2022, United States v. Matthew Wade Beasley, Case No. 2:22-MJ-00171-EJY (D. Nev.) .................................................................................54

# EXHIBIT A

Federal Bureau of Investigation, "Seeking Victim Information in Slip-and-Fall Lawsuit Ponzi Scheme Investigation"

t required

lespeople described the contracts as scarce and led buyers to believe they may not be able to immediate
est

restors were asked to verbally commit to a purchase between Thursday and Sunday and were required to
oney to the organization the following Monday or Tuesday

restors were asked to wire money to a company IOLTA (interest on lawyers' trust account)

restors were asked to set up an LLC to collect their return

restors were introduced to the scheme by persons who shared the same faith, hobbies, gym memberships

**elieve you were a victim of this scheme, please fill out the below questionnaire.**

now of someone else who may have been affected, please encourage them to complete the form themsel

sponses are voluntary but may be useful in the federal investigation and to identify potential victims. It ma
 have already given this information to an FBI agent, but please provide it again on this questionnaire. Ba
ponses provided, you may be contacted by the FBI.

**re information, visit fbi.gov/LVPonziScheme.**

---

**ACT INFORMATION**

**Name** ●

---

**e Name**

---

**Name** ●

---

**of Birth** *(mm/dd/yyyy)*

---

**Contact Number** ●

---

**Address** ●

---

**ess Line 1**

---

**ess Line 2**

**rson**

**e calls**

**messages**

**ls**

**ical mail (e.g., through USPS)**

**first contacted you about the contract?** *(List name of organization and/or individual as well as any kno*
*information)*

ers remaining

**u were introduced to additional points of contact related to this contract, please provide details.** *(L*
*f organization and/or individual as well as any known contact information)*

ers remaining

v were you introduced to this additional point of contact?

**rson by original point of contact**

**mail by original point of contact**

**ocial media by original point of contact**

**ional point of contact introduced themselves**

**pplicable**

**de a brief description of the contract and any changes.**

d States Postal Service

mercial carrier (FedEx, UPS, etc.)

.

pplicable

---

did you receive any disbursements of earnings or interest?

k

ronic funds transfer

wire transfer

.

---

at was the total amount of any returns you received? *(In U.S. dollars)*

---

en did you receive your return(s)? *(List all dates in mm/dd/yyyy format)*

---

you have any supporting documentation you would be willing to provide to law enforcement? *(e.g., copies*
*d checks, bank statements, wire transfer receipts, promissory notes, and written or email communication*
*g envelopes) received from individuals and companies regarding your investment this contract.)*

---

you willing to be further interviewed by law enforcement as a part of this investigation?

---

at happened to you because of this situation? *(Select all that apply)*

me insolvent

for bankruptcy

red loss of a retirement, education, or other savings or investment fund

changes to my employment (such as postponing retirement plans)

changes to my living arrangements (such as relocating to a less expensive home)

red harm to my ability to obtain credit

pplicable

## Privacy Act Statement

is authorized to collect the information on this form by one or more of the following provisions: Title 28, U
Code, sections 533 and 534; Title 28, Code of Federal Regulations, section 0.85; and the Attorney Genera

# FEDERAL BUREAU
# OF INVESTIGATION



# EXHIBIT B

An Alleged Fraud Uncovered by a Short Seller Ends in
Gunfire," The Wall Stree Journal

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/an-alleged-fraud-uncovered-by-a-short-seller-ends-in-gunfire-11648051215

◆ WSJ NEWS EXCLUSIVE | FINANCE

# An Alleged Fraud Uncovered by a Short Seller Ends in Gunfire

FBI standoff with lawyer is climax to citizen sting operation in a rented private jet



A SWAT team was called to the home of Matthew Beasley this month.
PHOTO: BIZUAYEHU TESFAYE/LAS VEGAS REVIEW-JOURNAL

*By* *Ben Foldy* Follow

March 23, 2022 12:00 pm ET

Matthew Beasley wasn't surprised when three FBI agents rang his doorbell.

Authorities were asking questions about a high-return, zero-risk investment plan that his law firm helped run. They had already visited an associate.

They also had secret recordings of the sales pitch from a citizen sting operation that involved an embittered improv comedian, a rented private jet and a well-known New York investment firm.

Mr. Beasley came to the front door of his Las Vegas home standing sideways. When he turned to face the agents, he was holding a gun to his head.

Then he swung the gun toward the agents, a federal prosecutor said during a court hearing earlier this month. The agents shot him twice, the prosecutor said. Mr. Beasley

retreated into his house.

The Federal Bureau of Investigation brought in a hostage negotiator. Mr. Beasley said he wished the agents had killed him—he said he would rather die than go to prison, the prosecutor said.



Las Vegas lawyer Matthew Beasley, charged with assaulting a federal officer.

Bleeding from gunshot wounds in his chest and shoulder, he confessed: The investments were a Ponzi scheme, according to the prosecutor. Check his bank records, Mr. Beasley said, and it will all be clear.

After nearly four hours, an FBI SWAT team brought Mr. Beasley out alive.

He was charged with assaulting a federal officer. He hasn't been charged with any financial improprieties. The FBI continues to investigate the alleged Ponzi scheme,

**8**

according to people familiar with the matter.

A lawyer representing Mr. Beasley declined to comment. He told a judge on March 8 that Mr. Beasley's actions pointed to remorse and a "one-time, extreme emotional crisis."

Individuals allegedly put in hundreds of millions of dollars for what were described as high-reward, low-risk contracts to fund loans tied to personal-injury lawsuits through two companies, J&J Purchasing and J&J Consulting Services, according to secretly recorded conversations with marketers and the companies' president, Jeffrey Judd. The money was wired to a bank account controlled by Mr. Beasley's law firm on behalf of the two companies, according to investment documents.

Neither J&J nor Mr. Judd has been accused of wrongdoing by prosecutors.

"The events surrounding attorney Beasley are both perplexing and shocking," said Nick Oberheiden, a lawyer representing Mr. Judd. His client will investigate what happened and expose those who sabotaged his operation, Mr. Oberheiden said.

J&J Consulting and the company's investors were victims of Mr. Beasley, said Kevin Anderson, a lawyer representing the company in civil matters.

In recent years, Messrs. Beasley and Judd and entities and trusts connected to them have acquired a private jet, millions of dollars worth of real estate in Nevada and Utah and top-end cars including a Rolls-Royce Dawn, two Bentley Continental GTs, a Porsche Taycan, an Aston Martin Vantage and a $500,000 RV. Mr. Judd's lawyer declined to comment on the acquisitions.



The private plane Mark Holt said he used to meet with marketers for J&J in February.
PHOTO: NIKI CHAN WYLIE FOR THE WALL STREET JOURNAL

The strategy promoted by Mr. Judd was "the most obvious Ponzi scheme we've ever seen," said Nate Anderson, founder of the investment firm that investigated it. In a notice seeking out victims of the alleged fraud, the FBI also called it a Ponzi scheme. Ponzi schemes are investment frauds where early investors are paid with funds raised from later investors. The money raised is generally not invested.

Mr. Anderson's Hindenburg Research is a Wall Street firm that investigates potential frauds at public companies and bets that their shares will decline.

The firm also raised questions about electric-truck company Nikola Corp. Among other things, it revealed Nikola had rolled a truck downhill in a video to make it appear to be a functioning vehicle. Nikola paid a $125 million fine related to the allegations and neither admitted nor denied wrongdoing.

Mr. Anderson got his start in fraud research investigating Ponzi schemes, including working with Harry Markopolos, who warned regulators for years about Bernard Madoff's multibillion-dollar fraud but was largely ignored.



Hindenburg Research founder Nate Anderson in 2020.

PHOTO: JOHNNY MILANO FOR THE WALL STREET JOURNAL

Like Mr. Madoff's fraud, the returns here seemed too good to be true. J&J said it made short-term loans to people awaiting payouts from settled personal-injury lawsuits, according to recorded conversations, documents, interviews with prospective investors and a court hearing following Mr. Beasley's arrest.

The contracts were said to provide a 12.5% payout after a loan was repaid in 90 days. They were sold as risk-free. "We've never had one—over 16,000 in six-plus years—go bad," said Mr. Judd in a pitch secretly recorded by Hindenburg in February.

Case 22-01061-mkn Doc 73 Entered 04/01/22 07:36:00 Page 78 of 173

Investors, the majority of them Mormons living across the Western U.S., usually heard about J&J from family and friends. They were connected to marketers, who solicited investments in increments of $80,000 and $100,000 into the J&J entities. Investors signed nondisclosure agreements, J&J documents and correspondence with marketers show.



Jeffrey Judd in his Rolls Royce Dawn.

Mr. Judd and several of the marketers also identified as Mormons. In one taped chat, a marketer said he thought of spreading the investment opportunity as a way to build up the church.

Neither Mr. Beasley nor Mr. Judd has a background in finance. Mr. Beasley practiced family law and civil litigation, according to a former colleague. Mr. Judd did pharmaceutical sales.

11

Case 22-01061-mkn Doc 13 Entered 04/01/22 07:36:03 Page 79 of 173

Since 2017, more than $300 million moved into the bank account at Mr. Beasley's law firm that was associated with J&J, prosecutors said.

In January, Hindenburg received a tip from an accountant who said several clients had invested in J&J. One provided investment documents. Mr. Anderson decided to investigate.

J&J's investments were private, so Hindenburg couldn't profit by betting against them. The firm has filed a whistleblower complaint with the Securities and Exchange Commission, putting it in line to get paid if the government collects a significant penalty.

The firm set up a sting operation to get Mr. Judd, who rarely met with investors, on tape promoting the investment strategy. A Hindenburg partner knew a high-school classmate of Mr. Judd's. The classmate, Mark Holt, didn't know Mr. Judd, but the two men had dozens of mutual friends on Facebook. They had dated the same woman, Mr. Holt said.

For Mr. Holt, fraud hits close to home. More than a decade ago, Mr. Holt gave money to a man who said his investment in Canadian oil wells would yield 25% returns as long as the price of oil stayed above $30 a barrel.

**12**



Mark Holt, who said he drew on experience in improv comedy to portray a prospective investor in J&J.

PHOTO: NIKI CHAN WYLIE FOR THE WALL STREET JOURNAL

After he got his initial returns as promised, Mr. Holt recommended the investment to his mother. She put a significant amount of her savings in. The man disappeared a few months later.

"There was guilt and shame and regret, all mixed together with bitterness," Mr. Holt said. "It's a victimization that never stops."

Mr. Holt, a former tech executive who now runs a private-jet charter company, told the J&J marketers he had a large sum to invest. He flew to Las Vegas on a chartered private jet secretly wired by Hindenburg with microphones and cameras to meet with J&J marketers.

Case 22-01061-mkn Doc 13 Entered 04/01/22 09:26:00 Page 81 of 173

In the meeting, he said he drew on his business experience but also a decade's worth of improv comedy.

"I was creating an improv scene with people who didn't know they were in a scene," he said. "I was a little concerned I'd come off as too sophisticated, but turns out playing dumb wasn't that hard."

All of the men left the jet and were standing on the tarmac. One of the marketers, discussing the reactions they have gotten to their offer, said, "You know, we've had some people say it's a Ponzi scheme," according to a recording of the conversation.



Interior of the private jet where Mark Holt said his meeting with the J&J marketers took place.
PHOTO: NIKI CHAN WYLIE FOR THE WALL STREET JOURNAL

After the meeting on the plane, Mr. Judd agreed to a call with Mr. Holt. On the secretly taped call, the two men discussed their mutual friends, Mr. Judd's recent purchase of a private jet and the particulars of the J&J investment. Mr. Judd made several of the same representations the marketers had made. He said on the call that he ran J&J himself, while Mr. Beasley handled the contracts and relationships with attorneys.

The litigation finance investments that J&J pitched weren't unusual. It was the risk that was surprising. Hindenburg consulted with professors who said the default rate on these types of contracts was around 1%. For J&J to have zero losses on 16,000 contracts was statistically near impossible, Hindenburg figured.

SHARE YOUR THOUGHTS

*Have you ever been offered an investment that seemed too good to be true? What did you do? Join the conversation below.*

The size and consistency of J&J's contracts also stood out to Hindenburg. Mr. Anderson read a study by three academics that looked at thousands of settlements and found the median post-settlement financing for a major industry lender was $6,000 per case, far smaller than the $80,000 or $100,000 contracts that J&J said it regularly financed.

Hindenburg said it had been sharing its findings with federal authorities. A few days after the recorded call with Mr. Judd, the FBI agents knocked on Mr. Beasley's door.

Word of the standoff spread quickly among investors. The FBI posted <u>a notice to an agency webpage</u> asking to speak to victims of what it called an alleged Ponzi scheme. While J&J wasn't named, details provided match those described in its investment documents reviewed by The Wall Street Journal.

Last Thursday, five investors with a combined $1.8 million invested in the J&J entities filed an involuntary bankruptcy petition against the companies. Two other lawsuits related to J&J have been filed by investors as well.



The FBI on scene in Las Vegas as Matthew Beasley was taken into custody.
PHOTO: BIZUAYEHU TESFAYE/LAS VEGAS REVIEW-JOURNAL

**Write to** Ben Foldy at <u>Ben.Foldy@wsj.com</u>

*Appeared in the March 24, 2022, print edition as 'Alleged Fraud Ends In Gunfire.'*

Copyright © 2022 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT C

Hindenburg Research, "J&J Purchasing: When It Sounds Too Good Too Be True"

# J&J Purchasing: When It Sounds Too Good To Be True

Published on March 24, 2022

## GET OUR LATEST REPORTS DELIVERED TO YOUR INBOX

email address    SUBSCRIBE

As some readers of Hindenburg may be aware, our founder, Nate Anderson, got his start in the fraud research world by investigating suspected Ponzi schemes and private market fraud. Prior to Hindenburg, Anderson had submitted whistleblower reports to regulators on the following funds:

1. Platinum Partners, a ~$1.4 billion firm where 7 fund managers (https://www.nytimes.com/2016/12/19/business/dealbook/platinum-partners-hedge-fund-founder-and-6-others-charged-with-fraud.html) were arrested and charged criminally following Anderson's work together with noted Madoff whistleblower Harry Markopolos.
2. TCA Global, a ~$400 million asset manager that was subsequently alleged by the SEC (https://www.sec.gov/news/press-release/2021-204) to have fraudulently inflated performance results.
3. RD Legal, a litigation finance firm with ~$150 million in assets which was subsequently alleged by the SEC (https://www.sec.gov/litigation/admin/2016/33-10111.pdf) to have defrauded its investors. The fund took the case to trial and lost on several claims.
4. Statim Holdings, a ~$40 million firm that was subsequently alleged by the SEC (https://www.sec.gov/litigation/litreleases/2019/lr24383.htm) to have defrauded its investors.
5. West Mountain LLC, a ~$54 million asset manager that was subsequently alleged by the SEC (https://www.sec.gov/litigation/litreleases/2019/lr24539.htm) to have fraudulently overvalued its assets.

Today, we go back to our origins. Over the last several months, we have been researching an investment firm that we believe to be a Ponzi scheme.

**18**

Privacy - Terms

This firm, J&J Purchasing, has pitched potential clients on an investment offering 50% annualized returns with virtually zero risk. It claimed, at one point, to have raised $400 million from over 1,000 investors since 2016.

Through the course of our research, we submitted our findings to regulators through the SEC's tip program. We recently also shared our work with reporters at the Wall Street Journal.

Our work has included in-house research, extensive document review, as well as in-person meetings and recorded correspondence with the firm's principals and marketers under the guise of becoming a potential client.

As reported by the WSJ(https://www.wsj.com/articles/an-alleged-fraud-uncovered-by-a-short-seller-ends-in-gunfire-11648051215), part of our research included hosting one of J&J's key marketing managers and a marketer in a private jet we rigged with hidden video and audio recording equipment.



(Hindenburg Research hidden camera photo of J&J marketers pitching investors inside the private jet)

Privacy - Terms



(Hindenburg Research surveillance photo of J&J marketers leaving the meeting)



(Hindenburg Research surveillance photo of J&J marketers leaving the airfield)

Earlier this month, Federal authorities visited (https://www.reviewjournal.com/crime/courts/lawyer-shot-by-fbi-agents-accused-of-running-300m-ponzi-scheme-2541707/) one of the firm's key principals, 49 year old attorney Matthew Beasley, in order to question him, according to court records (https://www.slideshare.net/HindenburgResearch/usa-vs-beasley-initial-appearance-transcript).

Privacy - Terms

Beasley had been tipped off about the prospect of an FBI visit by another individual at the firm who had also just been visited that day. Upon seeing FBI agents at his door, Beasley pointed a gun to his own head. The agents implored him to drop the weapon. Beasley instead pointed the weapon at the agents, who then opened fire, striking him in the chest and shoulder.



(Local news report (https://news3lv.com/news/local/fbi-alleges-las-vegas-attorney-pointed-gun-at-agents-before-he-was-shot-matthew-beasley-lawyer-federal-investigation-crime-las-vegas-police-nevada) on the stand-off)

According to the same court records (https://www.slideshare.net/HindenburgResearch/usa-vs-beasley-initial-appearance-transcript), Beasley survived the shooting and barricaded himself behind his door. The FBI then sent a negotiator, who attempted to convince Beasley to disarm.

Throughout the course of the 4-hour negotiation, Beasley "repeatedly confessed to his involvement in what he described as a Ponzi scheme", according to a court transcript (https://www.slideshare.net/HindenburgResearch/usa-vs-beasley-initial-appearance-transcript).

Eventually, a SWAT team was able to disarm and arrest him.

Beasley was released from the hospital the following week and was remanded into custody, according to local media (https://www.abajournal.com/news/article/lawyer-shot-and-injured-by-fbi-agents-admitted-orchestrating-300m-ponzi-scheme-prosecutor-alleges). He was charged (https://www.slideshare.net/HindenburgResearch/usa-v-matt-beasley-complaint) with 1 count of Assault on a Federal Officer and was denied bail (https://www.slideshare.net/HindenburgResearch/usa-v-beasley-initial-appearance-transcript) Thus far, neither Beasley nor anyone at the firm has been with fraud, though we expect that may change.

What follows is our research on just what happened with J&J Purchasing.

## Background on J&J Purchasing/J&J Consulting Services, a Firm That Claims Perfect 50% Annual Returns Across Its Portfolio of 20,000 Litigation Funding Contracts, With Zero Defaults and Zero Late Payments in the Past 4 Years

Until earlier this month, an investment firm in Las Vegas run by a former sales rep for a local pharmacy was virtually guaranteeing returns that would put almost every investment manager on earth to shame.

Las Vegas resident Jeffrey J. Judd launched J&J Consulting Services, Inc. in May 2005, per Nevada corporate records(https://opencorporates.com/companies/us_nv/E0328382005-8), which describe him as President/Treasurer/Director of the entity. In October 2021, Judd also launched (http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail? inquirytype=EntityName&directionType=ForwardList&searchNameOrder=JJPURCHASING%20L21000447 7540&aggregateId=flal-l21000447754-7a2dcfc0-9690-4eff-9d47- e2872cd1e514&searchTerm=JJP%20TRANSPORT%20SERVICES%20LLC&listNameOrder=JJPUMPING%20L0 50000947530) a new Florida entity called J&J Purchasing LLC.

Both J&J entities offer investments in "litigation finance", a fast-growing investment field whereby funds provide loans to law firms or their clients.

As detailed below, J&J had no marketing materials or website. We were only able to learn about the investment proposal through calls and meetings with Judd and some of the firm's marketers who pitched us as prospective investors. As Judd said to us during a call:

> *"The whole business is done off of referrals. There's no direct consumer marketing, nothing like that. It's just a referral-based business."*

According to a call we had with one marketer, J&J has 12-15 individual marketers canvassing for investors.

Jason Jongeward, a key J&J marketer whose prior work experience including running a small construction company(https://www.linkedin.com/in/jason-jongeward-45753695/) before quitting to raise capital full time, told us that the reason for the new entity with its new name was to indicate to the SEC that it was not making financial offerings (even though it does):

Privacy - Terms

> *"Jeff changed, or he created a new company called J&J Purchasing. Obviously, J&J Consulting does not give the right impression to the SEC that you're not giving any financial advice, right? So he changed the name to J&J Purchasing."*

J&J's litigation finance strategy solely involves investing in *post*-settlement claims in personal injury cases, offered to investors through a network of 66 law firms, according to its marketers. These are among the least risky forms of litigation finance because they take place *after* litigation has settled and after the amount of compensation to the victim has already been determined.

In other words, an insurance company has agreed to pay an injured party a settlement and the plaintiff is just waiting for the money to be sent. Shane Jager, a J&J marketing manager, said, "the bulk of the claims we work with are slip and falls."

J&J's Jongeward said "most of these injury claims are in the $225,000-$350,000 range" but the individuals entitled to payment are in "financial despair" so they can't wait 90 days to receive the payment.

This is where J&J comes in, offering law firms and their clients an immediate 90-day advance for a 25% fee. It's akin to the familiar TV commercials (https://www.youtube.com/watch?v=Q0klvfQ39o4&t=18s) from well-known litigation funder J.G. Wentworth:

> *"I have a structured settlement, and I need cash now!"*

The 25% interest rate for a 90-day advance translates to a simple interest rate of 100% per annum (or a 136% compounded rate of return). J&J's principals say they keep half of the profit (12.5% every 90 days) with the other half going to the investor (12.5%).

Investors were encouraged (but not required) to roll their capital back into new cases, for a simple 50% return per year (a 12.5% profit each quarter). Investors allocated either $80,000 or $100,000 to each investment contract. Investors could invest in multiple individual contracts, and many did.

Jongeward explained the mechanics to us as follows:

> *"We will give them [the plaintiff who has a settled claim] $80,000 or $100,000 in 72 hours. When they received the settlement after that 90-day period, the attorney and the plaintiff then pay us back according to the terms of our contract that $80,000 or $100,000. And with a 25% price tag on it."*

> *"Within two years, you're able to get your entire investment back, which is unheard of."*

J&J has claimed to have entered into 20,000 such contracts since inception. Incredibly, the firm has told investors there have been **zero defaults** Judd told us his firm has, "never had one of these go bad."

Similarly, Jongeward told us, over multiple calls:

> "*We've closed over **20,000 contracts with zero defaults**.*"

> "*Fast forwarding to today, we are at **20,000 contracts, successfully closed, zero defaults**.*"

When asked about the risk, Jongeward said:

> "*We really, really struggle to see the risk. I think that's probably why* **the performance has been—I'll call it immaculate. We haven't had any contract default, not one.** *So for me, it's really about the performance history on an investment really is the true indicator of what it's doing.*"

Jongeward also claimed, on several occasions, that J&J hasn't had any late payments in the past 4 years, an assertion that other J&J operators later repeated to us. Per Jongeward, early in J&J's history, they had experienced three delays in contract repayment, all of which related to Medicare and Medicaid, so they stopped signing contracts that had government payors:

> "*So, since they've stopped with Medicare, Medicaid, they haven't had any, any close slow. I think that was all have identified and adjusted in that first year* **So, in years 2,3,4,5 and then coming into 6 now they haven't had any late payment**'*s*

Essentially, J&J's pitch expected investors to believe that (1) for more than five years, J&J has issued and collected on ~20,000 contracts without any defaults, (2) that J&J has been able to generate a 25% return in 90 days (for every contract executed, for a 100% annual return), (3) that J&J's network of 66 law firms have always sent in payments precisely within the 90-day time frame and (4) that all of this has been achieved with J&J's paper-thin infrastructure (detailed further below).

The marketers for J&J Purchasing claimed to have placed over $400 million with over 1,000 participating investors. Jongeward described it to us as, "*it's just kind of this growing monster.*" (J&J principal Matt Beasley, as he lay barricaded behind his door with multiple gunshot wounds, contradicted the $400 million placement figure when he acknowledged to an FBI negotiator that the firm only had $300 million in assets.)

If the investment pitch sounds too good to be true, that's because it almost certainly is. Across our career in investment research, we have seen some brazen irregularities, but never have we seen clearer red flags than what we found at J&J.

## J&J's Claimed Investment Opportunities Have Abnormal Characteristics That Make No Sense For The Industry It Claimed To Operate In

The post-settlement litigation finance industry was studied in an academic paper (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3670825) published on August 10, 2020. Its findings underscore how J&J, if its claims are true, would represent a massive industry outlier in virtually every regard.

The study sampled over 3,200 post-settlement claims and found that the median **gross case value,** or the size of the plaintiff's settlement, was $50,000. [Pg. 35 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3670825)] This is far below the $225,000 to $350,000 range claimed by J&J's operators.

The research found that the median **amount funded** by litigation finance firms per post-settlement case was $5,000, far below either the $80,000 and $100,000 investment amounts offered by J&J. [Pg. 35 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3670825)] In a follow up with one of the study's authors, he explained to us that a funding amount of $40,000 or above falls within the 1 percentile of the study's sample.

Therefore, J&J's claimed $80,000 to $100,000 funding amounts put *each and every* case deep within the top 1 percentile of funded amounts in the post-settlement industry.

J&J's funded loan sizes are between 16x-20x the industry median. It simply defies all probability that J&J has financed 20,000 abnormally large post-settlement claims. We asked settlement funding industry experts what they thought about the consistent $80,000 and $100,000 investment amounts claimed by J&J. They told us:

> *"That sounds kind of insane to me, for a couple reasons. First, it's just really high, like how many people are really getting $400,000 [settlements]? You know, like, I think, I think the average advance to personal injury claimants is like, in the four figures, nationally. So that's really high, which means that, you know, sounds sketchy, and how are they finding so many of these?"*

> *"The numbers don't make sense in terms of their homogeneity, just the shape of the number, this thing at $80,000 to $100,000. Where does that come from? There's no, there's no rea: the world why that number would be that number"*

Privacy - Terms

Put simply, the number and size of cases in J&J's portfolio may not even exist across the entire post-litigation funding industry.

The academic research also shows that defaults for post-settlement claims are very low, albeit non-zero, at about 1%. [Pg. 42 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3670825)] Even with the low industry default rate, the claims by J&J of having no defaults across 20,000 claims becomes mathematically absurd: a roughly one in 2E87 (two with eighty-seven zeros) chance.

Written out, mathematically, we found that J&J was...

99.99999999999999999999
99999999999999999999999
99999999999999999999999
99999999999999999995%

...likely to be underreporting its default rates.

## J&J Has No Website and Provides No Marketing Materials, Unlike Virtually Every Other Private Investment We Have Ever Seen. All Pitches Are Done Over the Phone

We learned of J&J Purchasing LLC and J&J Consulting Services Inc. from a reader. Apart from this tip, There would be little chance we'd have heard of it otherwise—J&J has no website, doesn't share marketing materials with its prospective investors and confines its investor pitches to the phone only. J&J marketer Jongeward told us:

> "There's not that many people that know about it, because they, it's all word of mouth. And its such a great investment that you don't need to do any advertising."

This differs sharply from virtually every other private investment opportunity we've seen (a figure that likely numbers in the thousands). Prospective investors in such opportunities are generally provided a series of basic marketing materials such as (1) tear sheets or summaries; (2) full PowerPoint presentations; (3) investor update letters; and (4) due diligence questionnaires (DDQ). These materials are considered industry standard because they help prospective investors thoroughly understand the details of the investment they are considering.

One reason for J&J's secrecy, as indicated by Jongeward, is because the proprietary investment opportunity is *so* great that the group is worried it may leak out to the broader investment world

Privacy - Terms

> "We don't want anybody taking our documents and trying to create another company for competition."

But that is not the only reason for secrecy. According to Judd, J&J stopped doing contracts in Las Vegas, because, "we didn't want people knowing what we did in our backyard."

When we engaged with J&J as prospective investors, the only documents we received were subscription documents for the investment, and several nondisclosure agreements (NDAs).

We couldn't find any corporate offices for any of the J&J entities. J&J Consulting has a P.O. Box as a registered mailing address(https://opencorporates.com/companies/us_nv/E0328382005-8). J&J Purchasing's registered mailing address (http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail? inquirytype=EntityName&directionType=ForwardList&searchNameOrder=JJPURCHASING%20L21000447 7540&aggregateId=flal-l21000447754-7a2dcfc0-9690-4eff-9d47- e2872cd1e514&searchTerm=JJP%20TRANSPORT%20SERVICES%20LLC&listNameOrder=JJPUMPING%20L0 50000947530) corresponds with its registered agent(https://www.floridaregisteredagent.net/) address.

The operation seems to have no employees outside of Judd and his family. Judd explained his corporate operation:

> "**I manage the whole thing** with my son. He is 26. Does a lot of the paperwork."

We asked an industry expert what kind of corporate operation one would expect in order to execute J&J's claimed investment operation. He described the need for extensive overhead (as may seem obvious for an investment executing 20,000 contracts and working with over 1,000 investors.) He said:

> "You need underwriting people, you need people to follow up, you need people to document, you need people to talk to the attorneys' offices, and there's a lot of cajoling."

Another industry expert provided some details about the kind of tasks involved when buying an interest in a settled legal claim:

> "It's a lot of work to be [done], doing due diligence, verifying the settlement ... And then also controlling kind of how the money comes to you, right? Like, how do you make sure that, that when there's a settlement, your cut actually gets paid back? And the client doesn't just tak... "

As a comparable, an industry expert pointed us to Lawcash (https://lawcash.com/) a firm that focuses on litigation funding. According to the expert, Lawcash does $3.5 million in transactions every month; around $10 million a quarter. Despite Lawcash's quarterly transaction volumes representing about 2.5% of what J&J purports to do, the company's LinkedIn Page (https://www.linkedin.com/company/lawcash/) shows 35 employees.

Apart from Judd, we found no other J&J employees on LinkedIn.

## One Might Expect the Man Who Discovered Such a Flawless Investing Strategy to Have Extensive Experience In Litigation Funding

## Founder Jeff Judd's Prior Experience Was as a Sales Rep for a Local Pharmacy

Typically, brilliant investment strategies are discovered by those with deep knowledge and experience in a particular field. J&J's stated field is litigation finance, a highly competitive market that as of 2020 included at least 46 funds with a combined $11.3 billion in assets under management, according to a survey (https://www.westfleetadvisors.com/publications/) by industry research firm WestFleet Advisors.

Those include (https://www.pionline.com/investing/litigation-finance-finds-its-feet-targeting-returns-20) funds run by asset management giants such as:

- Elliot Management (~$34 billion (https://www.elliottmgmt.com/about-elliott/))
- D.E. Shaw (~$60 billion (https://www.deshaw.com/what-we-do/investment-approach))
- Fortress Investment Group (~$54 billion (https://www.fortress.com/about))

It also includes dedicated funds such as Burford Capital (https://www.burfordcapital.com/) staffed with numerous litigation and industry personnel. The litigation funding field also has smaller, nimble competitors focusing on specialties such as pre- and post-litigation financing, intellectual property, mass tort, complex commercial litigation, and personal injury.

Top funds in the industry typically aim for returns (https://www.pionline.com/investing/litigation-finance-finds-its-feet-targeting-returns-20) in the 20% range while taking on substantial risk, far below the virtually guaranteed 50% returns, net of fees, offered by J&J.

A simple Google search (https://www.google.com/search?q=post-settlement+funding) for "post settlement funding" turns up dozens of immediate competitors offering litigants interest + fee rates (https://deltalawsuitloans.com/post-settlement-loans-guide/#:~:text=Settled%20Case%20Funding%20Rates&text=On%20the%20lower%20end%20you ,of% 20h etween%201%2D3%25.) of 20%-30% per annum or lower, vastly less than the 136% compounded supposedly collected by J&J.

Privacy - Terms

So who came up with the J&J strategy that has consistently yielded perfect 50% returns for investors?

The principal of J&J, and its eponymous founder Jeff Judd, had no apparent experience in the field. Prior to J&J's investment offerings, Judd was the Vice President of Sales at a local pharmacy, per his LinkedIn profile (https://www.linkedin.com/in/jeffrey-judd-8ab0903b/). Judd's LinkedIn shows he has a degree in Kinesiology and Exercise Science from the University of Nevada-Las Vegas.

According to J&J marketer Jongeward, the entity began offering investments in 2016. Judd's LinkedIn profile shows that he quit the pharmacy in 2018, presumably to focus on investing.



*(Source: Linkedin* (https://www.linkedin.com/in/jeffrey-judd-8ab0903b/))

J&J Purchasing's Private Placement Memorandum (PPM) portrays Judd as someone "who excelled at sales" and had sales roles in various industries unrelated to litigation finance.

**D.  BACKGROUND OF COMPANY PRESIDENT - MR. JEFFREY JUDD**

Mr. Jeffrey Judd is the current Managing Member and President of J and J Purchasing, LLC.  Prior to serving as Company President, Jeffrey worked in various industries.  His first job out of college was with Bristol Myers as a Pharmaceutical Sales Representative.  Jeffrey held this same position with Schering Plough.  In the early 2000's the real estate sector was the place to be for someone like Jeffrey who excelled at sales, so he left the Pharmaceutical Industry and took a position with Countrywide Home Loans. When the bubble burst in 2009, Jeffrey took an ownership position in Partell Specialty Pharmacy serving as Vice - President of Sales and Marketing.

Privacy - Terms

Rather than crafting J&J's essentially perfect investment strategy through years in the litigation finance field, Jongeward explained its origins as emerging from a chance encounter with Judd's local lawyer friend, Matt Beasley:

> *"In 2016, he [Jeff Judd] was having lunch with a good friend of his named Matt Beasley. Matt Beasley is a personal injury attorney. So as Matt and Jeff were talking as they would often do, Jeff came up with the idea to you know, the comment typically was that, you know, how soon can I get my money from the plaintiffs once they knew that they reached their settlement? So, Jeff saw an opportunity to be able to give capital to someone who has a settlement coming but needs a little bit of capital right away. Because some of these a good portion of these individuals haven't been working for 18 months to 2 years. So they're in financial despair a little bit."*

Assuming it were all true, this is not the background or experience we would expect from what would be considered the best manager in the industry.

## J&J Claims That a Local Law Firm, Beasley Law Group P.C., Has Managed All 20,000 Legal Contracts, Interfacing With At Least 66 Personal Injury Law Firm Counterparties

## The Firm Has No Website and Appears to Have Only One Attorney, Matt Beasley, Who Works from Home

We spoke to both Judd and J&J marketers who described attorney Matt Beasley as critical to the operation. According to Judd, the key to the investment's success is simply "to have the right attorney." Beasley is the owner of Beasley Law Group, PC, founded in 2011, per Nevada corporate records (https://opencorporates.com/companies/us_nv/E0222452011-8) which lists him as the sole principal.

Prior to his armed standoff with the FBI, Beasley was said to manage J&J's relationships with 66 law firms it claims to work with. He also manages all the paperwork and payments, which all pass through his law firm's IOLTA (https://www.americanbar.org/groups/interest_lawyers_trust_accounts/overview/) account (similar to an escrow account). As Judd explained:

> *"He [Beasley] takes care of the attorneys because all the attorneys want to be arm's length from me. They don't want to know me. Which is smart, because then that way they can't accuse them of steering or anything like that"*

> *"He [Beasley] finds the other attorneys, and he writes the contracts"*

Privacy - Terms

Per Jongeward:

> "Matt Beasley is the one that takes care of all the purchase agreements. That's between Jeff and the participating attorney and the plaintiffs."

Per J&J marketing manager Shane Jager:

> "Jeff has no involvement with the attorneys. That's all handled by [Matt]. Matt is Jeff's attorney and he's contracted to work."

The firm's private placement memorandum (PPM) also references Beasley's IOLTA account as the destination of investor funds:



Investors will not become Members of the Company but only hold a beneficial interest as Investors in Company negotiated Partial Beneficial Interests, i.e., for a part of the proceeds from Purchase Contracts which sum is equal, and will never exceed, the "Investment Return." No fractional Partial Beneficial Interests may be subscribed for, except as the President may otherwise decide on a case-by-case basis and in President's sole discretion for such subscriptions meeting the Minimum Investment Subscription. Any Investment under this Offering will be made by ETF (wire transfer) upon subscription and acceptance of all Subscription Documents by President and which investment sums will be transferred to and deposited in the Company's Escrow Account at the following financial institution: **Well Fargo Bank NA (Nevada) Routing Number: 121000248, Account Name, Beasley Law Group IOLTA** (noting that, upon the Company's acceptance by Company of the Subscription Documents, an authorized Company officer will inform the prospective Investor of the Account Number).

J AND J PURCHASING, LLC – PRIVATE PLACEMENT MEMORANDUM                    7

*Source: J&J Purchasing PPM [Pg. 7]*

Nevada's Bar Association shows that Beasley has been a member since May 2, 2006.



Beasley, Matthew W.

Bar #: 9756
Member since: 5/2/2006
Status: ATTORNEY Active

**Company: Beasley Law Group PC**
5475 Ruffian Road, Las Vegas, NV 89149
Phone : (913) 486-9975

Law school : University of Missouri Kansas City

Disciplinary Actions:

None.

*Source: State Bar of Nevada*

Given the incredible volume of paperwork required to manage 20,000 contracts, investor inflows and outflows, and the relationships with 66 law firms, we would expect the Beasley Law Group to be a bustling operation staffed with dozens of paralegals and attorneys. Even Jongeward acknowledged the administrative burden:

> *"If you're only wanting to put it in for one contract cycle [90 days], maybe this isn't the right spot for you, because it's a lot of work for us to pull people out and redo that. And there's a lot of documentation."*

Contrary to this expectation, we found that Matthew Beasley is the Beasley Law Group's sole employee on LinkedIn (https://www.linkedin.com/in/matthew-beasley-02a3b942/).

The only addresses we found associated with the firm through Nevada corporate records was that of its registered agent and Beasley's personal residence.

Jongeward confirmed what corporate records show, that Beasley works from home:

> *"So I mean, you know, you don't have to have a location anymore. Things are just done differently than they used to be. But yeah, this is all that he [Beasley] does. He puts all the purchase agreements together. He works for Jeff. And we use his IOLTA account, to pass money back and forth."*

If the Beasley Law Group is supposedly interacting with 66 law firms and seeking to develop new relationships, one would presume it has some kind of public presence. We found that its web domain (http://www.beasleylawgrouplv.com/), listed on its Facebook (https://www.facebook.com/Beasley-Law-Group-PC-204301199591085/) page, leads to a GoDaddy landing page.



*Beasley Law Group landing page. Source: beasleylawgrouplv.com (http://beasleylawgrouplv.com/)*

The only other public presence we found was a Facebook (https://www.facebook.com/Beasley-Law-Group-PC-204301199591085/) page with 22 followers, no posts and almost zero engagement.



*Source: Facebook*

One of the litigation finance practitioners we talked to described a very administratively and operationally intense process. He said that it required about 4 hours of work to draft each contract.

At that rate, it would take Beasley roughly 40 years to draft 20,000 contracts, assuming he worked 8 hours every single working day of the week.

This strikes us as implausible. Beyond the obvious reasons, Beasley's recently purchased fleet of luxury cars, private plane, and sports all-terrain vehicles (detailed later) paint the picture of a man with plenty of leisure time.

### Rather Than Seeking Large, Sticky Institutional Capital, As One Would Expect for Such a Successful Strategy, J&J Appears to H Targeted Non-Financial Professionals Who Are Mainly Memb of the Mormon Church

**33**

Privacy · Terms

Often, when an incredibly attractive investment with limited capacity exists, investment managers forgo outside investor capital altogether in order to generate great returns for themselves. Had Judd simply deployed internal capital only, he could have turned $2.5 million into about $423 million, without raising *any* external capital, assuming he was able to reinvest at 25% for the 23 quarters between September 2016 and March 2022.

If Judd chose to raise outside capital anyway, one would expect the firm to seek institutional capital to efficiently raise large, long-term capital from qualified investors better positioned to understand the risk and complexity of the strategy.

J&J marketer Jongeward explained that Judd chose to forgo these approaches, out of apparent altruistic generosity:

> *"So essentially, the 25% comes back to Jeff and Matt. And they divide that they cut that in half, and they share 12.5% with the investor and they keep the other 12.5%. So, what you have is you got the owner of a company that's willing to split the profits with the investor. That never happens."*

J&J marketing manager Shane Jager said "He [Judd] sees the people as benefiting," and then explained how a family member is "living her best life" thanks to her J&J investments. Judd himself explained:

> *"It's changed a lot of people's lives.* **I wasn't greedy when I did that.** *I mean, we pay out a high percentage. So my thought process was, it's not my money, I'm gonna make my money on each deal, then why wouldn't I pay out a high percentage? So that's the way we set it up."*

It seems that Judd and his colleagues chose to "bless" many members of his Mormon church with this investment strategy.

Based on individuals we've interviewed, including prospective J&J investors, the marketers for J&J, and others familiar with the offerings, J&J's investor base mainly consists of regular, non-financial professionals such as small business owners and doctors.

And despite the fund's self-imposed marketing hurdles (i.e., no marketing materials at all), the J&J Purchasing investment opportunity has spread rapidly via word of mouth, largely through the Mormon communities centered around Nevada, where the firm and its principals are based.

Jongeward claimed to us that it was helping members of the religious community, for which he had a personal affinity:

> *"We kind of feel like we're building the (Mormon) church financially."*

According to Judd, at least 50% of the investors are Mormon. Jongeward estimated the number around 70%.

To put a finer point on it, this all flies in the face of what one would expect from a genuine strategy and appears more so to have all of the hallmarks of an affinity scheme (https://www.sec.gov/investor/pubs/affinity.htm).

But investors seem to have taken the bait. We have heard of investors taking out second mortgages to invest in J&J and even putting their life savings into the opportunity.

We mentioned the notion of taking out a Home Equity Line of Credit (HELOC) in order to participate in the fund. Jongeward told us:

> *"I took a HELOC out myself personally, it's easy to pay 5% on a HELOC and still gain 45%."*

## J&J's Subscription and Legal Documents Make No Mention of an Auditor or Administrator (Basic Independent Service Providers That Serve As Key Pillars of Safety For Investors)

## Monthly "Statements" Appear to Be Simple Tables Created By the Investment Manager In Microsoft Word

Every credible investment manager, including those with less than $50 million under management, seek to have independent administrators, a key service provider that manages investor subscriptions and redemptions, cash inflows & outflows, and provides independent reporting.

Similarly, every investment manager also has an auditor to ensure that books & records are balanced and independently monitored. (Even **Madoff** had the appearance of an auditor, though it was a tiny firm (https://www.nytimes.com/2015/05/29/business/dealbook/madoff-accountant-avoids-prison-term.html) that simply rubberstamped his reports).

Given that J&J now claims to be a bustling $400+ million investment manager, it should be a given that an administrator and an auditor are in place in order to offer investors basic protections.

Yet J&J's offering documents make no mention of any administrative agent, paying agent, or an auditor.

It seems that its marketers are playing a key part in managing these roles. Per Jongeward:

Privacy - Terms

> *"I have 150 investors in the group here that I manage. And it represents about 53 million of operating capital, including my own personal capital I have. So, I take care of the interest payments, I send those all out to everyone to take care of all of the document initial interaction and walk everyone through how to get that taken care of and reconciliation, spreadsheets, interest payouts, 1099 at the end of the year. We really, I really am kind of, you know, the full, the full turnkey manager for the entire group and it we're about 1000 investors total."*

We have never heard of an investment management company where a marketer performs tasks like distributing interest payments to investors. Put simply, they are wildly divergent tasks that have unique responsibilities and require distinct training.

Jongeward provided several details of how the payments get executed:

> *"When capital comes in, Matt [Beasley] forwards it to Shane [Jager], and Shane forwards it to me."*

> *"90 days later, when that capital is returned with interest, then I would then send you if you did 100, I would send you $12,500 into your bank account that you provided for me, so I can set you up in the Wells Fargo Direct Pay system. So that makes it really easy to get our investors set up there. It takes about five days to verify. And then once you're in there, it's really easy. It saves me quite a bit of capital to have all of these people. I have about a little over 150 people in my Wells Fargo Direct Pay system, so they only charged me $200 a month to have that, and then I can, it's as easy as clicking on your name, put any amount in. And then I always put the contract name that's maturing there."*

The way Jongeward described the flow of funds resembles a multi-level marketing organization. The lawyer initiates the payment to the marketers and then those marketers pay downline to the other marketers, who distribute payments to investors.

We have seen a copy of the "monthly statement" sent by a J&J marketer to one investor. It appeared to be a simple word table with labels for "Amount invested," "Name," "Date Started," "Date Matured," "Payout," and whether it had already been paid.

## According to J&J, the Attorneys Firms Are Benefiting, Making Up To $50,000 a Month, From Selling the Contracts to J&J.

## According to One Industry Expert, "That's Like an Egregious Conflict of Interest. That's Very Problematic."

Privacy - Terms

The law firms that refer borrowers to J&J do "very well," said Jongeward, explaining how they benefit from the transactions:

> *"So the attorneys are there benefiting from this as well … Everyone's benefiting [indistinguishable] There's an administration fee, on top of that, I think it's $5,000 … So if an attorney does 10 of these contracts in a month, you know, that's, that's $50,000 pretty easy to calculate that. So, there's definitely incentive for these attorneys to do that as well."*

We asked Shane Jager if the attorney that is representing the plaintiff also gets paid, the marketer replied: "Yeah. It's a couple of thousand dollars, I think."

Judd also made it clear to us:

> *"They [attorneys] split halve the admin fee, **which is perfectly fine** My attorney takes care of all that."*

The sample Contract found in the PPM, shows a Disclosure Table showing an Administration Fee, confirming the marketers' representation of the fee.

### DISCLOSURE TABLE

| | |
|---|---|
| Purchase Price: | $100,000.00 |
| Administration Fee: | $5,000.00 |

*(Source: J&J Purchasing's PPM [Pg. 63 (https://www.slideshare.net/HindenburgResearch/jj-purchasing-ppm)])*

We asked an expert in the litigation finance field about whether it was "perfectly fine" that the attorney firms got paid a fee for sending contracts to J&J. He said:

> *"There's no way, **it's impossible! That an attorney would get a cutback**. Any plaintiff's lawyer who would take a kickback or in any way would stand this, is like kryptonite. You don't understand, you probably do understand, but it is a Kryptonite like wrapped in barbed wire, right? Because if you have any fiduciary financial impropriety, if something stupid as this you could be disbarred in one second. Most people who are disbarred are for stupid shit like this. This is ridiculous. Never, sorry, will not happen."*

Privacy - Terms

Even when we proposed a scenario where the clients signed a tightly written and detailed permission to waive the conflict of interest, the industry expert categorically said:

> "No, no, no never happened **Are you kidding? That is the funniest thing I've heard anyone ever tell me. That is the most ridiculous. This is like asking Moses, if he'd like a cheeseburger.** Like I can't even begin to understand and explain to you. That is fucking just not even remotely possible."

Another industry expert told us:

> "What the hell are they thinking [the lawyers]? Were they thinking this will never be discovered? Once this is discovered we're looking at violations of ethical rules and also maybe some criminal rules. If they are aiding and abetting violating of usury laws, depending on the state, that might be criminal."

He added:

> "They're risking their careers and freedom in such a way." And described it as "So clearly problematic." In states where these violate usury laws "waivers aren't going to help you". He explained that usury laws may apply given that post-settlement should be easy for courts to deem as loans."

Given the above, it seems unlikely that lawyers at 66 law firms would collectively risk mass disbarment in order to accept a fee to direct their clients to expensive funding sources, as described by Judd and his marketers. Likewise, we struggle to see a scenario where 20,000 high-risk events took place without one single disciplinary action, which would inevitably produce delays or other issues.

## Judd Almost Always Makes Himself Unavailable to Speak to Prospective Investors, Contrary to Industry Practice

## Other Members of the Team Seem to Be Siloed From Each Other As Well. One Marketing Rep We Spoke With Claimed To Not Know Who Was On The Rest of the Team

Initially, when we asked about the possibility of talking to Judd or other higher-level officials on the pyramid we were told "we don't do that anymore." Judd was so inaccessible and such a god-like, bother figure that Jongeward said that he had met Judd only once for a 45-minute lunch. It seen

odd treatment for a marketer that was forecasting to generate $50 million of inflows, in 2022, for J&J Purchasing.

In contrast, most asset managers find it very important to let investors know the professional and educational backgrounds of who works for them. We found no J&J Purchasing marketing materials that identified employees. When we asked Jongeward who else worked at the firm, he told us he didn't know, as he only knew Jeff Judd, attorney Matthew Beasley, his direct report Shane Jager, and one other marketer.

The structure, in short, struck us as incredibly atypical. It also seemed designed to "silo" each member of the team should anything ever go wrong.

## In Accordance With J&J Purchasing's Contracts Stipulations, The Company Has the Right to Secure Their Lien On The Claim's Proceeds

## We Couldn't Find Any Lien Registered in Favor of J&J Purchasing Or Its Preceding Entity.

During calls with Jongeward, he made the following representations:

> "So we basically **place a lien through a purchase agreement** with the attorney and their plaintiffs. And, and so after 90 days, they give us that 80 or $100,000, back to us through the terms of the contract with interest"

> "[The purchase agreement/Contract] **is essentially a 14-page lien on the on the settlement**"

> "...if you look in the PPM if you looked at that purchase agreement that's between Jeff Judd and the client and his attorney. **It's a half-page of who we are and then the other 13 pages are what how we're going to make sure we receive our capital so it's basically a lien on a future settlement**"

The sample contracts annexed to J&J Purchasing's PPM show a clause where the seller grants J&J Purchasing a security interest and a lien in the proceeds from the seller's claim.

Privacy - Terms

**39**

2.    GRANT OF SECURITY INTEREST

By signing this Agreement, Seller grants to Buyer a security interest and a lien in the Settlement Amount and all Proceeds of the Claim ("Collateral"). Buyer shall have all rights and remedies of a secured party under the Nevada Uniform Commercial Code. Seller authorizes Buyer to file one or more UCC financing statements regarding Buyer's security interest and lien in the Collateral and Seller agrees to take all other steps reasonably required by Buyer to perfect and maintain the perfection of Buyer's security interest.

*Clause within a sample Contract. Source: J&J Purchasing's PPM [Pg. 54].*

J&J Purchasing states that the contracts backing their investments are a robust lien on a future cash flow. Given the importance of the liens in the collections process, and given that liens are publicly reported in state Uniform Commercial Code (UCC) databases, we would have expected to see the tens of thousands of liens reported through the dozens of law firms J&J works with.

However, based on UCC (lien) filling searches, we couldn't find a single UCC filling with any of the J&J entities as creditors. This was a massive red flag.

## J&J Seems To Be In Open Violation Of Several Securities Laws

## The Firm Claims To Have Over $400 Million In Assets, Well Above The Threshold Of Being Legally Required to Register With the SEC As An Investment Advisor

## It Is Not Registered with The SEC (Even Though a Marketer Claimed It Was "Licensed" By the SEC, Which Isn't a Thing)

Given that Federal law requires investment managers with greater than $100 million in assets to register with the SEC, we would have expected to find that J&J had registered as early as 2019, when, according to its own marketer, the firm had ~$125 million in assets.

We found no registration for either the firm or its principal Jeff Judd. This is more perplexing given that J&J is now well above that legal threshold, per both Judd and its own marketers, who repeated on several calls that the firm has over $400 million in client assets:

> *"When I got started, in the end of 2019, November, I put my first contract in we had about 125 million of operating capital within the investment. They had closed 4,500 contracts, to that point. And 26 months later, since I've been involved, **we're now up over 400 million, and we've closed over 20,000 contracts with zero defaults**"*

Privacy - Terms

> *"We're at 400 million of operating capital. And we have just over 1000 investors"*

Judd claimed to a prospective investor to have "about $475 million" in assets.

Given the above, it seems that J&J is either violating Federal securities laws by not registering as an investment advisor or is lying about its asset base, which would also be a violation of Federal securities laws.

Bizarrely, Jongeward explained that Judd had created his recent new funding vehicle because he is "licensed" with the SEC:

> *"He [Judd] just created a new entity this year [2022] **because he's now licensed with the SEC**, this has really expanded and grown. So, he did a business review with two attorneys out of Texas. They both previously worked for the SEC and so they put together a whole different program of documents."*

Note that while there are *registered* investment advisors, the SEC doesn't actually provide *licenses*. The difference isn't trivial, as licensure infers some sort of formalized credential that doesn't exist. (Consider: you may *register* to attend a conference, but that doesn't mean you have been *licensed* by the organization hosting the conference.)

Shane Jager pitched the same aura of legitimacy by saying:

> *"He [Judd] recently had a Texas based firm come in and essentially audit his company, a company that works with the SEC and FBI. And he had them come in, spent a couple 100k to do that. And they revised docs, they looked at everything, and said: 'Okay, we like this'."*

(As most investment professionals are aware, financial firms are usually audited by *audit* firms, not legal advisers. In either case Jager didn't name the actual law firm involved.)

The only SEC document we found relating to J&J is a Form D (https://www.sec.gov/Archives/edgar/data/1896470/000189647021000001/xslFormDX01/primary_doc.xml) filed with the SEC on December 13, 2021. A form D denotes that an entity may be offering private investments. It in no way blesses or "licenses" the offering.

The company's Form D, under section 5 "Issuer Size", declines to disclose its revenue:

Revenue Range

☐ No Revenues
☐ $1 - $1,000,000
☐ $1,000,001 - $5,000,000
☐ $5,000,001 - $25,000,000
☐ $25,000,001 - $100,000,000
☐ Over $100,000,000
☒ Decline to Disclose
☐ Not Applicable

*(Source: SEC EDGAR
(https://www.sec.gov/Archives/edgar/data/1896470/000189647021000001/xslFormDX01/primary_doc.xm*

In this case, given that the Form D to register a private placement offering took place roughly 6 years after an offering first took place (per the fund's principals and marketers), it seems to be an indirect admission that the firm had been raising capital without filing the requisite legal documents. Judd characterized the form D filing to a prospective investor:

> *"I registered the company with the SEC, Section D. And so now we have all that in place with the private money and the subscription agreement and all that"*

How did they raise capital before? In the context of explaining how the firm's new legal paperwork is really great, Jongeward informed us that J&J's prior legal documentation was "really anemic":

> ***"I was able to raise $49 million worth with a three-page confidentiality agreement and a two-page buyer's agreement.*** *Okay, so that the paperwork was really anemic and didn't really match the investment."*

## J&J Purchasing Legal Documents: We Don't Pay Commissions for The Sale Of Our Securities.

## Marketer: "I Make a Small Percentage Of Each Contract" (i.e., A Commission)

J&J Purchasing's PPM stipulates that no commission or remuneration is paid for the sale of its securities.

Privacy - Terms

| THE COMPANY AND THIS OFFERING GENERALLY | **J and J Purchasing, LLC** (the "Company") is a new Florida limited liability company that has no operating history but will hereafter under this Offering: (1) receive, certify, and manage the Investments Proceeds from this Offering as transferred by Investor to the Company's Escrow Account in full compliance with all Subscription Documentation matters hereto and concomitant Due Diligence by Company thereon; (2) utilize the Investor's Investment Principal as consideration for a Third-Party Beneficiary (owner of claims settled through an existing/expected Insurance Settlement Agreement) to assign certain beneficial interests under such Insurance Settlement Agreement to the Company and through a "Purchase Contract" instrument that is funded by the Investment Principal, and whereby a part of such Third-Party Beneficiary-assigned beneficial interest is retained on behalf of the Investor and will be paid to the Investor as Investor's "Partial Beneficial Interest" and which sum is the "Investment Return;" (3) provide Investors a monthly statement germane to the activity of their relevant Partial Beneficial Interest(s) under one or more Purchase Contract(s) and pay to Investors their Partial Beneficial Interest (the "Investment Return") upon the expiration of their relevant "Placement Period;" and (4) comply with Investor's right to redeem their Investment Principal pursuant to Investor's retained "Right of Redemption" or act consistent with Investor's "Option to Reinvest" as further delimited below. |
| | The opportunity to invest in Partial Beneficial Interests is offered by the Company with no commission or other remuneration paid to any person, directly or indirectly, for solicitation of Investors or otherwise for the offering and sale of Partial Beneficial Interests hereunder. Any "Finder" directly or indirectly affiliated with the Company may not serve or act in any way as a financial or investment advisor, any of which act would be prohibited under the Act or any other SEC limitations. |

*(Source: J&J Purchasing PPM Pg. 6*
*(https://www.slideshare.net/HindenburgResearch/jj-purchasing-ppm)])*

In other words, J&J's legal documents explain that no independent marketers are getting compensated to solicit investments. Despite this, Jongeward, the independent marketer we spoke with, confirmed that he was compensated for every investment he solicited:

> *"So my agreement is I make, you know, I make a small percentage on each contract."*

Note that marketers of private placement offerings such as J&J are required to be *licensed* to offer private placement securities and operate through a broker/dealer. The broker/dealer would be registered with FINRA, as is required by law.

The marketer we spoke with had no licenses and was not associated with any broker/dealer, per a check of FINRA's BrokerCheck system. Operating as an unlicensed broker could be considered a violation of Section 15(a)(1) of the Securities Exchange Act of 1934.

## Judd and Beasley Appear to Have Gone on a Luxury Spending Splurge by Acquiring a $5 Million Private Jet, Luxury Properties and at Least 16 Luxury Vehicles Estimated to be Worth $2.6 Million

With their newfound "wealth," Judd and Beasley have apparently embarked on a luxury spending spree in the past several years. On July 28, 2021, an entity (https://www.bizapedia.com/nv/bj-holdings-llc.html) owned by J&J and Beasley's law firm was registered as the owner (https://flightaware.com/resources/registration/N900XG) of a Hawker 900XP private jet.





*(Pictures of a* Hawker 900XP interior. *Source: centraljets.com)*

On February 20, 2020, Judd purchased a $5.5 million property(https://www.zillow.com/homedetails/9-Sky-Arc-Ct-Henderson-NV-89012/243070702_zpid/) in Henderson, Nevada, per Zillow.

An asset search by Hindenburg revealed that, over the last several years, Judd and Beasley have bought 16 luxury vehicles estimated to be worth $2.6 million, as shown in the table below. These include a $400,000 Rolls Royce Dawn, a Bentley Continental, and 4 Porsches owned by Judd. Beasley's collection also includes a Bentley Continental, an Aston Martin and a Mercedes Benz G Wagon.

| Year | Make | Model | Listing Price | Price Source | Generic Image |
|------|------|-------|---------------|--------------|---------------|
| 2020 | Rolls Royce | Dawn | $429,990 | dupontregistry.com | |
| 2021 | Bentley | Continental | $302,904 | vincheck.info | |
| 2020 | Bently | Continental | $253,888 | kbb.com | |

Privacy - Terms

| 2020 | Mercedes Benz | G63 AMG | $239,991 | kbb.com | |
| 2020 | Porsche | Taycan | $206,130 | vincheck.info | |
| 2020 | Porsche | Taycan | $206,130 | vincheck.info | |
| 2020 | Aston Martin | Vantage | $148,998 | kbb.com | |
| 2018 | Porsche | 911 | $144,488 | vincheck.info | |
| 2020 | Porsche | Cayenne | $131,250 | kbb.com | |
| 2019 | Cadillac | Escalade | $102,160 | vincheck.info | |
| 2019 | Lexus | LX | $101,965 | vincheck.info | |
| 2017 | Chevrolet | Corvette Z06 | $82,997 | vincheck.info | |
| 2018 | Land Rover | Range Rover | $79,999 | kbb.com | |
| 2018 | Chevrolet | Camaro | $69,805 | vincheck.info | |
| 2018 | Mercedes Benz | E43 AMG | $54,749 | vincheck.info | |
| 2019 | Toyota | 4Runner | $46,544 | kbb.com | |

Public records also reveal that Judd and Beasley appear to own several ATVs and boats. In the oral hearing (https://www.slideshare.net/HindenburgResearch/usa-vs-beasley-initial-appearance-transcript) that resulted in the denial of Beasley's bail, the Department of Justice also identified that Beasley owned a $300,000 Ferrari.

## We Believe J&J Is a Ponzi Scheme

Based on our research, we believe J&J is a Ponzi scheme. Additionally, we believe that all or a substantial portion of J&J's claimed $400+ million in investments simply don't exist.

Beasley's confession earlier this month certainly bolstered our conviction on this point, but it also shouldn't be a surprise to other J&J managers like Shane Jager, who told us:

> "You know we've had some people say it's a Ponzi scheme"

In defense of this apparently common objection, Jager informed us that he had personally seen the attorney's payments, putting those fears to rest:

> "I've seen the attorney's IOLTA account- Jeff's attorney. I just signed some NDAs, but I've seen it — actual payouts to the attorneys on the contracts...it's legit."

## Earlier This Month, J&J Imploded Following FBI Visits to At Least 2 Key Members of The Firm

As we noted in the introduction, earlier this month, the believed scheme ran face first into reality when FBI agents visited the home of attorney Matt Beasley.

The criminal complaint against Beasley, alleging one count of assault on a federal officer, filed on March 4, 2022, gives further insight into the confrontation.

> 7.    7. Agent J.M. believed BEASLEY wanted to see Agent J.M.'s badge, so Agent
> 8. J.M. pulled back his suit jacket to show BEASLEY his FBI badge.
> 9.    8. BEASLEY then stepped into complete view and the agents could see that
> 10. BEASLEY held a firearm in his left hand that was pointed at the left side of BEASLEY's
> 11. head.
> 12.   9. Agent J.M. stepped back and yelled "easy, easy," while another Agent yelled
> 13. "drop the gun." Instead of dropping the firearm, BEASLEY then pointed the firearm at the
> 14. agents in a sweeping motion, causing one or more agents to discharge their firearm, striking
> 15. BEASLEY. BEASLEY then barricaded himself inside the residence.

On March 9, 2022, additional court filings (https://www.slideshare.net/HindenburgResearch/usa-v-matt-beasley-extension) appear to show Beasley is on the path to a plea bargain for the charges stemming from the incident with the FBI, with Beasley's lawyer suggesting he expects additional forthcoming

charges (https://www.nevadaappeal.com/news/2022/mar/09/vegas-lawyer-shot-fbi-allegedly-headed-300m-ponzi-/).

| 12 | 4. In this case, the parties are attempting to resolve this matter before the |
| 13 | defendant is formally charged by a criminal indictment and therefore seek an extension of |
| 14 | the deadlines to do so. This continuance is not sought for the purposes of delay, but to allow |
| 15 | defense counsel an opportunity to examine the merits of this case before a potential |
| 16 | resolution can be reached between the parties. |
| 17 | 5. Accordingly, the parties jointly request that the Court schedule the |
| 18 | preliminary hearing in this case no sooner than 120 days from today's date. |
| 19 | 6. Defendant is in custody and agrees to the extension of the 14-day deadline |
| 20 | imposed by Rule 5.1(c) and waives any right to remedies under Rule 5.1(c) or 18 U.S.C. |
| 21 | § 3161(b). |
| 22 | 7. This extension supports the public interest in the prompt disposition of |
| 23 | criminal cases by permitting defendant time to consider entering into a pre-indictment plea |
| 24 | agreement. |

## J&J's Other Marketers Appear to Now Be Claiming Ignorance

After the story was made public on March 8, 2022, investors and potential investors received an email from Jason Jongeward with a purported "Contract Investment Update". The email shared the "unfortunate information" about Beasley's "unsettling" stand off with the FBI, and said "The Contract Investment is in 'pause' status currently".

The email, which included an attached email from Shane Jager to investors, noted that the group had hired a lawyer and was seeking to "freeze any and all monies", potentially via a Temporary Restraining Order (TRO).

> "Many questions remain unanswered," the attached email from Jager said.

Privacy - Terms

**From:** Jason Jongeward <████████@gmail.com>
**Sent:** Tuesday, March 8, 2022 4:03 PM
**Subject:** -Contract Investment Update -

Fellow Investors,

I have some unfortunate information to share of happenings over this past weekend with Matt Beasley, the attorney working with J&J Consulting.

https://www.reviewjournal.com/crime/shootings/attorney-shot-by-fbi-agents-after-pointing-gun-faces-assault-charges-2540851/

I have been in contact with Shane since Sunday and he has sent the following email for me to share with you. I will be reaching out to each of you personally to discuss the details that I know. Please wait for me to reach out to you. I will be spending the next few days giving details to each of you.

The Contract Investment is in "Pause" status currently. Many of you have payments coming this week. Those payments will also be in "Pause ". You will be hearing from me in a mass email like this one as I hear any information from the attorney, Mr. Bell, who has been hired by Shane Jager to represent our group.

Dear Investors,

In light of recent unsettling events regarding Matthew Beasley of Beasley Law and his standoff with the FBI, we are taking steps to freeze any and all monies including but not limited to filing a lawsuit and applying for a TRO (temporary restraining order). We will circulate a draft in the next day or two.
Many questions remain unanswered. Our attorney is drafting correspondence containing updates and will be emailing that out later this week.

I ask that any capital return requests should be directed to J&J Consulting by and through Jeffrey Judd. Jeff Judd's email is Jeffbarca@aol.com. We have also been directed to cc Matt Beasleys email matthew@beasleylawgrouplv.com.

We will all diligently pursue attorney Matthew Beasley and provide information as the situation unfolds.

Respectfully,
Shane Jager

On March 9, 2022, Jongeward sent another email to investors, wherein he said that he contacted a lawyer to discuss a class action lawsuit.

In the same email, Jongeward also suggests it might be best for investors not to fill out a questionnaire that the FBI has set up for potential victims (https://forms.fbi.gov/seeking-victim-information-in-slip-and-fall-lawsuit-ponzi-scheme-investigation/) saying that if they instead file a lawsuit it will somehow give them the "option to keep your privacy in this matter."

**From:** Jason Jongeward <████████@gmail.com>
**Date:** March 9, 2022 at 4:11:28 PM PST
**Subject:** -Contract Investment Update March 9th-

Dear Fellow Investors,

I wanted to give you an update that I have currently reached out to an attorney in Las Vegas to discuss a class-action lawsuit in order to represent us as a group. He will be in contact with me by Friday to identify whether we will do a class-action or a multiple beneficiary suit.
Many of you have received the FBI questionnaire and have asked me if you should fill it out or not. I will leave it up to each of you to decide. My hope was to include each of you in the Lawsuit and have the option to keep your privacy in this matter.

I am still reaching out directly to each you and appreciate your patience.

Sincerely,
Jason

This, of course, is nonsense on multiple levels. A class action does not ensure privacy, and helping regulators doesn't prohibit privacy.

## Despite the Recent Meltdown of J&J, Several J&J Marketers Are Pushing A Battery Start-Up Opportunity as the New "Safe" Investment

Remarkably, the recent events don't seem to have slowed J&J's marketers down all that much. Days ago (and only about a week after the armed standoff,) Shane Jager called one of our contacts. On the call, he explained the shocking unraveling of the alleged Ponzi scheme, despite having pitched it as virtually risk-free weeks earlier.

After expressing his surprise and blaming the events around J&J squarely on attorney Matt Beasley, halfway through the call Jager suddenly pivoted and pitched an investment in a start-up battery company. Per Jager, it's a "safe", hot opportunity that is time-sensitive:

> *"On a side note, I know we talked about Eco-battery, something that is safe, I will say. I talked to the partners just a few days ago and it may be a good opportunity for you and maybe some of your close friends to, they need an injection of capital really quick. Like $2 million probably in the next week or less."*

The same day, Jongeward emailed saying he'd "had a few fires to put out" but wanted to schedule a call to "bring you up to speed on the contract settlement investment **as well as another investment we were doing with the battery company here in St. George**"

Jager then followed up with another high-pressure text message on the battery investment:

Privacy - Terms

**49**



(Text from Shane Jager pressuring an investor to invest millions into battery start-up Eco Battery, just weeks after J&J melted down.)

## J&J is An Example of Effective, Prophylactic Enforcement By Regulators

Ponzi schemes generally have three phases: (1) early stage; (2) rapid growth; and (3) ultimate collapse.

The public is often critical of regulatory agencies for going after Ponzi schemes after they have already collapsed (like Madoff). Such post-mortem enforcement can make recovery for victims more difficult (even though Madoff victims were, thankfully, ultimately made nearly whole.)

Practically speaking, it is not always possible to identify Ponzi schemes early because they tend to intentionally fly under the radar. In the case of J&J, the firm seemed to have taken great efforts to minimize its paper trail.

Despite those hurdles, regulators moved expediently and effectively to investigate and to take action. This is likely to result in vastly more favorable recovery scenarios for J&J's suspected victims. Given the pace that regulators worked, we would not be surprised if they had been onto J&J well before we even began our own research.

The tendency is often for the public to criticize regulators, while rarely spotlighting effective efforts. Based on everything we have seen thus far, we believe this will ultimately be a success story for regulators that deserves highlighting.

Privacy - Terms

# Important Message For Potential Victims of J&J

Based on what we know thus far, there seem to be hundreds of victims of J&J. We have been in those shoes before. In fact, those experiences largely fueled our efforts to identify and expose fraud.

We have felt the shock of learning that people you trusted, who in many instances were introduced by friends, family, or members of a local religious community, turned out to have been lying in order to take advantage of you.

It's incredibly painful, both for victims who are now worried about their finances, and for those who thought they were doing friends and family a favor by introducing them to an opportunity they genuinely believed in.

It's also an experience that makes one question one's own judgement and ask questions like "if I've missed this, what else have I missed?" It's extremely unsettling, but know that it is also something that decent people are susceptible to. Often when we have good intentions towards our friends and family, we assume that others we meet do as well. And thankfully, that is *usually* the case. Most people are decent people. There are a small number who aren't, but they can unfortunately have a large negative impact through their actions.

On the prospect of recovery, given the expediency of the regulatory action, we hope there is a high recovery. It's certainly not an exact science, and the process typically takes several years, but often the recovery on Ponzi schemes can be quite substantial, especially when there are numerous physical assets such as property and vehicles, as is the case here.

We also do not think potential victims should take Jongeward's and Jager's advice to *not* reach out to regulators, and believe that advice could be self serving. Anyone who believes they may have been a victim of this scheme should fill out a survey on the FBI's website(https://forms.fbi.gov/seeking-victim-information-in-slip-and-fall-lawsuit-ponzi-scheme-investigation/) An expedient resolution is often the best outcome for everyone. Often regulators take a role in establishing a receiver and collecting/distributing funds and proactive outreach could help aid that process.

You can also reach out to us with information or just to talk about the situation, as desired. Our email is info@hindenburgresearch.com(mailto:info@hindenburgresearch.com). Keep your heads up, it gets better from here (unless you're a part of J&J, we reckon).

## Legal Disclaimer

Use of Hindenburg Research's research is at your own risk. In no event should Hindenburg Research or any affiliated party be liable for any direct or indirect investment losses caused by any informati report. You further agree to do your own research and due diligence, consult your own financia and tax advisors before making any investment decision with respect to transacting in any securities

covered herein. This is not an offer to sell or a solicitation of an offer to buy any security, nor shall any security be offered or sold to any person, in any jurisdiction in which such offer would be unlawful under the securities laws of such jurisdiction. Hindenburg Research is not registered as an investment advisor in the United States or have similar registration in any other jurisdiction. To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from sources we believe to be accurate and reliable. However, such information is presented "as is," without warranty of any kind – whether express or implied. Hindenburg Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. All expressions of opinion are subject to change without notice, and Hindenburg Research does not undertake to update or supplement this report or any of the information contained herein.

Posted in Uncategorized(https://hindenburgresearch.com/category/uncategorized/) ·

© 2018 Hindenburg Research (//hindenburgresearch.com). All Rights ReservedLegal Disclaimer (/legal-disclaimer) ·
Privacy Policy (/privacy-policy)
Theme by Robert DeVore(https://robertdevore.com).

Privacy - Terms

# EXHIBIT D

Tr. of Initial Hr'g, Mar. 8, 2022, United States v. Matthew
Wade Beasley,
Case No. 2:22-MJ-00171-EJY (D. Nev.)

1

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1          UNITED STATES DISTRICT COURT

2             DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )  Case No. 2:22-mj-00171-EJY
5         Plaintiff,                 )
                                     )  Las Vegas, Nevada
6         vs.                        )  Tuesday, March 8, 2022
                                     )  Courtroom 3D
7   MATTHEW WADE BEASLEY,            )
                                     )  Initial Appearance
8         Defendant.                 )
                                     )  **C E R T I F I E D   C O P Y**
9                                    )
                                     )
10  _____ )

11

12

13                   TRANSCRIPT OF PROCEEDINGS

14        BEFORE THE HONORABLE ELAYNA J. YOUCHAH,
               UNITED STATES MAGISTRATE JUDGE

15

16

17  APPEARANCES:                    See next page

18
    DIGITALLY RECORDED:             Liberty Court Recorder (LCR)
19                                  2:34 p.m. - 2:53 p.m.

20
    RECORDED BY:                    E. Garcia
21

22  TRANSCRIBED BY:                 Samantha N. McNett
                                    Samantha_McNett@nvd.uscourts.gov
23

24

25  Proceedings recorded by electronic sound recording; transcript
    produced by machine shorthand and computer-aided transcription.

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

 1  APPEARANCES:

 2  For the Plaintiff:

 3      **TONY LOPEZ, ESQ.**
         **ERIC SCHMALE, ESQ.**
 4      U.S. ATTORNEY'S OFFICE
         501 Las Vegas Boulevard South
 5      Suite 1100
         Las Vegas, Nevada 89101
 6      702-388-6551

 7
     For the Defendant:
 8
         **ROBERT M. DRASKOVICH, ESQ.**
 9      ROBERT M. DRASKOVICH, CHTD.
         815 South Casino Center
10      Las Vegas, Nevada 89101
         702-474-4222
11

12  Also Present:

13      Emily McKillip, Pretrial Services Officer

14                          * * *

15

16

17

18

19

20

21

22

23

24

25

─────────────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────────────

1          LAS VEGAS, NEVADA; TUESDAY, MARCH 8, 2022; 2:34 P.M.

2                              --oOo--

3                      P R O C E E D I N G S

4          THE COURTROOM ADMINISTRATOR:  This is the time set in

5   the case of 2:22-mj-171-EJY, United States of America versus

6   Matthew Wade Beasley.

7          Counsel, please enter your appearance for the record.

8          MR. LOPEZ:  Good afternoon, your Honor.  Tony Lopez

9   for the United States.  With me is AUSA Eric Schmale who may

10  have to leave before the hearing ends.

11         THE COURT:  Thank you.

12         MR. DRASKOVICH:  And good afternoon, your Honor.

13  Robert Draskovich on behalf of Mr. Beasley.

14         THE COURT:  Thank you.

15         All right.  Mr. Beasley, before we commence the

16  substance of this hearing, I must advise you that I am

17  authorized to hold this proceeding by videoconference.  That

18  authority comes from an act of Congress as well as an order

19  from the chief justice of the United States District Court for

20  the District of Nevada.

21         However, I need to ensure that you understand you have

22  the right to be here in person and that you are choosing to be

23  here by videoconference.

24         Do you wish to proceed today appearing by

25  videoconference, sir?

```
                    ─TRANSCRIBED FROM DIGITAL RECORDING─
```

1           THE DEFENDANT:  Yes, your Honor.

2           THE COURT:  All right.  Thank you.

3           Would you state your full name for me, please?

4           THE DEFENDANT:  Matthew Wade Beasley.

5           THE COURT:  How old are you, sir?

6           THE DEFENDANT:  49.

7           THE COURT:  How many years of school did you complete?

8           THE DEFENDANT:  20.

9           THE COURT:  Thank you.

10          I do understand -- I believe you're an attorney.  Is

11   that right, sir?

12          THE DEFENDANT:  That is correct.

13          THE COURT:  All right.  Even though some of these

14   questions may be obvious to you, I need to go through them with

15   you irrespective of your legal training.

16          You are here today because a criminal complaint was

17   filed against you in the United States District Court for the

18   District of Nevada.  In that complaint, which was filed on

19   March 4, 2022, there is one count, and that count is assault on

20   a federal officer in violation of 18 USC Section 111(a)(1) and

21   111(b).

22          Have you received a copy of the complaint?

23          THE DEFENDANT:  Yes, I have, your Honor.

24          THE COURT:  And have you had a chance to review it?

25          THE DEFENDANT:  Yes, I have.

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1        THE COURT:  You're not required to make any statement

2   today at this proceeding or at any other time to anyone,

3   including law enforcement, about the charge in the complaint.

4   Anything you say can be used against you.

5        Do you understand that right?

6        THE DEFENDANT:  Yes, your Honor.

7        THE COURT:  You have the right to a preliminary

8   hearing, because this is a complaint, at which time the

9   Government is required to provide evidence of probable cause to

10  support the crime with which you have been charged in the

11  complaint.

12        At that hearing, you have the right to call witnesses,

13  to give evidence on your behalf, you have the right to

14  cross-examine witnesses who are called to give evidence against

15  you, and you have the right to take the witness stand and

16  testify on your own behalf, if you choose to do so, but you

17  cannot be compelled to do so and your choice not to do so

18  cannot be held against you or commented upon by the Court.

19        Do you understand those rights?

20        THE DEFENDANT:  Yes, your Honor.

21        THE COURT:  In the event that an indictment is

22  returned against you -- and I'm sure you understand what that

23  is, but I'll state it for the record -- that means that the

24  grand jury has met and found probable cause for the crime that

25  is alleged in the complaint.  There will be, in that case, no

**58**

```
———— TRANSCRIBED FROM DIGITAL RECORDING ————
```

1    preliminary hearing.  The preliminary hearing will be vacated.

2              I know that you have retained counsel in this matter,

3    and I have a copy of the designated -- a designation of

4    retained counsel in front of me, which will be entered -- or

5    has been entered in the Court.

6              Did you have a chance to speak with your counsel

7    before today's hearing about the charge?

8              THE DEFENDANT:  Yes, I have.

9              THE COURT:  And do you understand what you are charged

10   with?

11             THE DEFENDANT:  Yes, I -- yes, I do.

12             THE COURT:  Mr. Draskovich, do you have any reason to

13   question the competence of Mr. Beasley or his ability to assist

14   you in his defense going forward?

15             MR. DRASKOVICH:  No, I do not.

16             THE COURT:  Thank you.

17             The preliminary hearing in this matter is set for

18   Tuesday, March 22, 2022 at 4:00 p.m. in courtroom 3B.

19             We will now proceed with the detention hearing.

20             Mr. Lopez, is the Government prepared to go forward

21   today with detention?

22             MR. LOPEZ:  Yes, your Honor.

23             THE COURT:  And are -- and are you seeking detention,

24   sir?

25             MR. LOPEZ:  Yes, your Honor.  The Government seeks

```
————TRANSCRIBED FROM DIGITAL RECORDING————
```

 1  detention under 3142(f)(1) and (f)(2).

 2          THE COURT:  Thank you.

 3          And Mr. Draskovich, are you prepared to go forward

 4  today with the detention hearing?

 5          MR. DRASKOVICH:  Yes, I am.

 6          THE COURT:  And are you seeking release for your

 7  client?

 8          MR. DRASKOVICH:  Yes, I am.

 9          THE COURT:  All right.  Mr. Lopez, would you please

10  make your presentation first.

11          MR. LOPEZ:  Thank you, your Honor.

12          The Government concurs with pretrial services's

13  recommendation that the Court detain the defendant as both a

14  risk of nonappearance and a danger to himself and the

15  community.

16          The defendant is accused of a crime of violence,

17  assaulting FBI agents by brandishing a firearm at them causing

18  the agents to shoot him and striking him in the chest and

19  shoulder.

20          After the shooting, the defendant retreated into his

21  home and refused to come out for nearly four hours despite

22  suffering from two bullet wounds and in need of medical

23  attention.

24          While the defendant was speaking with the FBI

25  negotiator trying to get him out of the house, the defendant

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1   repeatedly confessed to his involvement in what he described as
2   a Ponzi scheme.  He repeatedly claimed that he wished the
3   agents had killed him.  And he repeatedly stated that the
4   stand-off was going to end with him dead, killing himself
5   because he could not go to prison and he was unwilling to come
6   out of the house alive.

7           Now, in his report to pretrial services, the defendant
8   claimed that he thought of attempting suicide after he was shot
9   and lying in his own blood, but this significantly minimizes
10  what happened here.

11          First of all, before he was shot, he held a gun to his
12  head when the FBI appeared at his door.  After he was shot,
13  over and over again for several hours, the defendant told the
14  FBI negotiator that this was going to end with the defendant
15  killing himself.

16          So despite the best efforts of the negotiator, the
17  defendant never came out voluntarily.  And the FBI SWAT team
18  had to forcibly enter the home and bring him out.  When they
19  did, the FBI recovered the defendant's firearm and discovered
20  it was loaded indicating that he was capable of harming the
21  agents but also capable of following through on his threats to
22  kill himself during the stand-off.

23          This was also not a "spur of the moment" act.
24  Bringing this gun to the door was premeditated.  The defendant
25  said that he expected the FBI to come for him that day because

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1    the FBI visited an associate earlier.  Out front, the FBI rang

2    a Ring brand doorbell.  Those often have a camera that display

3    real-time video where the -- which may have allowed the

4    defendant to see who was there.  And when he came to the front

5    door, the defendant already had a gun in his hand, which shows

6    he knew who was coming.

7          So while the defendant faces a significant sentence

8    for the conduct charged in this complaint, he also faces a

9    significant sentence for the Ponzi scheme I mentioned earlier

10   that he admitted orchestrating.  He told the FBI negotiator

11   that the scheme started as far back as 2017 and involved

12   $300 million.  This is the potential prison exposure that

13   triggered his extreme reaction when the FBI came to his door.

14         At one point, the defendant told the negotiator that

15   his bank records will make it all clear.  And on that point,

16   the defendant is correct.  He's an attorney with an IOLTA

17   account that tells a clear story.

18         Since 2017, the defendant has taken in more than

19   $300 million through that IOLTA account.  This nine figure

20   Ponzi scheme is what made the defendant hole up in his house

21   for four hours until the FBI had to literally drag him out.  He

22   was willing to take his own life rather than answer for his

23   actions.  He expressly told the negotiator he wished the FBI

24   had killed him so he didn't have to do it himself.

25         At a minimum, the defendant is an extreme danger to

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1    himself.

2           But even if he doesn't harm himself, he's a danger of

3    fleeing if he's released.  His financial disclosure to pretrial

4    services shows that he has accumulated significant assets

5    during the course of this Ponzi scheme he admitted to:  A

6    $4 million home near Tahoe, the $1.8 million home where the

7    assault took place, two other residences worth almost a million

8    dollars combined, an RV worth almost half a million dollars, a

9    $300,000 Bentley, a $300,000 Ferrari, and a $100,000 Escalade.

10          Notably, the defendant claims to only have $40,000 in

11   bank accounts which is suspiciously low given the volume of

12   funds that he took in and the assets he's acquired.  It's also

13   inconsistent with the bank statements for his IOLTA account.

14   We do not have bank statements yet from 2022, but the most

15   recent statements that we have from 2021 show average daily

16   balances of $3- to $4 million.  So it seems surprising that the

17   defendant now claims he only has $40,000 in the bank.

18          The defendant's words and actions from March 3rd, the

19   day he brandished the gun in front of the FBI agents, those

20   words and actions were erratic, desperate, dangerous.  He

21   refused to come out of his home for four hours rather than get

22   the medical attention he needed.  He would have rather died in

23   his home bleeding out from two gunshot wounds than surrender to

24   police.

25          So this Court cannot be assured that Mr. Beasley will

**63**

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1   voluntarily appear, it cannot be assured that he won't harm

2   himself, and the Court cannot be assured that he won't cause

3   another stand-off with law enforcement when the time comes for

4   the defendant to answer for his deeds.

5         And for all those reasons, the Court should detain him

6   pending trial.

7         THE COURT:  Thank you, Mr. Lopez.

8         Mr. Draskovich?

9         MR. DRASKOVICH:  Your Honor, thank you.

10        Beginning with the pretrial services's report, as far

11   as the assessment of non-appearance, you know, the first two

12   factors, the nature of the instant alleged offense and

13   (unintelligible) behavior as noticed in the complaint -- or as

14   noted in the complaint, are basically the same thing.  Your

15   Honor is well aware of the Bail Reform Act, the nature and --

16   of the -- and circumstances of the alleged conduct -- criminal

17   conduct should be given the least amount of weight.

18        It goes on to state that factors should be his mental

19   health history.  And this gentleman has none.  That was

20   verified by him in his interview with pretrial services as well

21   as his wife's interview.

22        As far as financial assets that are inconsistent with

23   the defendant's reported income, you know, obviously we'll get

24   to that and review the evidence as it's produced in discovery.

25        I would submit that what the Government has pointed to

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1    concerning the facts and circumstances of his arrest point to

2    remorse and point to a one-time, extreme emotional crisis that

3    he experienced that day FBI agents came to his home.

4         It should be noted that although he needed medical

5    attention and although he was in his house for nearly four

6    hours, no harm was attempted to the FBI agents when they'd

7    entered his home or were at the door.  It appears that during

8    this period of extreme mental duress, the anguish, you know,

9    and the concern was pointed to himself, but nonetheless, he did

10   not take his life.

11        As far as the assessment of danger, again, it notes

12   the nature of the instant alleged offense and arrest behavior

13   as noted in the complaint, and I would submit they're one in

14   the same thing.

15        The third factor, mental health history, this

16   gentleman has none other than this one isolated day on

17   March 3rd.

18        This gentleman -- I spent some time with him this

19   morning through a video link -- has never been out of the

20   country.  He does not own a passport.  He has significant

21   family ties to this community.  Family ties to this community.

22   In fact, his wife and his three sons are in my office for this

23   hearing and they completely support their husband and -- and

24   father.

25        I would submit that both as to assessment of

**65**

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1   non-appearance and assessment of danger there are a combination

2   of conditions that can be imposed that would reasonably assure

3   that he present neither.  Obviously, there would be a firearms

4   requirement, that he's not to possess or have in his home or

5   anywhere (unintelligible) associated with a firearm.  I think

6   that would alleviate the Government's danger concerns.

7           This gentleman is willing to undergo electronic

8   monitoring, although he is not going anywhere.

9           In our discussion -- our lengthy discussion this

10  morning, he is ready to address some issues that were brought

11  up by the Government and move forward.

12          He'd be happy to -- I mean his wife would be happy to

13  serve as a third-party custodian or promisor for future court

14  appearances.

15          What happened on March 3rd is he was simply

16  overwhelmed and, in part based upon what the Government has

17  stated, it's understandable and it was an understandable

18  reaction, but it's not a course of conduct or a pattern of

19  conduct or a history of conduct that this gentleman has engaged

20  in.  It was a one-time deal.

21          Based upon these factors and these arguments and these

22  facts, I would urge the Court to release him with these

23  conditions and any other conditions the Court sees fit to

24  impose.

25          And on that, I'll submit it.

—TRANSCRIBED FROM DIGITAL RECORDING—

1          THE COURT:  Thank you, Mr. Draskovich.

2          Of course, under 3142 -- 18 USC 3142, the Court must

3   determine by a preponderance of the evidence in this case

4   whether there are any conditions or combination of conditions

5   that will reasonably assure the defendant's appearance as

6   required in the future and by clear and convincing evidence

7   whether there is any condition or combination of conditions

8   that will ameliorate any danger that he may pose to the

9   community.

10         The Court read the complaint and, of course, has

11  listened to the presentation by both parties.  The conduct that

12  occurred on the day that Mr. Beasley, the defendant, was

13  arrested is frightening and certainly of grave concern to the

14  Court.

15         With respect to danger of future -- of failing to

16  appear in the future and the preponderance of the evidence and

17  whether there are any conditions, the Court finds that there

18  are none, that Mr. Beasley has extraordinary resources at his

19  disposal.

20         And while the Court recognizes that he owns property

21  in the State of Nevada and has family in the State of Nevada,

22  that he is facing a substantial jail sentence should he be

23  convicted of either the crime in this charge or the underlying

24  offense that apparently led him to the desperate acts that

25  occurred on the date in March when he faced law enforcement,

— TRANSCRIBED FROM DIGITAL RECORDING —

1   those -- those desperate acts indicate to this Court -- and the

2   description of those desperate acts including bringing a gun to

3   a door that someone knows on the other side is federal law

4   enforcement and being willing to point that gun first at your

5   own head and then at law enforcement and then barricading

6   oneself in the home for four hours while you're bleeding --

7   indicates to me a desperation that cannot be addressed through

8   any condition or combination of conditions the Court could

9   fashion that would reasonably assure the appearance in the

10  future.

11         With respect to danger to the community, the Court

12  finds the nature and circumstances of the offense establish

13  clear and convincing evidence that there are no conditions or

14  combination of conditions the Court could fashion that would

15  reasonably ameliorate that danger.

16         While I appreciate the defendant's wife's willingness

17  to act as a third-party custodian for her husband, that

18  relationship did not in any way prevent the events that

19  occurred on the date that FBI showed up at his house, which are

20  extreme.

21         And while I appreciate that any guns might be removed,

22  there's no way to stop guns from reappearing whether that is

23  through associates or family or friends.  And given the

24  repeated statements regarding willingness to take one's own

25  life and the indication that he was willing to shoot law

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  enforcement cannot be ameliorated sufficiently through a

2  third-party custodian or home detention or GPS monitoring to

3  satisfy the Court.

4          The reports indicate that Mr. Beasley knew it was law

5  enforcement when he came to his door.  He came to his door with

6  a loaded gun.  He came to the door with a loaded gun willing to

7  kill himself.  He came to the door with a loaded gun willing to

8  shoot law enforcement.  He came to the door of his own home

9  with a gun.  He aimed and waved that gun at law enforcement

10 even after they backed away and told him to drop the gun.  And

11 then he barricaded himself in his home for over four hours

12 while he bled and was undoubtedly in pain and terrified for his

13 own future but apparently willing to continue to think about

14 taking his own life at that time as opposed to coming out.

15         This is not conduct that can be adequately addressed

16 through conditions the Court can impose.

17         The Court finds by clear and convincing evidence that

18 there are no conditions or combination of conditions that will

19 reasonably assure the safety of the community or by

20 preponderance of the evidence that there are no conditions or

21 combination of conditions that will reasonably assure

22 Mr. Beasley's appearance in the future.

23         And for those reasons, he is detained and remanded to

24 the custody of the U.S. Marshal Service until his next hearing

25 date.

┌─────────────────────────────────────────────────────────────┐
─TRANSCRIBED FROM DIGITAL RECORDING─

1           With that, I must read the Brady admonition, which is

2    required by the Ninth Circuit, which states, under Criminal

3    Rule 5(f), the Government is ordered to comply with its

4    disclosure obligations under Brady vs. Maryland and related

5    cases.  Failure to do so may result in sanctions.  A written

6    order will follow.

7           Thank you, everyone.  This matter is adjourned.

8           (Whereupon, the proceedings concluded at 2:53 p.m.)

9                              * * *

10

11

12

13

14                           --o0o--

15              COURT REPORTER'S CERTIFICATE

16

17       I, SAMANTHA N. MCNETT, Official Court Reporter, United

18   States District Court, District of Nevada, Las Vegas, Nevada

19   certify that the foregoing is a correct transcript from the

20   record of proceedings in the above-entitled matter.

21

22   Date:  March 10, 2022

23

24                              /s/ Samantha N. McNett
                                Samantha McNett, RPR, CRR, CCR
25

└─────────────────────────────────────────────────────────────┘

**70**

# EXHIBIT 4

# J&J Purchasing: When It Sounds Too Good To Be True

Published on March 24, 2022

## GET OUR LATEST REPORTS DELIVERED TO YOUR INBOX

| email address | SUBSCRIBE |

As some readers of Hindenburg may be aware, our founder, Nate Anderson, got his start in the fraud research world by investigating suspected Ponzi schemes and private market fraud. Prior to Hindenburg, Anderson had submitted whistleblower reports to regulators on the following funds:

1. Platinum Partners, a ~$1.4 billion firm where 7 fund managers (https://www.nytimes.com/2016/12/19/business/dealbook/platinum-partners-hedge-fund-founder-and-6-others-charged-with-fraud.html) were arrested and charged criminally following Anderson's work together with noted Madoff whistleblower Harry Markopolos.
2. TCA Global, a ~$400 million asset manager that was subsequently alleged by the SEC (https://www.sec.gov/news/press-release/2021-204) to have fraudulently inflated performance results.
3. RD Legal, a litigation finance firm with ~$150 million in assets which was subsequently alleged by the SEC (https://www.sec.gov/litigation/admin/2016/33-10111.pdf) to have defrauded its investors. The fund took the case to trial and lost on several claims.
4. Statim Holdings, a ~$40 million firm that was subsequently alleged by the SEC (https://www.sec.gov/litigation/litreleases/2019/lr24383.htm) to have defrauded its investors.
5. West Mountain LLC, a ~$54 million asset manager that was subsequently alleged by the SEC (https://www.sec.gov/litigation/litreleases/2019/lr24539.htm) to have fraudulently overvalued its assets.

Today, we go back to our origins. Over the last several months, we have been researching an investment firm that we believe to be a Ponzi scheme.

Privacy · Terms

This firm, J&J Purchasing, has pitched potential clients on an investment offering 50% annualized returns with virtually zero risk. It claimed, at one point, to have raised $400 million from over 1,000 investors since 2016.

Through the course of our research, we submitted our findings to regulators through the SEC's tip program. We recently also shared our work with reporters at the Wall Street Journal.

Our work has included in-house research, extensive document review, as well as in-person meetings and recorded correspondence with the firm's principals and marketers under the guise of becoming a potential client.

As reported by the WSJ (https://www.wsj.com/articles/an-alleged-fraud-uncovered-by-a-short-seller-ends-in-gunfire-11648051215), part of our research included hosting one of J&J's key marketing managers and a marketer in a private jet we rigged with hidden video and audio recording equipment.



(Hindenburg Research hidden camera photo of J&J marketers pitching investors inside the private jet)

Privacy · Terms



(Hindenburg Research surveillance photo of J&J marketers leaving the meeting)



(Hindenburg Research surveillance photo of J&J marketers leaving the airfield)

Earlier this month, Federal authorities visited (https://www.reviewjournal.com/crime/courts/lawyer-shot-by-fbi-agents-accused-of-running-300m-ponzi-scheme-2541707/) one of the firm's key principals, 49 year old attorney Matthew Beasley, in order to question him, according to court records (https://www.slideshare.net/HindenburgResearch/usa-vs-beasley-initial-appearance-transcript).

Privacy · Terms

Beasley had been tipped off about the prospect of an FBI visit by another individual at the firm who had also just been visited that day. Upon seeing FBI agents at his door, Beasley pointed a gun to his own head. The agents implored him to drop the weapon. Beasley instead pointed the weapon at the agents, who then opened fire, striking him in the chest and shoulder.



(Local news report (https://news3lv.com/news/local/fbi-alleges-las-vegas-attorney-pointed-gun-at-agents-before-he-was-shot-matthew-beasley-lawyer-federal-investigation-crime-las-vegas-police-nevada) on the stand-off)

According to the same court records (https://www.slideshare.net/HindenburgResearch/usa-vs-beasley-initial-appearance-transcript), Beasley survived the shooting and barricaded himself behind his door. The FBI then sent a negotiator, who attempted to convince Beasley to disarm.

Throughout the course of the 4-hour negotiation, Beasley "repeatedly confessed to his involvement in what he described as a Ponzi scheme", according to a court transcript (https://www.slideshare.net/HindenburgResearch/usa-vs-beasley-initial-appearance-transcript).

Eventually, a SWAT team was able to disarm and arrest him.

Beasley was released from the hospital the following week and was remanded into custody, according to local media (https://www.abajournal.com/news/article/lawyer-shot-and-injured-by-fbi-agents-admitted-orchestrating-300m-ponzi-scheme-prosecutor-alleges). He was charged (https://www.slideshare.net/HindenburgResearch/usa-v-matt-beasley-complaint) with 1 count of Assault on a Federal Officer and was denied bail (https://www.slideshare.net/HindenburgResearch/usa-vs-beasley-initial-appearance-transcript). Thus far, neither Beasley nor anyone at the firm has been c with fraud, though we expect that may change.

What follows is our research on just what happened with J&J Purchasing.

## Background on J&J Purchasing/J&J Consulting Services, a Firm That Claims Perfect 50% Annual Returns Across Its Portfolio of 20,000 Litigation Funding Contracts, With Zero Defaults and Zero Late Payments in the Past 4 Years

Until earlier this month, an investment firm in Las Vegas run by a former sales rep for a local pharmacy was virtually guaranteeing returns that would put almost every investment manager on earth to shame.

Las Vegas resident Jeffrey J. Judd launched J&J Consulting Services, Inc. in May 2005, per Nevada corporate records(https://opencorporates.com/companies/us_nv/E0328382005-8) which describe him as President/Treasurer/Director of the entity. In October 2021, Judd also launched (http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail? inquirytype=EntityName&directionType=ForwardList&searchNameOrder=JJPURCHASING%20L21000447 7540&aggregateId=flal-l21000447754-7a2dcfc0-9690-4eff-9d47- e2872cd1e514&searchTerm=JJP%20TRANSPORT%20SERVICES%20LLC&listNameOrder=JJPUMPING%20L0 50000947530) a new Florida entity called J&J Purchasing LLC.

Both J&J entities offer investments in "litigation finance", a fast-growing investment field whereby funds provide loans to law firms or their clients.

As detailed below, J&J had no marketing materials or website. We were only able to learn about the investment proposal through calls and meetings with Judd and some of the firm's marketers who pitched us as prospective investors. As Judd said to us during a call:

> *"The whole business is done off of referrals. There's no direct consumer marketing, nothing like that. ==It's just a referral-based business.=="*

According to a call we had with one marketer, J&J has 12-15 individual marketers canvassing for investors.

Jason Jongeward, a key J&J marketer whose prior work experience including running a small construction company (https://www.linkedin.com/in/jason-jongeward-45753695/) before quitting to raise capital full time, told us that the reason for the new entity with its new name was to indicate to the SEC that it was not making financial offerings (even though it does):

> *"Jeff changed, or he created a new company called J&J Purchasing. Obviously, J&J Consulting does not give the right impression to the SEC that you're not giving any financial advice, right? So he changed the name to J&J Purchasing."*

J&J's litigation finance strategy solely involves investing in *post*-settlement claims in personal injury cases, offered to investors through a network of 66 law firms, according to its marketers. These are among the least risky forms of litigation finance because they take place *after* litigation has settled and after the amount of compensation to the victim has already been determined.

In other words, an insurance company has agreed to pay an injured party a settlement and the plaintiff is just waiting for the money to be sent. Shane Jager, a J&J marketing manager, said, "the bulk of the claims we work with are slip and falls."

J&J's Jongeward said "most of these injury claims are in the $225,000-$350,000 range" but the individuals entitled to payment are in "financial despair" so they can't wait 90 days to receive the payment.

This is where J&J comes in, offering law firms and their clients an immediate 90-day advance for a 25% fee. It's akin to the familiar TV commercials (https://www.youtube.com/watch?v=Q0klvfQ39o4&t=18s) from well-known litigation funder J.G. Wentworth:

> *"I have a structured settlement, and I need cash now!"*

The 25% interest rate for a 90-day advance translates to a simple interest rate of 100% per annum (or a 136% compounded rate of return). J&J's principals say they keep half of the profit (12.5% every 90 days) with the other half going to the investor (12.5%).

Investors were encouraged (but not required) to roll their capital back into new cases, for a simple 50% return per year (a 12.5% profit each quarter). Investors allocated either $80,000 or $100,000 to each investment contract. Investors could invest in multiple individual contracts, and many did.

Jongeward explained the mechanics to us as follows:

> *"We will give them [the plaintiff who has a settled claim] $80,000 or $100,000 in 72 hours. When they received the settlement after that 90-day period, the attorney and the plaintiff then pay us back according to the terms of our contract that $80,000 or $100,000. And with a 25% price tag on it."*

> *"Within two years, you're able to get your entire investment back, which is unheard of."*

Privacy - Terms

J&J has claimed to have entered into 20,000 such contracts since inception. Incredibly, the firm has told investors there have been **zero defaults**. Judd told us his firm has, "never had one of these go bad."

Similarly, Jongeward told us, over multiple calls:

> *"**We've closed over 20,000 contracts with zero defaults**."*

> *"Fast forwarding to today, we are at **20,000 contracts, successfully closed, zero defaults**."*

When asked about the risk, Jongeward said:

> *"We really, really struggle to see the risk. I think that's probably why **the performance has been—I'll call it immaculate. We haven't had any contract default, not one.** So for me, it's really about the performance history on an investment really is the true indicator of what it's doing."*

Jongeward also claimed, on several occasions, that J&J hasn't had any late payments in the past 4 years, an assertion that other J&J operators later repeated to us. Per Jongeward, early in J&J's history, they had experienced three delays in contract repayment, all of which related to Medicare and Medicaid, so they stopped signing contracts that had government payors:

> *"So, since they've stopped with Medicare, Medicaid, they haven't had any, any close slow. I think that was all have identified and adjusted in that first year. **So, in years 2,3,4,5 and then coming into 6 now they haven't had any late payments**".*

Essentially, J&J's pitch expected investors to believe that (1) for more than five years, J&J has issued and collected on ~20,000 contracts without any defaults, (2) that J&J has been able to generate a 25% return in 90 days (for every contract executed, for a 100% annual return), (3) that J&J's network of 66 law firms have always sent in payments precisely within the 90-day time frame and (4) that all of this has been achieved with J&J's paper-thin infrastructure (detailed further below).

The marketers for J&J Purchasing claimed to have placed over $400 million with over 1,000 participating investors. Jongeward described it to us as, *"it's just kind of this growing monster."* (J&J principal Matt Beasley, as he lay barricaded behind his door with multiple gunshot wounds, contradicted the $400 million placement figure when he acknowledged to an FBI negotiator that the firm only had $300 million in assets.)

If the investment pitch sounds too good to be true, that's because it almost certainly is. Across our career in investment research, we have seen some brazen irregularities, but never have we seen clearer red flags than what we found at J&J.

## J&J's Claimed Investment Opportunities Have Abnormal Characteristics That Make No Sense For The Industry It Claimed To Operate In

The post-settlement litigation finance industry was studied in an academic paper (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3670825) published on August 10, 2020. Its findings underscore how J&J, if its claims are true, would represent a massive industry outlier in virtually every regard.

The study sampled over 3,200 post-settlement claims and found that the median **gross case value,** or the size of the plaintiff's settlement, was $50,000. [Pg. 35 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3670825)] This is far below the $225,000 to $350,000 range claimed by J&J's operators.

The research found that the median **amount funded** by litigation finance firms per post-settlement case was $5,000, far below either the $80,000 and $100,000 investment amounts offered by J&J. [Pg. 35 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3670825)] In a follow up with one of the study's authors, he explained to us that a funding amount of $40,000 or above falls within the 1 percentile of the study's sample.

Therefore, J&J's claimed $80,000 to $100,000 funding amounts put *each and every* case deep within the top 1 percentile of funded amounts in the post-settlement industry.

J&J's funded loan sizes are between 16x-20x the industry median. It simply defies all probability that J&J has financed 20,000 abnormally large post-settlement claims. We asked settlement funding industry experts what they thought about the consistent $80,000 and $100,000 investment amounts claimed by J&J. They told us:

> *"That sounds kind of insane to me, for a couple reasons. First, it's just really high, like how many people are really getting $400,000 [settlements]? You know, like, I think, I think the average advance to personal injury claimants is like, in the four figures, nationally. So that's really high, which means that, you know, sounds sketchy, and how are they finding so many of these?"*

> *"The numbers don't make sense in terms of their homogeneity, just the shape of the number, this thing at $80,000 to $100,000. Where does that come from? There's no, there's no reaso the world why that number would be that number"*

Put simply, the number and size of cases in J&J's portfolio may not even exist across the entire post-litigation funding industry.

The academic research also shows that defaults for post-settlement claims are very low, albeit non-zero, at about 1%. [Pg. 42 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3670825)] Even with the low industry default rate, the claims by J&J of having no defaults across 20,000 claims becomes mathematically absurd: a roughly one in 2E87 (two with eighty-seven zeros) chance.

Written out, mathematically, we found that J&J was...

99.99999999999999999999
99999999999999999999999
99999999999999999999999
9999999999999999999995%

...likely to be underreporting its default rates.

## J&J Has No Website and Provides No Marketing Materials, Unlike Virtually Every Other Private Investment We Have Ever Seen. All Pitches Are Done Over the Phone

We learned of J&J Purchasing LLC and J&J Consulting Services Inc. from a reader. Apart from this tip, There would be little chance we'd have heard of it otherwise—J&J has no website, doesn't share marketing materials with its prospective investors and confines its investor pitches to the phone only. J&J marketer Jongeward told us:

> *"There's not that many people that know about it, because they, it's all word of mouth. And its such a great investment that you don't need to do any advertising."*

This differs sharply from virtually every other private investment opportunity we've seen (a figure that likely numbers in the thousands). Prospective investors in such opportunities are generally provided a series of basic marketing materials such as (1) tear sheets or summaries; (2) full PowerPoint presentations; (3) investor update letters; and (4) due diligence questionnaires (DDQ). These materials are considered industry standard because they help prospective investors thoroughly understand the details of the investment they are considering.

One reason for J&J's secrecy, as indicated by Jongeward, is because the proprietary investment opportunity is *so* great that the group is worried it may leak out to the broader investment world:

Privacy · Terms

> *"We don't want anybody taking our documents and trying to create another company for competition."*

But that is not the only reason for secrecy. According to Judd, J&J stopped doing contracts in Las Vegas, because, "we didn't want people knowing what we did in our backyard."

When we engaged with J&J as prospective investors, the only documents we received were subscription documents for the investment, and several nondisclosure agreements (NDAs).

We couldn't find any corporate offices for any of the J&J entities. J&J Consulting has a P.O. Box as a registered mailing address (https://opencorporates.com/companies/us_nv/E0328382005-8). J&J Purchasing's registered mailing address (http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=ForwardList&searchNameOrder=JJPURCHASING%20L210004477540&aggregateId=flal-l21000447754-7a2dcfc0-9690-4eff-9d47-e2872cd1e514&searchTerm=JJP%20TRANSPORT%20SERVICES%20LLC&listNameOrder=JJPUMPING%20L050000947530) corresponds with its registered agent (https://www.floridaregisteredagent.net/) address.

The operation seems to have no employees outside of Judd and his family. Judd explained his corporate operation:

> *__I manage the whole thing__ with my son. He is 26. Does a lot of the paperwork."*

We asked an industry expert what kind of corporate operation one would expect in order to execute J&J's claimed investment operation. He described the need for extensive overhead (as may seem obvious for an investment executing 20,000 contracts and working with over 1,000 investors.) He said:

> *"You need underwriting people, you need people to follow up, you need people to document, you need people to talk to the attorneys' offices, and there's a lot of cajoling."*

Another industry expert provided some details about the kind of tasks involved when buying an interest in a settled legal claim:

> *"It's a lot of work to be [done], doing due diligence, verifying the settlement ... And then also controlling kind of how the money comes to you, right? Like, how do you make sure that, that when there's a settlement, your cut actually gets paid back? And the client doesn't just take it."*

As a comparable, an industry expert pointed us to Lawcash (https://lawcash.com/), a firm that focuses on litigation funding. According to the expert, Lawcash does $3.5 million in transactions every month; around $10 million a quarter. Despite Lawcash's quarterly transaction volumes representing about 2.5% of what J&J purports to do, the company's LinkedIn Page (https://www.linkedin.com/company/lawcash/) shows 35 employees.

Apart from Judd, we found no other J&J employees on LinkedIn.

## One Might Expect the Man Who Discovered Such a Flawless Investing Strategy to Have Extensive Experience In Litigation Funding

### Founder Jeff Judd's Prior Experience Was as a Sales Rep for a Local Pharmacy

Typically, brilliant investment strategies are discovered by those with deep knowledge and experience in a particular field. J&J's stated field is litigation finance, a highly competitive market that as of 2020 included at least 46 funds with a combined $11.3 billion in assets under management, according to a survey (https://www.westfleetadvisors.com/publications/) by industry research firm WestFleet Advisors.

Those include (https://www.pionline.com/investing/litigation-finance-finds-its-feet-targeting-returns-20) funds run by asset management giants such as:

- Elliot Management (~$34 billion (https://www.elliottmgmt.com/about-elliott/))
- D.E. Shaw (~$60 billion (https://www.deshaw.com/what-we-do/investment-approach))
- Fortress Investment Group (~$54 billion (https://www.fortress.com/about))

It also includes dedicated funds such as Burford Capital (https://www.burfordcapital.com/), staffed with numerous litigation and industry personnel. The litigation funding field also has smaller, nimble competitors focusing on specialties such as pre- and post-litigation financing, intellectual property, mass tort, complex commercial litigation, and personal injury.

Top funds in the industry typically aim for returns (https://www.pionline.com/investing/litigation-finance-finds-its-feet-targeting-returns-20) in the 20% range while taking on substantial risk, far below the virtually guaranteed 50% returns, net of fees, offered by J&J.

A simple Google search (https://www.google.com/search?q=post-settlement+funding) for "post settlement funding" turns up dozens of immediate competitors offering litigants interest + fee rates (https://deltalawsuitloans.com/post-settlement-loans-guide/#:~:text=Settled%20Case%20Funding%20Rates&text=On%20the%20lower%20end%20you,of%20b etween%201%2D3%25.) of 20%-30% per annum or lower, vastly less than the 136% compounded supposedly collected by J&J.

Privacy · Terms

So who came up with the J&J strategy that has consistently yielded perfect 50% returns for investors?

The principal of J&J, and its eponymous founder Jeff Judd, had no apparent experience in the field. Prior to J&J's investment offerings, Judd was the Vice President of Sales at a local pharmacy, per his LinkedIn profile (https://www.linkedin.com/in/jeffrey-judd-8ab0903b/). Judd's LinkedIn shows he has a degree in Kinesiology and Exercise Science from the University of Nevada-Las Vegas.

According to J&J marketer Jongeward, the entity began offering investments in 2016. Judd's LinkedIn profile shows that he quit the pharmacy in 2018, presumably to focus on investing.



*(Source: Linkedin* (https://www.linkedin.com/in/jeffrey-judd-8ab0903b/)*)*

J&J Purchasing's Private Placement Memorandum (PPM) portrays Judd as someone "who excelled at sales" and had sales roles in various industries unrelated to litigation finance.

**D. BACKGROUND OF COMPANY PRESIDENT - MR. JEFFREY JUDD**

Mr. Jeffrey Judd is the current Managing Member and President of J and J Purchasing, LLC. Prior to serving as Company President, Jeffrey worked in various industries. His first job out of college was with Bristol Myers as a Pharmaceutical Sales Representative. Jeffrey held this same position with Schering Plough. In the early 2000's the real estate sector was the place to be for someone like Jeffrey who excelled at sales, so he left the Pharmaceutical Industry and took a position with Countrywide Home Loans. When the bubble burst in 2009, Jeffrey took an ownership position in Partell Specialty Pharmacy serving as Vice - President of Sales and Marketing.

Rather than crafting J&J's essentially perfect investment strategy through years in the litigation finance field, Jongeward explained its origins as emerging from a chance encounter with Judd's local lawyer friend, Matt Beasley:

> "In 2016, he [Jeff Judd] was having lunch with a good friend of his named Matt Beasley. Matt Beasley is a personal injury attorney. So as Matt and Jeff were talking as they would often do, Jeff came up with the idea to you know, the comment typically was that, you know, how soon can I get my money from the plaintiffs once they knew that they reached their settlement? So, Jeff saw an opportunity to be able to give capital to someone who has a settlement coming but needs a little bit of capital right away. Because some of these a good portion of these individuals haven't been working for 18 months to 2 years. So they're in financial despair a little bit."

Assuming it were all true, this is not the background or experience we would expect from what would be considered the best manager in the industry.

## J&J Claims That a Local Law Firm, Beasley Law Group P.C., Has Managed All 20,000 Legal Contracts, Interfacing With At Least 66 Personal Injury Law Firm Counterparties

## The Firm Has No Website and Appears to Have Only One Attorney, Matt Beasley, Who Works from Home

We spoke to both Judd and J&J marketers who described attorney Matt Beasley as critical to the operation. According to Judd, the key to the investment's success is simply "to have the right attorney." Beasley is the owner of Beasley Law Group, PC, founded in 2011, per Nevada corporate records (https://opencorporates.com/companies/us_nv/E0222452011-8), which lists him as the sole principal.

Prior to his armed standoff with the FBI, Beasley was said to manage J&J's relationships with 66 law firms it claims to work with. He also manages all the paperwork and payments, which all pass through his law firm's IOLTA (https://www.americanbar.org/groups/interest_lawyers_trust_accounts/overview/) account (similar to an escrow account). As Judd explained:

> "He [Beasley] takes care of the attorneys because all the attorneys want to be arm's length from me. They don't want to know me. Which is smart, because then that way they can't accuse them of steering or anything like that"

> "He [Beasley] finds the other attorneys, and he writes the contracts"

Privacy - Terms

Per Jongeward:

> "Matt Beasley is the one that takes care of all the purchase agreements. That's between Jeff and the participating attorney and the plaintiffs."

Per J&J marketing manager Shane Jager:

> "Jeff has no involvement with the attorneys. That's all handled by [Matt]. Matt is Jeff's attorney and he's contracted to work."

The firm's private placement memorandum (PPM) also references Beasley's IOLTA account as the destination of investor funds:



*Source: J&J Purchasing PPM [Pg. 7]*

Nevada's Bar Association shows that Beasley has been a member since May 2, 2006.



*Source: State Bar of Nevada*

Given the incredible volume of paperwork required to manage 20,000 contracts, investor inflows and outflows, and the relationships with 66 law firms, we would expect the Beasley Law Group to be a bustling operation staffed with dozens of paralegals and attorneys. Even Jongeward acknowledged the administrative burden:

> *"If you're only wanting to put it in for one contract cycle [90 days], maybe this isn't the right spot for you, because it's a lot of work for us to pull people out and redo that. And there's a lot of documentation."*

Contrary to this expectation, we found that Matthew Beasley is the Beasley Law Group's sole employee on LinkedIn (https://www.linkedin.com/in/matthew-beasley-02a3b942/).

The only addresses we found associated with the firm through Nevada corporate records was that of its registered agent and Beasley's personal residence.

Jongeward confirmed what corporate records show, that Beasley works from home:

> *"So I mean, you know, you don't have to have a location anymore. Things are just done differently than they used to be. But yeah, this is all that he [Beasley] does. He puts all the purchase agreements together. He works for Jeff. And we use his IOLTA account, to pass money back and forth."*

If the Beasley Law Group is supposedly interacting with 66 law firms and seeking to develop new relationships, one would presume it has some kind of public presence. We found that its web domain (http://www.beasleylawgrouplv.com/), listed on its Facebook (https://www.facebook.com/Beasley-Law-Group-PC-204301199591085/) page, leads to a GoDaddy landing page.



*Beasley Law Group landing page. Source: beasleylawgrouplv.com (http://beasleylawgrouplv.com/)*

The only other public presence we found was a Facebook (https://www.facebook.com/Beasley-Law-Group-PC-204301199591085/) page with 22 followers, no posts and almost zero engagement.

Privacy · Terms



*Source: Facebook*

One of the litigation finance practitioners we talked to described a very administratively and operationally intense process. He said that it required about 4 hours of work to draft each contract.

At that rate, it would take Beasley roughly 40 years to draft 20,000 contracts, assuming he worked 8 hours every single working day of the week.

This strikes us as implausible. Beyond the obvious reasons, Beasley's recently purchased fleet of luxury cars, private plane, and sports all-terrain vehicles (detailed later) paint the picture of a man with plenty of leisure time.

### Rather Than Seeking Large, Sticky Institutional Capital, As One Would Expect for Such a Successful Strategy, J&J Appears to H Targeted Non-Financial Professionals Who Are Mainly Mem of the Mormon Church

Privacy · Terms

Often, when an incredibly attractive investment with limited capacity exists, investment managers forgo outside investor capital altogether in order to generate great returns for themselves. Had Judd simply deployed internal capital only, he could have turned $2.5 million into about $423 million, without raising *any* external capital, assuming he was able to reinvest at 25% for the 23 quarters between September 2016 and March 2022.

If Judd chose to raise outside capital anyway, one would expect the firm to seek institutional capital to efficiently raise large, long-term capital from qualified investors better positioned to understand the risk and complexity of the strategy.

J&J marketer Jongeward explained that Judd chose to forgo these approaches, out of apparent altruistic generosity:

> *"So essentially, the 25% comes back to Jeff and Matt. And they divide that they cut that in half, and they share 12.5% with the investor and they keep the other 12.5%. So, what you have is you got the owner of a company that's willing to split the profits with the investor. That never happens."*

J&J marketing manager Shane Jager said "He [Judd] sees the people as benefiting," and then explained how a family member is "living her best life" thanks to her J&J investments. Judd himself explained:

> *"It's changed a lot of people's lives. **I wasn't greedy when I did that.** I mean, we pay out a high percentage. So my thought process was, it's not my money, I'm gonna make my money on each deal, then why wouldn't I pay out a high percentage? So that's the way we set it up."*

It seems that Judd and his colleagues chose to "bless" many members of his Mormon church with this investment strategy.

Based on individuals we've interviewed, including prospective J&J investors, the marketers for J&J, and others familiar with the offerings, J&J's investor base mainly consists of regular, non-financial professionals such as small business owners and doctors.

And despite the fund's self-imposed marketing hurdles (i.e., no marketing materials at all), the J&J Purchasing investment opportunity has spread rapidly via word of mouth, largely through the Mormon communities centered around Nevada, where the firm and its principals are based.

Jongeward claimed to us that it was helping members of the religious community, for which he had a personal affinity:

3/28/22, 1:56 PM                    J&J Purchasing: Extreme Due Diligence Proves Elusive For This Mormon-Affiliated Hidden Gem | Hindenburg Research

Case 22-01061-mkn    Doc 3    Entered 04/01/22 07:26:00    Page 156 of 173

> *"We kind of feel like we're building the (Mormon) church financially."*

According to Judd, at least 50% of the investors are Mormon. Jongeward estimated the number around 70%.

To put a finer point on it, this all flies in the face of what one would expect from a genuine strategy and appears more so to have all of the hallmarks of an underlined affinity scheme (https://www.sec.gov/investor/pubs/affinity.htm).

But investors seem to have taken the bait. We have heard of investors taking out second mortgages to invest in J&J and even putting their life savings into the opportunity.

We mentioned the notion of taking out a Home Equity Line of Credit (HELOC) in order to participate in the fund. Jongeward told us:

> *"I took a HELOC out myself personally, it's easy to pay 5% on a HELOC and still gain 45%."*

## J&J's Subscription and Legal Documents Make No Mention of an Auditor or Administrator (Basic Independent Service Providers That Serve As Key Pillars of Safety For Investors)

## Monthly "Statements" Appear to Be Simple Tables Created By the Investment Manager In Microsoft Word

Every credible investment manager, including those with less than $50 million under management, seek to have independent administrators, a key service provider that manages investor subscriptions and redemptions, cash inflows & outflows, and provides independent reporting.

Similarly, every investment manager also has an auditor to ensure that books & records are balanced and independently monitored. (Even **Madoff** had the appearance of an auditor, though it was a underlined tiny firm (https://www.nytimes.com/2015/05/29/business/dealbook/madoff-accountant-avoids-prison-term.html) that simply rubberstamped his reports).

Given that J&J now claims to be a bustling $400+ million investment manager, it should be a given that an administrator and an auditor are in place in order to offer investors basic protections.

Yet J&J's offering documents make no mention of any administrative agent, paying agent, or an auditor.

It seems that its marketers are playing a key part in managing these roles. Per Jongeward:

Privacy - Terms

> *"I have 150 investors in the group here that I manage. And it represents about 53 million of operating capital, including my own personal capital I have. So, I take care of the interest payments, I send those all out to everyone to take care of all of the document initial interaction and walk everyone through how to get that taken care of and reconciliation, spreadsheets, interest payouts, 1099 at the end of the year. We really, I really am kind of, you know, the full, the full turnkey manager for the entire group and it we're about 1000 investors total."*

We have never heard of an investment management company where a marketer performs tasks like distributing interest payments to investors. Put simply, they are wildly divergent tasks that have unique responsibilities and require distinct training.

Jongeward provided several details of how the payments get executed:

> *"When capital comes in, Matt [Beasley] forwards it to Shane [Jager], and Shane forwards it to me."*

> *"90 days later, when that capital is returned with interest, then I would then send you if you did 100, I would send you $12,500 into your bank account that you provided for me, so I can set you up in the Wells Fargo Direct Pay system. So that makes it really easy to get our investors set up there. It takes about five days to verify. And then once you're in there, it's really easy. It saves me quite a bit of capital to have all of these people. I have about a little over 150 people in my Wells Fargo Direct Pay system, so they only charged me $200 a month to have that, and then I can, it's as easy as clicking on your name, put any amount in. And then I always put the contract name that's maturing there."*

The way Jongeward described the flow of funds resembles a multi-level marketing organization. The lawyer initiates the payment to the marketers and then those marketers pay downline to the other marketers, who distribute payments to investors.

We have seen a copy of the "monthly statement" sent by a J&J marketer to one investor. It appeared to be a simple word table with labels for "Amount invested," "Name," "Date Started," "Date Matured," "Payout," and whether it had already been paid.

## According to J&J, the Attorneys Firms Are Benefiting, Making Up To $50,000 a Month, From Selling the Contracts to J&J.

## According to One Industry Expert, "That's Like an Egregious Conflict of Interest. That's Very Problematic."

Privacy · Terms

The law firms that refer borrowers to J&J do "very well," said Jongeward, explaining how they benefit from the transactions:

> "So the attorneys are there benefiting from this as well ... Everyone's benefiting [indistinguishable] There's an administration fee, on top of that, I think it's $5,000 ... So if an attorney does 10 of these contracts in a month, you know, that's, that's $50,000 pretty easy to calculate that. So, there's definitely incentive for these attorneys to do that as well."

We asked Shane Jager if the attorney that is representing the plaintiff also gets paid, the marketer replied: "Yeah. It's a couple of thousand dollars, I think."

Judd also made it clear to us:

> "They [attorneys] split halve the admin fee, **which is perfectly fine**. My attorney takes care of all that."

The sample Contract found in the PPM, shows a Disclosure Table showing an Administration Fee, confirming the marketers' representation of the fee.

<u>DISCLOSURE TABLE</u>

| | |
|---|---|
| Purchase Price: | $100,000.00 |
| <u>Administration Fee:</u> | $5,000.00 |

*(Source: J&J Purchasing's PPM [Pg. 63 (https://www.slideshare.net/HindenburgResearch/jj-purchasing-ppm)])*

We asked an expert in the litigation finance field about whether it was "perfectly fine" that the attorney firms got paid a fee for sending contracts to J&J. He said:

> "There's no way, **it's impossible! That an attorney would get a cutback** ... Any plaintiff's lawyer who would take a kickback or in any way would stand this, is like kryptonite. You don't understand, you probably do understand, but it is a Kryptonite like wrapped in barbed wire, right? Because if you have any fiduciary financial impropriety, if something stupid as this you could be disbarred in one second. Most people who are disbarred are for stupid shit like this. This is ridiculous. Never, sorry, will not happen."

Privacy - Terms

Even when we proposed a scenario where the clients signed a tightly written and detailed permission to waive the conflict of interest, the industry expert categorically said:

> "No, no, no never happened**. Are you kidding? That is the funniest thing I've heard anyone ever tell me. That is the most ridiculous. This is like asking Moses, if he'd like a cheeseburger.** Like I can't even begin to understand and explain to you. That is fucking just not even remotely possible."

Another industry expert told us:

> "What the hell are they thinking [the lawyers]? Were they thinking this will never be discovered? Once this is discovered we're looking at violations of ethical rules and also maybe some criminal rules. If they are aiding and abetting violating of usury laws, depending on the state, that might be criminal."

He added:

> "They're risking their careers and freedom in such a way." And described it as "So clearly problematic." In states where these violate usury laws "waivers aren't going to help you". He explained that usury laws may apply given that post-settlement should be easy for courts to deem as loans."

Given the above, it seems unlikely that lawyers at 66 law firms would collectively risk mass disbarment in order to accept a fee to direct their clients to expensive funding sources, as described by Judd and his marketers. Likewise, we struggle to see a scenario where 20,000 high-risk events took place without one single disciplinary action, which would inevitably produce delays or other issues.

## Judd Almost Always Makes Himself Unavailable to Speak to Prospective Investors, Contrary to Industry Practice

## Other Members of the Team Seem to Be Siloed From Each Other As Well. One Marketing Rep We Spoke With Claimed To Not Know Who Was On The Rest of the Team

Initially, when we asked about the possibility of talking to Judd or other higher-level officials on the pyramid we were told "we don't do that anymore." Judd was so inaccessible and such a god-like, not to bother figure that Jongeward said that he had met Judd only once for a 45-minute lunch. It seemed

odd treatment for a marketer that was forecasting to generate $50 million of inflows, in 2022, for J&J Purchasing.

In contrast, most asset managers find it very important to let investors know the professional and educational backgrounds of who works for them. We found no J&J Purchasing marketing materials that identified employees. When we asked Jongeward who else worked at the firm, he told us he didn't know, as he only knew Jeff Judd, attorney Matthew Beasley, his direct report Shane Jager, and one other marketer.

The structure, in short, struck us as incredibly atypical. It also seemed designed to "silo" each member of the team should anything ever go wrong.

## In Accordance With J&J Purchasing's Contracts Stipulations, The Company Has the Right to Secure Their Lien On The Claim's Proceeds

## We Couldn't Find Any Lien Registered in Favor of J&J Purchasing Or Its Preceding Entity.

During calls with Jongeward, he made the following representations:

> "So we basically **place a lien through a purchase agreement** with the attorney and their plaintiffs. And, and so after 90 days, they give us that 80 or $100,000, back to us through the terms of the contract with interest"

> "[The purchase agreement/Contract] **is essentially a 14-page lien on the on the settlement**"

> "...if you look in the PPM if you looked at that purchase agreement that's between Jeff Judd and the client and his attorney. **It's a half-page of who we are and then the other 13 pages are what how we're going to make sure we receive our capital so it's basically a lien on a future settlement**."

The sample contracts annexed to J&J Purchasing's PPM show a clause where the seller grants J&J Purchasing a security interest and a lien in the proceeds from the seller's claim.

3/28/22, 1:56 PM    J&J Purchasing: Exit Resources Via A Bizarre Collection Of Zero-Recourse, Zero-Collateral "Investments" – Hindenburg Research

Case 22-01061-mkn    Doc 3    Entered 04/01/22 07:26:00    Page 161 of 173

## 2.    GRANT OF SECURITY INTEREST

By signing this Agreement, Seller grants to Buyer a security interest and a lien in the Settlement Amount and all Proceeds of the Claim ("Collateral").  Buyer shall have all rights and remedies of a secured party under the Nevada Uniform Commercial Code. Seller authorizes Buyer to file one or more UCC financing statements regarding Buyer's security interest and lien in the Collateral and Seller agrees to take all other steps reasonably required by Buyer to perfect and maintain the perfection of Buyer's security interest.

*Clause within a sample Contract. Source: J&J Purchasing's PPM [Pg. 54].*

J&J Purchasing states that the contracts backing their investments are a robust lien on a future cash flow. Given the importance of the liens in the collections process, and given that liens are publicly reported in state Uniform Commercial Code (UCC) databases, we would have expected to see the tens of thousands of liens reported through the dozens of law firms J&J works with.

However, based on UCC (lien) filling searches, we couldn't find a single UCC filling with any of the J&J entities as creditors. This was a massive red flag.

# J&J Seems To Be In Open Violation Of Several Securities Laws

## The Firm Claims To Have Over $400 Million In Assets, Well Above The Threshold Of Being Legally Required to Register With the SEC As An Investment Advisor

## It Is Not Registered with The SEC (Even Though a Marketer Claimed It Was "Licensed" By the SEC, Which Isn't a Thing)

Given that Federal law requires investment managers with greater than $100 million in assets to register with the SEC, we would have expected to find that J&J had registered as early as 2019, when, according to its own marketer, the firm had ~$125 million in assets.

We found no registration for either the firm or its principal Jeff Judd. This is more perplexing given that J&J is now well above that legal threshold, per both Judd and its own marketers, who repeated on several calls that the firm has over $400 million in client assets:

> *"When I got started, in the end of 2019, November, I put my first contract in we had about 125 million of operating capital within the investment. They had closed 4,500 contracts, to that point. And 26 months later, since I've been involved, **we're now up over 400 million, and we've closed over 20,000 contracts with zero defaults.**"*

> *"We're at 400 million of operating capital. And we have just over 1000 investors"*

Judd claimed to a prospective investor to have "about $475 million" in assets.

Given the above, it seems that J&J is either violating Federal securities laws by not registering as an investment advisor or is lying about its asset base, which would also be a violation of Federal securities laws.

Bizarrely, Jongeward explained that Judd had created his recent new funding vehicle because he is "licensed" with the SEC:

> *"He [Judd] just created a new entity this year [2022], **because he's now licensed with the SEC**, this has really expanded and grown. So, he did a business review with two attorneys out of Texas. They both previously worked for the SEC and so they put together a whole different program of documents."*

Note that while there are *registered* investment advisors, the SEC doesn't actually provide *licenses*. The difference isn't trivial, as licensure infers some sort of formalized credential that doesn't exist. (Consider: you may *register* to attend a conference, but that doesn't mean you have been *licensed* by the organization hosting the conference.)

Shane Jager pitched the same aura of legitimacy by saying:

> *"He [Judd] recently had a Texas based firm come in and essentially audit his company, a company that works with the SEC and FBI. And he had them come in, spent a couple 100k to do that. And they revised docs, they looked at everything, and said: Okay, we like this'."*

(As most investment professionals are aware, financial firms are usually audited by *audit* firms, not legal advisers. In either case Jager didn't name the actual law firm involved.)

The only SEC document we found relating to J&J is a Form D (https://www.sec.gov/Archives/edgar/data/1896470/000189647021000001/xslFormDX01/primary_doc.xml) filed with the SEC on December 13, 2021. A form D denotes that an entity may be offering private investments. It in no way blesses or "licenses" the offering.

The company's Form D, under section 5 "Issuer Size", declines to disclose its revenue:

| Revenue Range | |
|---|---|
| ☐ | No Revenues |
| ☐ | $1 - $1,000,000 |
| ☐ | $1,000,001 - $5,000,000 |
| ☐ | $5,000,001 - $25,000,000 |
| ☐ | $25,000,001 - $100,000,000 |
| ☐ | Over $100,000,000 |
| ☒ | Decline to Disclose |
| ☐ | Not Applicable |

*(Source: SEC EDGAR
(https://www.sec.gov/Archives/edgar/data/1896470/000189647021000001/xslFormDX01/primary_doc.xml))*

In this case, given that the Form D to register a private placement offering took place roughly 6 years after an offering first took place (per the fund's principals and marketers), it seems to be an indirect admission that the firm had been raising capital without filing the requisite legal documents. Judd characterized the form D filing to a prospective investor:

> *"I registered the company with the SEC, Section D. And so now we have all that in place with the private money and the subscription agreement and all that".*

How did they raise capital before? In the context of explaining how the firm's new legal paperwork is really great, Jongeward informed us that J&J's prior legal documentation was "really anemic":

> ***"I was able to raise $49 million worth with a three-page confidentiality agreement and a two-page buyer's agreement.** Okay, so that the paperwork was really anemic and didn't really match the investment."*

## J&J Purchasing Legal Documents: We Don't Pay Commissions for The Sale Of Our Securities.

## Marketer: "I Make a Small Percentage Of Each Contract" (i.e., A Commission)

J&J Purchasing's PPM stipulates that no commission or remuneration is paid for the sale of its securities.

*(Source: J&J Purchasing PPM [Pg. 6*
*(https://www.slideshare.net/HindenburgResearch/jj-purchasing-ppm)])*

In other words, J&J's legal documents explain that no independent marketers are getting compensated to solicit investments. Despite this, Jongeward, the independent marketer we spoke with, confirmed that he was compensated for every investment he solicited:

> *"So my agreement is I make, you know, I make a small percentage on each contract."*

Note that marketers of private placement offerings such as J&J are required to be *licensed* to offer private placement securities and operate through a broker/dealer. The broker/dealer would be registered with FINRA, as is required by law.

The marketer we spoke with had no licenses and was not associated with any broker/dealer, per a check of FINRA's BrokerCheck system. Operating as an unlicensed broker could be considered a violation of Section 15(a)(1) of the Securities Exchange Act of 1934.

## Judd and Beasley Appear to Have Gone on a Luxury Spending Splurge by Acquiring a $5 Million Private Jet, Luxury Properties and at Least 16 Luxury Vehicles Estimated to be Worth $2.6 Million

With their newfound "wealth," Judd and Beasley have apparently embarked on a luxury spending spree in the past several years. On July 28, 2021, an entity (https://www.bizapedia.com/nv/bj-holdings-llc.html) owned by J&J and Beasley's law firm was registered as the owner (https://flightaware.com/resources/registration/N900XG) of a Hawker 900XP private jet.

Privacy · Terms





*(Pictures of a* Hawker 900XP interior. *Source: centraljets.com)*

On February 20, 2020, Judd purchased a <u>$5.5 million property (https://www.zillow.com/homedetails/9-Sky-Arc-Ct-Henderson-NV-89012/243070702_zpid/)</u> in Henderson, Nevada, per Zillow.

An asset search by Hindenburg revealed that, over the last several years, Judd and Beasley have bought 16 luxury vehicles estimated to be worth $2.6 million, as shown in the table below. These include a $400,000 Rolls Royce Dawn, a Bentley Continental, and 4 Porsches owned by Judd. Beasley's collection also includes a Bentley Continental, an Aston Martin and a Mercedes Benz G Wagon.

| Year | Make | Model | Listing Price | Price Source | Generic Image |
|------|------|-------|---------------|--------------|---------------|
| 2020 | Rolls Royce | Dawn | $429,990 | dupontregistry.com | |
| 2021 | Bentley | Continental | $302,904 | vincheck.info | |
| 2020 | Bently | Continental | $253,888 | kbb.com | |

Privacy · Terms

| 2020 | Mercedes Benz | G63 AMG | $239,991 | kbb.com | |
| 2020 | Porsche | Taycan | $206,130 | vincheck.info | |
| 2020 | Porsche | Taycan | $206,130 | vincheck.info | |
| 2020 | Aston Martin | Vantage | $148,998 | kbb.com | |
| 2018 | Porsche | 911 | $144,488 | vincheck.info | |
| 2020 | Porsche | Cayenne | $131,250 | kbb.com | |
| 2019 | Cadillac | Escalade | $102,160 | vincheck.info | |
| 2019 | Lexus | LX | $101,965 | vincheck.info | |
| 2017 | Chevrolet | Corvette Z06 | $82,997 | vincheck.info | |
| 2018 | Land Rover | Range Rover | $79,999 | kbb.com | |
| 2018 | Chevrolet | Camaro | $69,805 | vincheck.info | |
| 2018 | Mercedes Benz | E43 AMG | $54,749 | vincheck.info | |
| 2019 | Toyota | 4Runner | $46,544 | kbb.com | |

Public records also reveal that Judd and Beasley appear to own several ATVs and boats. In the oral hearing (https://www.slideshare.net/HindenburgResearch/usa-vs-beasley-initial-appearance-transcript) that resulted in the denial of Beasley's bail, the Department of Justice also identified that Beasley owned a $300,000 Ferrari.

## We Believe J&J Is a Ponzi Scheme

Privacy · Terms

Based on our research, we believe J&J is a Ponzi scheme. Additionally, we believe that all or a substantial portion of J&J's claimed $400+ million in investments simply don't exist.

Beasley's confession earlier this month certainly bolstered our conviction on this point, but it also shouldn't be a surprise to other J&J managers like Shane Jager, who told us:

> "You know we've had some people say it's a Ponzi scheme"

In defense of this apparently common objection, Jager informed us that he had personally seen the attorney's payments, putting those fears to rest:

> "I've seen the attorney's IOLTA account- Jeff's attorney. I just signed some NDAs, but I've seen it — actual payouts to the attorneys on the contracts...it's legit."

## Earlier This Month, J&J Imploded Following FBI Visits to At Least 2 Key Members of The Firm

As we noted in the introduction, earlier this month, the believed scheme ran face first into reality when FBI agents visited the home of attorney Matt Beasley.

The criminal complaint against Beasley, alleging one count of assault on a federal officer, filed on March 4, 2022, gives further insight into the confrontation.

| | |
|---|---|
| 7 | 7.   Agent J.M. believed BEASLEY wanted to see Agent J.M.'s badge, so Agent |
| 8 | J.M. pulled back his suit jacket to show BEASLEY his FBI badge. |
| 9 | 8.   BEASLEY then stepped into complete view and the agents could see that |
| 10 | BEASLEY held a firearm in his left hand that was pointed at the left side of BEASLEY's |
| 11 | head. |
| 12 | 9.   Agent J.M. stepped back and yelled "easy, easy," while another Agent yelled |
| 13 | "drop the gun." Instead of dropping the firearm, BEASLEY then pointed the firearm at the |
| 14 | agents in a sweeping motion, causing one or more agents to discharge their firearm, striking |
| 15 | BEASLEY. BEASLEY then barricaded himself inside the residence. |

On March 9, 2022, additional court filings (https://www.slideshare.net/HindenburgResearch/usa-v-matt-beasley-extension) appear to show Beasley is on the path to a plea bargain for the charges stemming from the incident with the FBI, with Beasley's lawyer suggesting additional forthcoming charges (https://www.nevadaappeal.com/news/2022/mar/09/vegas-lawyer-shot-fbi-allegedly-head-300m-ponzi-/).

| | | |
|---|---|---|
| 12 | 4. | In this case, the parties are attempting to resolve this matter before the |

defendant is formally charged by a criminal indictment and therefore seek an extension of

the deadlines to do so. This continuance is not sought for the purposes of delay, but to allow

defense counsel an opportunity to examine the merits of this case before a potential

resolution can be reached between the parties.

5.      Accordingly, the parties jointly request that the Court schedule the

preliminary hearing in this case no sooner than 120 days from today's date.

6.      Defendant is in custody and agrees to the extension of the 14-day deadline

imposed by Rule 5.1(c) and waives any right to remedies under Rule 5.1(c) or 18 U.S.C.

§ 3161(b).

7.      This extension supports the public interest in the prompt disposition of

criminal cases by permitting defendant time to consider entering into a pre-indictment plea

agreement.

## J&J's Other Marketers Appear to Now Be Claiming Ignorance

After the story was made public on March 8, 2022, investors and potential investors received an email from Jason Jongeward with a purported "Contract Investment Update". The email shared the "unfortunate information" about Beasley's "unsettling" stand off with the FBI, and said "The Contract Investment is in 'pause' status currently".

The email, which included an attached email from Shane Jager to investors, noted that the group had hired a lawyer and was seeking to "freeze any and all monies", potentially via a Temporary Restraining Order (TRO).

> *"Many questions remain unanswered," the attached email from Jager said.*

Privacy · Terms

**From:** Jason Jongeward [_____]@gmail.com
**Sent:** Tuesday, March 8, 2022 4:03 PM
**Subject:** -Contract Investment Update -

Fellow Investors,

I have some unfortunate information to share of happenings over this past weekend with Matt Beasley, the attorney working with J&J Consulting.

https://www.reviewjournal.com/crime/shootings/attorney-shot-by-fbi-agents-after-pointing-gun-faces-assault-charges-2540851/

I have been in contact with Shane since Sunday and he has sent the following email for me to share with you. I will be reaching out to each of you personally to discuss the details that I know. Please wait for me to reach out to you. I will be spending the next few days giving details to each of you.

The Contract Investment is in "Pause" status currently. Many of you have payments coming this week. Those payments will also be in "Pause ". You will be hearing from me in a mass email like this one as I hear any information from the attorney, Mr. Bell, who has been hired by Shane Jager to represent our group.

Dear Investors,

In light of recent unsettling events regarding Matthew Beasley of Beasley Law and his standoff with the FBI, we are taking steps to freeze any and all monies including but not limited to filing a lawsuit and applying for a TRO (temporary restraining order). We will circulate a draft in the next day or two.
Many questions remain unanswered. Our attorney is drafting correspondence containing updates and will be emailing that out later this week.

I ask that any capital return requests should be directed to J&J Consulting by and through Jeffrey Judd. Jeff Judd's email is Jeffbarca@aol.com. We have also been directed to cc Matt Beasleys email matthew@beasleylawgrouplv.com.

We will all diligently pursue attorney Matthew Beasley and provide information as the situation unfolds.

Respectfully,
Shane Jager

On March 9, 2022, Jongeward sent another email to investors, wherein he said that he contacted a lawyer to discuss a class action lawsuit.

In the same email, Jongeward also suggests it might be best for investors not to fill out a questionnaire that the FBI has set up for potential victims (https://forms.fbi.gov/seeking-victim-information-in-slip-and-fall-lawsuit-ponzi-scheme-investigation/), saying that if they instead file a lawsuit it will somehow give them the "option to keep your privacy in this matter."

**From:** Jason Jongeward < [_____]@gmail.com>
**Date:** March 9, 2022 at 4:11:28 PM PST
**Subject:** -Contract Investment Update March 9th-

Dear Fellow Investors,

I wanted to give you an update that I have currently reached out to an attorney in Las Vegas to discuss a class-action lawsuit in order to represent us as a group. He will be in contact with me by Friday to identify whether we will do a class-action or a multiple beneficiary suit.
Many of you have received the FBI questionnaire and have asked me if you should fill it out or not. I will leave it up to each of you to decide. My hope was to include each of you in the Lawsuit and have the option to keep your privacy in this matter.

I am still reaching out directly to each you and appreciate your patience.

Sincerely,
Jason

Privacy - Terms

This, of course, is nonsense on multiple levels. A class action does not ensure privacy, and helping regulators doesn't prohibit privacy.

## Despite the Recent Meltdown of J&J, Several J&J Marketers Are Pushing A Battery Start-Up Opportunity as the New "Safe" Investment

Remarkably, the recent events don't seem to have slowed J&J's marketers down all that much. Days ago (and only about a week after the armed standoff,) Shane Jager called one of our contacts. On the call, he explained the shocking unraveling of the alleged Ponzi scheme, despite having pitched it as virtually risk-free weeks earlier.

After expressing his surprise and blaming the events around J&J squarely on attorney Matt Beasley, halfway through the call Jager suddenly pivoted and pitched an investment in a start-up battery company. Per Jager, it's a "safe", hot opportunity that is time-sensitive:

> "On a side note, I know we talked about Eco-battery, something that is safe, I will say. I talked to the partners just a few days ago and it may be a good opportunity for you and maybe some of your close friends to, they need an injection of capital really quick. Like $2 million probably in the next week or less."

The same day, Jongeward emailed saying he'd "had a few fires to put out" but wanted to schedule a call to "bring you up to speed on the contract settlement investment **as well as another investment we were doing with the battery company here in St. George**."

Jager then followed up with another high-pressure text message on the battery investment:



(Text from Shane Jager pressuring an investor to invest millions into battery start-up Eco Battery, just weeks after J&J melted down.)

## J&J is An Example of Effective, Prophylactic Enforcement By Regulators

Ponzi schemes generally have three phases: (1) early stage; (2) rapid growth; and (3) ultimate collapse.

The public is often critical of regulatory agencies for going after Ponzi schemes after they have already collapsed (like Madoff). Such post-mortem enforcement can make recovery for victims more difficult (even though Madoff victims were, thankfully, ultimately made nearly whole.)

Practically speaking, it is not always possible to identify Ponzi schemes early because they tend to intentionally fly under the radar. In the case of J&J, the firm seemed to have taken great efforts to minimize its paper trail.

Despite those hurdles, regulators moved expediently and effectively to investigate and to take action. This is likely to result in vastly more favorable recovery scenarios for J&J's suspected victims. Given the pace that regulators worked, we would not be surprised if they had been onto J&J well before we even began our own research.

The tendency is often for the public to criticize regulators, while rarely spotlighting effective efforts. Based on everything we have seen thus far, we believe this will ultimately be a success story for regulators that deserves highlighting.

Privacy · Terms

# <u>Important Message For Potential Victims of J&J</u>

Based on what we know thus far, there seem to be hundreds of victims of J&J. We have been in those shoes before. In fact, those experiences largely fueled our efforts to identify and expose fraud.

We have felt the shock of learning that people you trusted, who in many instances were introduced by friends, family, or members of a local religious community, turned out to have been lying in order to take advantage of you.

It's incredibly painful, both for victims who are now worried about their finances, and for those who thought they were doing friends and family a favor by introducing them to an opportunity they genuinely believed in.

It's also an experience that makes one question one's own judgement and ask questions like "if I've missed this, what else have I missed?" It's extremely unsettling, but know that it is also something that decent people are susceptible to. Often when we have good intentions towards our friends and family, we assume that others we meet do as well. And thankfully, that is *usually* the case. Most people are decent people. There are a small number who aren't, but they can unfortunately have a large negative impact through their actions.

On the prospect of recovery, given the expediency of the regulatory action, we hope there is a high recovery. It's certainly not an exact science, and the process typically takes several years, but often the recovery on Ponzi schemes can be quite substantial, especially when there are numerous physical assets such as property and vehicles, as is the case here.

We also do not think potential victims should take Jongeward's and Jager's advice to *not* reach out to regulators, and believe that advice could be self serving. Anyone who believes they may have been a victim of this scheme should fill out a survey on the FBI's website (https://forms.fbi.gov/seeking-victim-information-in-slip-and-fall-lawsuit-ponzi-scheme-investigation/). An expedient resolution is often the best outcome for everyone. Often regulators take a role in establishing a receiver and collecting/distributing funds and proactive outreach could help aid that process.

You can also reach out to us with information or just to talk about the situation, as desired. Our email is info@hindenburgresearch.com (mailto:info@hindenburgresearch.com). Keep your heads up, it gets better from here (unless you're a part of J&J, we reckon).

## Legal Disclaimer

Use of Hindenburg Research's research is at your own risk. In no event should Hindenburg Research or any affiliated party be liable for any direct or indirect investment losses caused by any information in report. You further agree to do your own research and due diligence, consult your own financial, l and tax advisors before making any investment decision with respect to transacting in any securit

Privacy · Terms

covered herein. This is not an offer to sell or a solicitation of an offer to buy any security, nor shall any security be offered or sold to any person, in any jurisdiction in which such offer would be unlawful under the securities laws of such jurisdiction. Hindenburg Research is not registered as an investment advisor in the United States or have similar registration in any other jurisdiction. To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from sources we believe to be accurate and reliable. However, such information is presented "as is," without warranty of any kind – whether express or implied. Hindenburg Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. All expressions of opinion are subject to change without notice, and Hindenburg Research does not undertake to update or supplement this report or any of the information contained herein.

Posted in Uncategorized (https://hindenburgresearch.com/category/uncategorized/)  ·

© 2018 Hindenburg Research (//hindenburgresearch.com). All Rights Reserved · Legal Disclaimer (/legal-disclaimer) · Privacy Policy (/privacy-policy)
Theme by Robert DeVore (https://robertdevore.com).